# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | |
|---|---|
| DESIREE TURNER, | ) |
| | ) |
| PLAINTIFF, | ) |
| | ) CASE NO. |
| VS. | ) |
| | ) |
| BOARD OF REGENTS OF THE | ) HON. |
| UNIVERSITY SYSTEM OF GEORGIA by | ) |
| and on behalf of GEORGIA INSTITUTE OF | ) |
| TECHNOLOGY, and DAMON P. | ) |
| WILLIAMS, in his official and individual | ) |
| capacities, | ) |
| | |
| DEFENDANTS. | |

## COMPLAINT

PLAINTIFF DESIREE TURNER, by and through her attorneys, CARLA D. AIKENS, P.L.C., submits the following Complaint against BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GEORGIA by and on behalf of GEORGIA INSTITUTE OF TECHNOLOGY and DAMON P. WILLIAMS.

## JURY DEMAND

COMES NOW PLAINTIFF, Desiree Turner and hereby makes her demand for trial by jury.

## JURISDICTION

1. At all times relevant to this complaint, Plaintiff Desiree Turner was a resident of Fulton County in the State of Georgia.

2. Defendant BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GEORGIA by

1

and on behalf of GEORGIA INSTITUTE OF TECHNOLOGY ("Georgia Tech") is a university in the State of Georgia.

3. The Board of Regents is vested with the government, control, and management of the University System of Georgia and all of its institution pursuant to O.C.G.A. § 20-3-51.

4. As a part of the University System of Georgia, Georgia Tech is subject to the jurisdiction of this Court.

5. At all relevant times, Defendant Damon P. Williams ("Williams" or "Defendant Williams") was employed by Defendant Georgia Tech, and, upon information and belief, was a resident of this district.

6. The events in question took place in Fulton County.

7. This court has jurisdiction over these claims on the basis of federal question jurisdiction pursuant to title 7 Civil Rights Act of 1964, 42 USC sec.2000 9-16.

## VENUE

8. Venue is proper in this Court, the Northern District of Georgia, pursuant to sec. 706 d3 of Title 7 42 USC sec. 2000e-5(f)(3) 5c, because the unlawful employment discrimination occurred in this district.

## STATEMENT OF FACTS

9. Ms. Turner started working with Georgia Tech on or about June 1, 2022 as the Associate Director for the Women in Engineering ("WIE") program in the College of Engineering.

10. Plaintiff's first notable conversation with Defendant Damon P. Williams, the then-Director of the WIE program, occurred on October 24, 2022.

11. Plaintiff had previously seen Williams at Georgia Tech events and had spoken with him briefly, but had not had any significant interactions with him.

12. On or about October 24, 2022, Plaintiff approached Williams after learning that Dr. Christine Valle, who was at that time the Director of the WIE program.

13. When Dr. Valle left her position, Williams became Plaintiff's new direct supervisor.

14. Upon information and belief, Dr. Valle left her position because she felt her vision for the future of the WIE program did not align with senior leadership's vision of the program's future.

15. Plaintiff reached out to Williams to set up the October 24, 2022 meeting because she believed that Williams would be responsible for selecting Dr. Valle's replacement, and she wanted to share her perspective on the WIE program since Williams would now be her direct supervisor.

16. Specifically, Plaintiff wanted to discuss how to fill gaps in the program such as increasing outreach to graduate students, reducing the financial burden on students who wanted to participate in the K-12 outreach programs, the current perception of WIE by students, experience she had heard about and learned by meeting with students, and increasing diversity within WIE.

17. Williams agreed with all of Plaintiff's suggestions and encouraged her to apply for the Director role.

18. Williams also floated the idea of placing her in the role temporarily then asked Williams if she wanted to serve as the Interim Director while the university searched for a permanent replacement.

19. Plaintiff expressed hesitancy about taking on the Director role – on an interim basis or otherwise.

20. Williams continued to encourage Plaintiff to pursue the position and suggested that he and Plaintiff meet regularly to discuss her ideas.

21. When discussing the Director position, Williams assured Plaintiff that he had made the

decision to lower the requirement of having a doctorate from "required" to "preferred."

22. Plaintiff was happy to learn about this change because she did not have a doctoral degree.

23. Upon information and belief, Williams altered the position's requirements unilaterally.

24. On or about November 8, 2022, Plaintiff and Williams again met one-on-one to discuss the vacant Director role.

25. During this meeting, Williams asked Plaintiff whether she would be applying to the Director role.

26. Williams further suggested that if Plaintiff was not planning on applying, that she join the Selection Committee for the Director role.

27. Plaintiff informed Williams that she intended to apply for the Director role and declined being placed on the Selection Committee.

28. Williams responded that he was proud of Plaintiff for applying and asked her if the two of them would still be friends if Plaintiff did not get the job.

29. Williams also informed Plaintiff that she would need to prepare a list of PhD programs to which Plaintiff planned to apply as she would need to be pursuing a terminal degree to serve in the Director role.

30. Williams asked Plaintiff to prepare the list of PhD programs she might want to pursue prior to their next scheduled meeting on December 1, 2022.

31. Plaintiff applied to the Director role on November 10, 2022 and began preparing her list of possible PhD programs as requested.

32. On December 1, 2022, Plaintiff and Williams had two one-on-one meetings and they interacted in two group settings.

33. In the first interaction, after the academic team meeting, Williams approached Plaintiff,

Lauren Morton (Program Manager for Clark & Dean Scholars), and Mitchell Walker (Associate Dean for Academics) while they were talking after the team meeting.

34. When Williams approached their table, he told Plaintiff that she "looked different." The manner in which Williams made the comment made her uncomfortable, but tried to hide her discomfort with humor.

35. Plaintiff responded with a joke about him pointing out that she was not wearing makeup and made a light-hearted comment about contacting Human Resources.

36. The topic of conversation moved on and then Williams backtracked to Plaintiff's appearance again and Williams commented on Plaintiff's skin tone, stating that she looked lighter-skinned and questioning whether her makeup made her skin look darker.

37. After Williams made the comment about Plaintiff's skin tone, Ms. Morton made a comment about Plaintiff being "beautiful as always," and the group conversation continued.

38. Ms. Morton and Mr. Mitchell witnessed the above-described interaction. Plaintiff later discussed the incident with Ms. Morton privately.

39. Ms. Morton defended Williams in this conversation and stated that Williams just had a "big personality" and was well-respected on campus, so if he wanted to be a mentor to Plaintiff, then she should take him up on that offer.

40. Mr. Walker did not say anything during the December 1, 2022 group interaction, but he appeared uncomfortable and she did not discuss the incident with him after the fact.

41. Williams then asked Plaintiff to grab him a plate of food from the break room where lunch was being delivered.

42. After making this request, Williams referred to Plaintiff as his "bestie" when speaking with Ms. Morton.

5

43.     Plaintiff was offended by Williams' request, believing that it was demeaning and sexist as he had never asked anyone else to do this, but she felt put on the spot and prepared a plate for Williams.

44.     Williams later asked Plaintiff if they could move up their one-on-one meeting to earlier in the day.

45.     Plaintiff agreed to the scheduling revision.

46.     During the December 1, 2022 one-on-one meeting, Williams informed Plaintiff that she would not be selected for the Director role.

47.     Plaintiff was surprised to learn of her non-selection, as she had only applied based on Williams' encouragement.

48.     Williams explained to Plaintiff that he did not believe she was ready to take on the role's responsibilities.

49.     Williams then offered to coach and mentor Plaintiff to better prepare her for taking on the role (or a similar one) in the future.

50.     Williams did not specifically identify areas where Plaintiff could improve, nor did he elaborate on how he specifically planned to coach and mentor her in order to be more successful at obtaining a more senior position in the future.

51.     In addition to offering coaching and mentoring, Williams asked Plaintiff to trust him and that he would help "get [her] to where she was trying to go."

52.     Plaintiff believes the decision not to select her for the position was solely made by Williams.

53.     In this same conversation, Williams noted how he perceived another female co-worker, Felicia Benton-Johnson, former Director of the Center of Engineering, Education, and Diversity

("CEED"), to be "disgruntled and unhappy" and expressed how he did not want Plaintiff to end up like Ms. Benton-Johnson.

54. Williams elaborated that he and Ms. Benton-Johnson used to be friends but then she turned against him because she did not get his job.

55. Williams then noted that "[Plaintiff is] young and energetic and…prettier than [Ms. Benton-Johnson]." Plaintiff felt uncomfortable at these statements and did not know how to respond.

56. Williams then asked Plaintiff to write down an organizational chart he had drafted in his office. The chart was fairly simple and involved only four organizational relationships.

57. While Plaintiff was writing down the organizational chart, she noticed Williams pulling her "Buzzcard" (Georgia Tech's identification card) in and out of her wallet-keychain set, which had Plaintiff's picture on it.

58. Plaintiff did not say anything to Williams about him looking at her Buzzcard.

59. Plaintiff did not mention the Buzzcard incident to anyone that day, but did confide in LaJauna Ellis on January 6th about it, and then to Felicia Benton-Johnson on January 10th.

60. Later that day on December 1, 2022, Plaintiff was meeting with a student when Ms. Morton came into Plaintiff's office.

61. Ms. Morton then informed Plaintiff that Williams was looking for her and that he wanted Plaintiff to come downstairs to meet him.

62. Plaintiff paused her meeting with the student and spoke with Williams.

63. Williams asked her to attend a meeting between himself, Chris Griffin, and Luoluo Hong later that day.

64. Specifically, Williams asked Plaintiff to take notes for him during the meeting.

65. Plaintiff was bothered by this request as it was outside of her job description and her attendance at the meeting took away from her other work.

66. Plaintiff returned to her meeting with the student after speaking with Williams.

67. While attending the meeting, Plaintiff was further frustrated because the meeting was centered on Williams presenting Plaintiff's concerns about the sexual harassment experienced by students at internships as his own concerns.

68. On December 7, 2022, Plaintiff and Williams had a virtual meeting. Williams was unhappy about the meeting being virtual, as his stated preference was to meet in person.

69. Williams told Plaintiff he would be there for her if she "need[ed] a shoulder to cry on," as her grandmother had recently passed away. Williams also offered his services as a pastor.

70. Plaintiff responded that she does not cry often and would not need to cry on his shoulder.

71. During this meeting, Williams also informed Plaintiff that Ms. Benton-Johnson would be leaving the university and that Williams would be serving as the Interim Director of WIE and CEED.

72. On December 15, 2022, Plaintiff and Williams had one one-on-one interaction and one group interaction.

73. In the first interaction, Williams messaged Plaintiff asking if she was available to meet him in the third-floor conference room of the Tech Tower building.

74. Williams wanted Plaintiff to meet with him, Lakeita Servance, and Cassandra Evans.

75. This meeting primarily focused on Ms. Servance explaining her administrative needs for Ms. Evans.

76. Plaintiff was not otherwise needed nor required to attend the meeting, nor did Plaintiff and Williams have a meeting scheduled for this date.

77. Nevertheless, Plaintiff agreed to attend the meeting.

78. When Plaintiff arrived, Williams looked her up-and-down in a suggestive manner.

79. Plaintiff responded to Williams' behavior by making a face to indicate her disgust.

80. Williams then asked Plaintiff to sit beside him during the virtual meeting he was having instead of using the conference room AV equipment that would have enabled to the two of them to sit further apart.

81. Sitting this close to Williams made Plaintiff feel uncomfortable.

82. Following the meeting where Plaintiff served as administrative support, Williams asked her if she wanted to ride with him and LaJuana Ellis, the administrator for the Dean, to the holiday luncheon, and Plaintiff accepted the offer. David Terello also rode in the car with them.

83. At the luncheon, Plaintiff and Williams were seated at the same table.

84. The group's conversation turned to their families. Williams mentioned his wife. Plaintiff talked about her boyfriend.

85. Williams made a comment to the effect of "your friend, boyfriend, whatever he is" when discussing Plaintiff's boyfriend, which made Plaintiff uncomfortable at this comment.

86. After the luncheon concluded, Plaintiff, Williams, Ms. Ellis, and Mr. Terello walked together back to Tech Tower.

87. At some point, Ms. Ellis and Mr. Terello ended up several steps ahead of Plaintiff and Williams.

88. Williams then made a comment about how nice Plaintiff's hair looked.

89. Plaintiff did not appreciate this comment and it made her uncomfortable to have Williams continue to be focused on her appearance.

90. Plaintiff and Williams interacted again in a group setting and in a one one-on-one

meeting on January 6, 2023.

91. On January 6, 2023, Plaintiff and Williams both attended the celebration of a team member who was moving to another group.

92. At the celebration, Williams made several comments about how Plaintiff always schedules "unnecessary meetings" and that Plaintiff mistreats him.

93. Williams made these comments in front of two of their colleagues.

94. While it appeared that Williams said these comments in a joking manner, Plaintiff felt there was an aggressive undertone.

95. Plaintiff had scheduled a 3 p.m. meeting with Williams on this date because she had been working remotely the day before and Williams had previously expressed his dislike for virtual meetings.

96. After the group interaction, Plaintiff and Williams met one-on-one to discuss her career goals and performance review; however, the conversation primarily focused on Plaintiff's appearance.

97. Specifically, Williams stated that Plaintiff needed to "dress up more" if she wanted to be taken seriously.

98. Williams then elaborated that he would never wear jeans on campus.

99. On this date, Plaintiff was wearing jeans, as was typical on Fridays for everyone in the office. WIE website and her Teams profile were unprofessional and looked more like a "Facebook photo."

100. Williams then offered to introduce Plaintiff to his wife, as he assumed a conversation about Plaintiff's appearance would be easier for her to take if coming from a woman.

101. Williams then searched for examples of female professional headshots and reviewed

them with Plaintiff to provide examples of how he believed Plaintiff should present herself on campus.

102. After reviewing the headshots, Williams instructed Plaintiff that when she was "lying in bed" with her boyfriend that night, she should look through the pictures more and pick a pose for her new headshot.

103. The above comment made Plaintiff feel very uncomfortable and objectified.

104. Williams mentioned Plaintiff's boyfriend several times during this interaction and often asked Plaintiff to repeat her boyfriend's name as if Williams had forgotten.

105. The meeting then moved to discussing the goals that Plaintiff had listed on her performance review.

106. Williams dismissed the goals drafted by Plaintiff and instead suggested that she create an application like "Tinder" to match female students with engineering jobs.

107. Plaintiff responded that this type of goal would be unrealistic in the six-month period proscribed in the performance review.

108. Williams continued to theorize how the algorithm would work by analogizing it to Tinder.

109. Williams asked Plaintiff how tall a man would need to be for her to date him. He also made references to skin color during this interaction and referred to light-skinned Black persons as "light-brights."

110. At the meeting's conclusion, Williams described himself as a workaholic and told Plaintiff that she could contact him at three in the morning and he would answer. Plaintiff found this comment odd and uncomfortable.

111. Also on January 6, 2023, Plaintiff spoke with LaJuana Ellis to ask Ms. Ellis's experience

working with Williams and to get Ms. Ellis' advice on whether Plaintiff should be concerned about some of Williams' comments to her.

112. Ms. Ellis suggested that Plaintiff redirect the conversation the next time Williams made an inappropriate comment and also noted that she too found Williams to be too personable.

113. Ms. Ellis instructed Plaintiff to address Williams' comments head on.

114. Ms. Ellis further stated that she planned to speak with Dean Beyah about Williams because he was acting like an "Associate Dean gone wild" and was "too familiar" with others.

115. Plaintiff filed a Title IX complaint on January 10, 2023.

116. On or around February 9, 2023, Williams excluded Plaintiff from the process for selecting scholarship recipients.

117. After Williams stated that Plaintiff should not be in the meeting for selection of scholarship recipients, she emailed him directly expressing that she disagreed with the decision not to include her in the meeting. She further explained this is not how things have been done in the past, but that she would oblige if he did not want her to participate.

118. Williams responded by forwarding their entire email chain to the Associate Deans and implied that Plaintiff was trying to create a new way of selecting the winners and that the meeting could move forward without Plaintiff's participation.

119. Williams also referred to Plaintiff as the Educational Outreach Manager of WIE instead of her appropriate title of "Associate Director."

120. One of the Associate Deans responded to the thread, confirming that what Plaintiff initially stated was correct and she should be in attendance at the meeting for the selection process.

121. The selection meeting was held on February 21, 2023, which Williams did not attend.

122. On or around March 7, 2023, Plaintiff reached out to the director of Title IX, Chris Griffin, to express concerns of retaliation.

123. On March 13, 2023, Plaintiff met with Griffin who informed Plaintiff that there seemed to just be a "misunderstanding."

124. Upon information and belief, Williams was instructed to not speak to Plaintiff, creating an uncomfortable working environment for Plaintiff.

125. Plaintiff was informed that additional investigation would be conducted but Plaintiff did not heard back regarding the same until much later when the Title IX investigation and hearing took place.

126. Thereafter, Williams appointed an interim director for WIE and neither Williams nor the interim director – Joy Harris – communicated with her nor did she perform any job duties as a director.

127. Plaintiff continued to do the work for her prior role and as the Director, for which she was not being appropriately paid.

128. Plaintiff had been receiving supplemental pay for doing the Director work, but when a new Director was brought in, Plaintiff's pay decreased despite no change to her duties.

129. Plaintiff submits that she was retaliated against as a direct result of making complaints, as stated above.

130. Defendant conducted a Title IX hearing in which many of the above facts were substantiated, yet Georgia Tech did nothing to address Williams' behavior.

131. Upon information and belief, Williams has had other complaints related to his behavior towards women at Georgia Tech, and the school has continued to not address his behavior.

132. Williams prevented Plaintiff from obtaining a promotion so that he could keep her in as

lesser role and in need of him to help her advance.

133. However, since Plaintiff complained about Williams, she has been passed over for the promotion to Director, and Williams has ostracized her, caused others to ostracize her, and has prevented her from advancing in career opportunities.

134. Williams has further made comments to individuals at other schools, which has affected Plaintiff's job prospects and tainted her professional reputation.

135. Plaintiff received her right to sue notice from the EEOC on February 15, 2024.

136. Plaintiff requests relief as described in the Prayer for Relief below.

**COUNT I**
**GENDER/SEXUAL HARRASMENT/DISCRIMINATION IN VIOLATION OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. 2000e et seq. ("Title VII"), as to Defendant Georgia Tech**

137. Plaintiff incorporates by reference all allegations in the preceding paragraphs.

138. At all material times, Defendant Georgia Tech was an employer covered by, and within the meaning of, Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended.

139. Defendant's conduct, as alleged herein, violated Title VII, which makes it unlawful to sexually harass an employee or discriminate against said employee on the basis of gender.

140. A respondeat superior relationship existed because Plaintiff's supervisors, had the ability to undertake or recommend tangible decisions affecting Plaintiff or the authority to direct Plaintiff's daily work activity as alleged in the statement of facts.

141. Plaintiff is a woman and a member of a protected class.

142. Plaintiff was subjected to communication or conduct on the basis of her gender, as indicated in the facts above.

143. The communication and conduct was unwelcomed.

144. The unwelcomed conduct or communication was intended to or in fact did substantially interfere with the Plaintiff's employment or created an intimidating, hostile, or offensive work environment as alleged in the statement of facts.

145. Plaintiff notified Defendant and/or Defendant's agents of the unwelcomed conduct and communication and Defendant failed to remedy the unwelcomed conduct or communication.

146. As a direct and proximate result of Defendant's wrongful acts, Plaintiff sustained injuries and damages including, but not limited to, outrage and humiliation, mental anguish, anxiety about their future, physical and emotional distress, loss of income, loss of professional reputation and loss of the ordinary pleasures of everyday life.

147. Plaintiff requests relief as described in the Prayer for Relief below.

## COUNT II

### GENDER/SEXUAL HARRASMENT/DISCRIMINATION IN VIOLATION OF THE GA CODE, ARTICLE 2 - FAIR EMPLOYMENT PRACTICES § 45-19-29

148. Plaintiff incorporates by reference all allegations in the preceding paragraphs.

149. At all material times, Defendant Georgia Tech was an employer covered by, and within the meaning of the GA Code, ARTICLE 2 - FAIR EMPLOYMENT PRACTICES § 45-19-29.

150. Defendant's conduct, as alleged herein, violated the GA Code, ARTICLE 2 - FAIR EMPLOYMENT PRACTICES § 45-19-29, which makes it unlawful to sexually harass or discriminate against an employee.

151. A respondeat superior relationship existed because Plaintiff's supervisors, had the ability to undertake or recommend tangible decisions affecting Plaintiff or the authority to direct Plaintiff's daily work activity as alleged in the statement of facts.

152. Plaintiff is a woman and a member of a protected class.

153. Plaintiff was subjected to communication or conduct on the basis of her gender, as indicated in the facts above.

154. A male who worked for Defendant, Williams, sexually harassed Plaintiff.

155. The communication and conduct from Williams was unwelcomed.

156. The unwelcomed conduct or communication was intended to or in fact did substantially interfere with the Plaintiff's employment or created an intimidating, hostile, or offensive work environment as alleged in the statement of facts.

157. Plaintiff notified Defendant and/or Defendant's agents of the unwelcomed conduct and communication and Defendant failed to remedy the unwelcomed conduct or communication.

158. As a direct and proximate result of Defendant's and Defendant's agent's wrongful acts and omissions, Plaintiff has sustained loss of earnings, earning capacity, and fringe benefits and has suffered mental anguish, emotional distress, humiliation and embarrassment, loss of professional reputation, and was constructively terminated.

159. Plaintiff requests relief as described in the Prayer for Relief below

## COUNT III
## RETALIATION IN VIOLATION OF TITLE VII as to Defendant Georgia Tech

160. Plaintiff incorporates by reference all allegations in the preceding paragraphs.

161. At all material times, Defendant Georgia Tech was an employer and Plaintiff an employee, covered by, and within the meaning of Title VII.

162. Defendant's conduct, as alleged herein, violated Title VII of the Civil Rights Act of 1964, which makes it unlawful to retaliate against an employee for engaging in protected activity.

163. A respondeat superior relationship existed because Defendant had the ability to undertake or recommend tangible decisions affecting Plaintiff and the authority to direct Plaintiff's daily work activity, as alleged in the statement of facts.

16

164. Plaintiff engaged in protected activity when she took the following actions, including but not limited to, reporting Williams' sexual harassment, as stated herein.

165. Defendant, through its employees, had knowledge that Plaintiff engaged in protected behavior, because they either observed the behavior themselves, Plaintiff was advised they were told and Plaintiff was advised by Defendant's agents as to how to report Williams.

166. Defendant and/or its agents took adverse employment actions against Plaintiff, including but not limited to not promoting her, making her continue to do all of the Director duties without the requisite pay,

167. But for Plaintiff's participation in protected activity, Defendant would not have taken said adverse employment actions against Plaintiff.

168. Defendant and its agents' unlawful actions were intentional, willful, malicious and/or done with reckless disregard for Plaintiff's rights.

169. As a proximate result of Defendant's retaliatory actions, Plaintiff has suffered losses in earning capacity, humiliation, mental anguish, and emotional distress.

170. As a result of those actions and consequent harms, Plaintiff has suffered such damages in an amount to be proved at trial.

171. Plaintiff requests relief as described in the Prayer for Relief below.

**COUNT IV**
**RETALIATION IN VIOLATION OF THE GA CODE, ARTICLE 2 - FAIR EMPLOYMENT PRACTICES § 45-19-29**

172. Plaintiff incorporates by reference all allegations in the preceding paragraphs.

173. At all material times, Plaintiff was an employee, and Defendant Georgia Tech was her employer covered by, and within the meaning of, the GA Code, ARTICLE 2 - FAIR EMPLOYMENT PRACTICES § 45-19-29.

174. A respondeat superior relationship existed because agents of Defendant had the ability to undertake or recommend tangible decisions affecting Plaintiff and the authority to direct all of Plaintiff's daily work activity.

175. Defendant's conduct, as alleged herein, violated the GA Code, ARTICLE 2 - FAIR EMPLOYMENT PRACTICES § 45-19-29 which makes it unlawful to retaliate against an employee who has engaged in protected activity.

176. Plaintiff engaged in protected activity when she took the following actions, including but not limited to, reporting Williams' sexual harassment, as stated herein.

177. Defendant, through its employees, had knowledge that Plaintiff engaged in protected behavior, because they either observed the behavior themselves, Plaintiff was advised they were told and Plaintiff was advised by Defendant's agents as to how to report Williams.

178. Defendant and/or its agents took adverse employment actions against Plaintiff, including but not limited to not promoting her, making her continue to do all of the Director duties without the requisite pay,

179. But for Plaintiff's participation in protected activity, Defendant would not have taken said adverse employment actions against Plaintiff.

180. Defendant and its agents' unlawful actions were intentional, willful, malicious and/or done with reckless disregard for Plaintiff's rights.

181. As a proximate result of Defendant's retaliatory actions, Plaintiff has suffered losses in earning capacity, humiliation, mental anguish, and emotional distress.

182. As a result of those actions and consequent harms, Plaintiff has suffered such damages in an amount to be proved at trial.

183. Plaintiff requests relief as described in the Prayer for Relief below.

## COUNT V
## HOSTILE WORKPLACE ENVIRONMENT IN VIOLATION OF TITLE VII as to
## Defendant Georgia Tech

184.    Plaintiff incorporates by reference all allegations in the preceding paragraphs.

185.    At all material times, Defendant Georgia Tech was an employer and Plaintiff was an employee covered by, and within the meaning of, Title VII, as amended.

186.    A respondeat superior relationship existed because agents of Defendant had the ability to undertake or recommend tangible decisions affecting Plaintiff and the authority to direct all of Plaintiff's daily work activity.

187.    Defendant's conduct, as alleged herein, violated Title VII which makes it unlawful to create a work environment that a reasonable person would consider intimidating, hostile, or abusive.

188.    Upon information and belief, Defendant is aware of claims that Williams sexually harassed other women in the Georgia Tech community.

189.    Plaintiff's work environment, as alleged in the statement of facts, was hostile, based upon Williams' sexual harassment of her, which was observed and known by others without any actions being taken to prevent the same, and now, since she complained, her isolation and deterioration of her role, resulting in an unworkable work environment.

190.    The communication and conduct were unwelcomed.

191.    The unwelcomed conduct and communication were intended to, or in fact have substantially interfered, and do substantially interfere, with Plaintiff's employment, and created an intimidating, hostile, and offensive work environment, as alleged in the statement of facts.

19

192. As a direct and proximate result of Defendant's discriminatory actions, Plaintiff has suffered losses in earning capacity, humiliation, mental anguish, and emotional distress.

193. As a result of those actions and consequent harms, Plaintiff has suffered such damages in an amount to be proven at trial.

194. Plaintiff requests relief as described in the Prayer for Relief below.

<u>**COUNT VI**</u>
<u>**VIOLATION OF 42 U.S.C. 1983 as to Defendant Williams (Sexual/Gender Harassment)**</u>

195. Plaintiff incorporates by reference all allegations in the preceding paragraphs.

196. Defendant Williams at all times relevant to this action was acting under color of state law with respect to his supervising and authority over Plaintiff's work.

197. Defendant Williams mistreated and harassed Plaintiff, and unfairly prevented her from being promoted so that he could continue to be her superior/supervisor, so that she would need to rely on him for career advancement, as stated above, in substantial part because of Plaintiff's gender.

198. Defendant Williams unlawfully deprived Plaintiff of her civil rights, in violation of Equal Protection Clause under the Fourteenth Amendment to the Constitution of the United States.

199. At all times relevant hereto, Defendant Williams acted pursuant to a policy or custom of Defendant Williams in depriving female employees of their civil rights protected under the Constitution and equal protection of the law.

200. Defendant Williams intentionally mistreated and failed to properly support female employees including Plaintiff, and caused a hostile workplace environment on the basis of gender with his sexually inappropriate behavior.

201. Defendant Georgia Tech's policy or custom, and its failure to adopt clear policies concerning avoiding sexual harassment of female employees including Plaintiff, was a direct and proximate cause of the constitutional deprivation suffered by Plaintiff.

202. Plaintiff has suffered damages as a result of Defendants' actions.

## **RELIEF REQUESTED**

PLAINTIFF, DESIREE TURNER, respectfully requests that this Honorable Court enter judgment against Defendants as follows:

1. Compensatory and pecuniary damages in whatever amount to which Plaintiff is entitled;

2. Exemplary and/or punitive damages in whatever amount which Plaintiff is entitled;

3. An award of interest, costs, and reasonable attorney fees; and

4. An order awarding whatever other equitable relief appears appropriate at the time of final judgment.

Dated:  May 15, 2024

Respectfully Submitted,

**BEY & ASSOCIATES, LLC**

*/s/ James O'Brien*
James O'Brien
Georgia Bar No. 962509
Attorneys for Plaintiff
191 Peachtree Street, NE, Ste. 3230
Atlanta, Georgia 30303
Telephone: (404) 344-4448
jim@beyandassociates.com

/s/*Carla D. Aikens*
Carla D. Aikens (*pro hac vice pending*)
CARLA D. AIKENS, P.L.C.
*Attorneys for Plaintiff*
615 Griswold Ste. 709
Detroit, MI 48226
carla@aikenslawfirm.com
rejanae@aikenslawfirm.com