1      UNITED STATES DISTRICT COURT
       FOR THE NORTHERN DISTRICT OF GEORGIA
2              ATLANTA  DIVISION

3

4

DESIREE TURNER,              )
5                            )
   Plaintiff,                )
6                            )CIVIL ACTION FILE NO:
       vs.                   )1:24-CV-2139-SEG-JEM
7                            )
BOARD OF REGENTS OF THE      )
8  UNIVERSITY SYSTEM OF      )
   GEORGIA, et al.,          )
9                            )
   Defendants.               )
10 _____  )

11

12

13                  Deposition of

14                 DESIREE TURNER

15               September 3, 2025

16                  10:00 a.m.

17       ZOOM VIDEOCONFERENCE DEPOSITION

18

19            Signature waived

20        Marianne Vargas, CCR, CVR-M

21  _____

22

23        VARGAS REPORTING SERVICES, INC.
            5755 N. Hillbrooke Trace
24           Johns Creek, GA  30005
                678.458.4030
25        marianne@vargasreporting.com

```
 1               APPEARANCES OF COUNSEL:

 2      ON BEHALF OF THE PLAINTIFF:

 3      CARLA AIKENS, ESQ.
        CARLA D. AIKENS, P.L.C.
 4      615 Griswold Street
        Suite 709
 5      Detroit, MI  48226
        844.835.2993
 6      carla@aikenslawfirm.com

 7

 8      ON BEHALF OF THE DEFENDANTS:

 9      ALLISON M. WHITFIELD, ESQ.
        Assistant Attorney General
10      OFFICE OF THE ATTORNEY GENERAL
        40 Capitol Square, S.W
11      Atlanta, Georgia  30334
        470.866.5340
12      awhitfield@law.ga.gov

13

14      SHELLEY S. SEINBERG, ESQ.
        Senior Assistant Attorney General
15      OFFICE OF THE ATTORNEY GENERAL
        40 Capitol Square, S.W
16      Atlanta, Georgia  30334
        404.458.3255
17      sseinberg@law.ga.gov

18

19

20

21

22

23

24

25
```

**INDEX OF EXAMINATIONS**

PAGE

**DESIREE TURNER**

Examination by MS. WHITFIELD                    7

**INDEX OF EXHIBITS**

| DEFENSE NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Plaintiff's Responses to Defendants' First Interrogatories to Plaintiff | 13 |
| Exhibit 2 | 9/27/2023 EEOC Charge of Discrimination.  Bates D889-890 | 15 |
| Exhibit 3 | 2/15/2024 Right to Sue letter.  Bates DT136-137 | 16 |
| Exhibit 4 | Turner Complaint | 18 |
| Exhibit 5 | Educational Outreach Manager I job description.  Bates D332-333 | 22 |
| Exhibit 6 | Turner Personnel File signatures | 25 |
| Exhibit 7 | E-mail, Turner Probationary Period Performance Review Bates D885-888 | 28 |
| Exhibit 8 | Director of WIE job description.  Bates D2331-2332 | 38 |
| Exhibit 9 | WIE application.  Bates D321-326 | 52 |
| Exhibit 10 | E-mail, 12/21/2022 Working Titles.  Bates D330-331 | 109 |
| Exhibit 11 | E-mail, Title IX communication.  Bates D1162-1166 | 142 |

**INDEX OF EXHIBITS**
(Continued)

| DEFENSE NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 12 | Title IX Complaint.  Bates D238-241 | 144 |
| Exhibit 13 | 7/11/2023, Title IX Final Report of Investigation. Bates D225-231 | 149 |
| Exhibit 14 | 10/25/2023 Title IX hearing decision.  Bates D851-862 | 153 |
| Exhibit 15 | E-mail, re: Grenga Award. Bates D1327-1330 | 157 |
| Exhibit 16 | E-mail chain, top date 2/21/2023 re: Grenga Award. Bates 1414-1420 | 165 |
| Exhibit 17 | Employee Cost Detail, Turner. Bates D168 | 174 |
| Exhibit 18 | Turner resignation letter. Bates D2632 | 191 |

<pre>
 1              P R O C E E D I N G S
 2                    10:01 a.m.
 3          MS. WHITFIELD:  This is going to be
 4      the deposition of Desiree Turner, Plaintiff
 5      in the case Desiree Turner v. Georgia Board
 6      of Regents, et al., currently pending in
 7      the United States District Court for the
 8      Northern District of Georgia.  This
 9      deposition is being taken for all purposes
10      allowed by law, including under the Federal
11      Rules of Civil Procedure and Evidence, and
12      the Local Rules for the Northern District
13      of Georgia.
14          Also present at the deposition is my
15      colleague, Shelley Seinberg, and of course
16      Plaintiff and her counsel.
17          Madam Court Reporter, if you could
18      please swear in the witness.
19          THE COURT REPORTER:  All right.  And
20      Ms. Turner, since you're out of the state
21      of Georgia at the moment, I'm going to
22      swear you in differently.  It's more of a
23      stipulation.
24          Will counsel please stipulate that in
25      lieu of formally swearing in the witness,
</pre>

the reporter will instead ask the witness
to acknowledge that their testimony will be
true under the penalty of perjury, and that
counsel will not object to the
admissibility of the transcript based on
proceeding in this way?

Ms. Whitfield?

MS. WHITFIELD:  I'll stipulate.

THE COURT REPORTER:  Okay.  And
Ms. Thurman?

MS. THURMAN:  I'll stipulate to that.

THE COURT REPORTER:  And then to the
witness, do you agree that your testimony
is taken under the penalty of perjury?

THE WITNESS:  I do.

MS. WHITFIELD:  Thank you very much.
And will you and your counsel, Ms. Turner,
agree to waive reading and signature of
this deposition transcript?

MS. THURMAN:  Yep.  I indicated that
earlier before you got on.

MS. WHITFIELD:  Okay.  Thank you.

---------------------------

DESIREE TURNER,
having first been duly sworn or having affirmed

to give truthful testimony, was examined and

testified as follows:

EXAMINATION

BY MS. WHITFIELD:

Q.   Good morning, Ms. Turner.  How are you today?

A.   I'm doing well.  How are you?

Q.   I'm doing great.  Thank you.  I just wanted to go over a couple of ground rules for our deposition today.  Hopefully we should not be here too long, but this could take a little bit of time, so I just want to go over some things.

You will be allowed some breaks, obviously.  If you need a comfort break, please let me know.  We will probably be breaking for lunch, as well, so if you need one, feel free to ask.  You're not going to be penalized or anything like that.  I do just ask, though, if you need to take a break, that you answer whatever question I have before you go on break, before we break.

And as far as the questions go, if you don't understand any of them, you can always ask for me to rephrase them.  Otherwise, I'm going to assume that you understood.  I'm happy

1    to repeat any question.

2            You can also go back and add to your

3    answer to a prior question.  We've got about 40

4    different things that we want to know all at

5    once, and sometimes they get a little jumbled up

6    in our brain, so I'm happy to repeat, happy to

7    rephrase.

8            You can also respond with "I don't

9    know," but I do just ask that you give verbal

10   responses, so, yes, no, making it very clear for

11   the court reporter.  And that we not talk over

12   each other, especially since the court reporter

13   also has to take down everything we're saying.

14   We don't want the transcript jumbled.  And I ask

15   that you give complete responses, too.

16           So just as far as your ability to

17   answer questions today, do you understand that

18   you are under oath, and that your testimony has

19   the full force and effect as if you were

20   testifying at a trial today?

21       A.    Yes.

22       Q.    Are you taking any medications that

23   would impair your ability to tell the truth or

24   understand my questions today?

25       A.    No.

1    Q.    Is there anything else that would

2  impair your ability to testify fully and honestly

3  today?

4    A.    No.

5    Q.    Did you review -- now generally I

6  understand that you and your counsel have

7  probably discussed preparing for this deposition

8  today.  I don't want to know any discussions that

9  the two of you had.  That's privileged

10  communication, so you don't need to tell me that

11  today, but I do want to know if you reviewed any

12  documents in preparation for this deposition.

13    A.    Documents, like -- no, no.  I have my

14  documentation from when I went through this

15  process at Georgia Tech, but otherwise, no, no

16  documents were given to me or anything like that.

17    Q.    Sure.  Did you review any of your

18  previous notes or documentation from your time at

19  Georgia Tech for this deposition?

20    A.    Briefly.

21    Q.    All right.  What was that?  Just some

22  notes or any official reports?

23    A.    No.  I have my --

24    Q.    A notebook.  Understood.

25         Other than your counsel, did you talk

     1   to anyone in preparation for this deposition?

     2        A.    No.

     3        Q.    If you could state your full name for

     4   the record, please.

     5        A.    Desiree Turner.

     6        Q.    Have you ever been known by any other

     7   names?

     8        A.    No.

     9        Q.    What is your date of birth?

    10        A.    ███████████████

    11        Q.    And where is your current residence?

    12        A.    ████████████████████

    13        Q.    All right.  How long have you lived

    14   there?

    15        A.    I moved here in May.

    16        Q.    Does anybody live with you?

    17        A.    My son.

    18        Q.    Your son?  How old is your son?

    19        A.    Five.

    20        Q.    He's five.  Are you married --

    21        A.    No.

    22        Q.    -- or separated, anything like that?

    23        A.    No.

    24        Q.    Do you belong to any churches?

    25        A.    My church doesn't have a membership.

1    I go to church.

2          Q.    Understood.  What church -- well, I

3    guess it wouldn't -- yeah.  For the record, what

4    church would that be?

5          A.    2819.

6          Q.    And that's up in ███████?

7          A.    No.  It's in ██████.

8          Q.    Do you attend virtually?

9          A.    Yes.

10          Q.    Do you participate in any other clubs

11    or organizations, especially around Atlanta

12    still?

13          A.    No.  I'm part of another ministry,

14    but it's a virtual -- it's a virtual ministry.

15    It's not based in Atlanta.

16          Q.    Sure.  What's that called?

17          A.    It's called Crisis Here Ministries.

18          Q.    Crisis Here?

19          A.    Crisis Here Ministries.

20          Q.    And the reason I ask about club

21    memberships, organizations, you know, churches,

22    is because if this case proceeds to trial and we

23    have to pick a jury, we want to make sure that

24    nobody on the jury knows you from these

25    organizations.

1          A.     Understood.

2          Q.     Have you ever been charged or

3     convicted of a crime other than a minor traffic

4     violation?

5          A.     No.

6          Q.     Now, what I would like to do is

7     introduce some exhibits.  Some of these you've

8     already provided to us.  Some of these have been

9     in discovery in this case.  I believe most, if

10    not all of them, have been through discovery.  So

11    let me know if you have a hard time seeing them.

12    I'm going to share my screen with you.  Give me

13    just a moment to rearrange everything here.

14             Can you see this blue page here that

15    I've accidentally highlighted?

16         A.     Yeah.

17         Q.     Can you see this page?

18         A.     Yes.

19         Q.     And this is a page labeled

20    Plaintiff's Responses to Defendants' First

21    Interrogatories to Plaintiff.  Can you see that?

22         A.     Yes.

23         Q.     And then if I scroll down here, do

24    these look -- and obviously we're going to get

25    through a lot of these.  These were your

1   responses from back in, I believe, January of

2   this year.  Do these look -- does this look

3   similar to any document you've seen before?

4          A.    Yes.

5          Q.    And then is this, down at the bottom,

6   your signature dated January 17,2025?

7          A.    Yes.

8          MS. WHITFIELD:  I'm going to mark

9          this as Defendants' Exhibit 1.

10                       (Exhibit 1 was marked for

11                        identification.)

12  BY MS. WHITFIELD:

13         Q.    All right.  Now, just going through,

14  we just have some more background questions for

15  you here.  No. 3, as far as your educational

16  background, all schools, universities, degrees,

17  you have indicated you went to Virginia Tech,

18  have a Bachelor of Science in Applied Economic

19  Management, graduation date May 2015.  Is that

20  still accurate?

21         A.    Yes.

22         Q.    And Relay Graduate School of

23  Education, Master of Arts in Teaching,

24  graduation, June 2020.  Is it also still

25  accurate?

1          A.     Yes.

2          Q.     What is your highest degree attained?

3          A.     My master's degree.

4          Q.     Do you have any additional

5     professional or educational certificates on top

6     of these?

7          A.     I'm a Certified Project Manager.

8          Q.     And I see you have a Bachelor of

9     Science in Applied Economic Management, but do

10    you have any other STEM-related educational

11    background, STEM meaning Science, Technology,

12    Engineering and Math?

13         A.     No.

14         Q.     Interrogatory No. 11 here, we're

15    going to move on.  So I noticed you've indicated

16    on No. 11, please identify every lawsuit that you

17    might have been a part of, you indicated -- your

18    response is none.  Is that still accurate?

19         A.     Yes.

20         Q.     And now in this case, in this

21    particular case, did you file EEOC charges, Equal

22    Employment Opportunity Commission?

23         A.     Yes.

24         Q.     Let me pull those up here.  I'm

25    introducing another exhibit here.  Can you see

1    this page, as well --

2         A.    Yes.

3         Q.    -- where it says Charge of

4    Discrimination at the top?

5         A.    Uh-huh (affirmative).

6         Q.    And this is -- does this look like

7    the Charge of Discrimination that you filed with

8    the EEOC in this case?  We'll scroll down here to

9    let you see.

10        A.    Yes.

11        Q.    So does this look like a fair and

12   accurate copy of that --

13        A.    Yes.

14        Q.    -- dated September 27th, 2023?  And

15   that's your signature?

16        A.    Yes.

17             MS. WHITFIELD:  And then I'll mark

18        this as Defense Exhibit 2.

19                       (Exhibit 2 was marked for

20                       identification.)

21   BY MS. WHITFIELD:

22        Q.    And then another letter here from the

23   Equal Employment Opportunity Commission.  Do you

24   recognize this letter sent to you from Carmen

25   Bethune of the EEOC dated February 15th, 2024?  I

1   can scroll down if you need to review it.

2        A.    I honestly can't recall.  I can't

3   recall if I've seen this or not.  I don't

4   remember.

5        Q.    All right.  Do you recall receiving a

6   letter from the EEOC in February of 2024

7   notifying you of your right to sue?

8        A.    I'm sure -- I'm sure I have.  I think

9   I've gotten so many things in my e-mails and

10  different things, so I'm sure it's accurate and

11  true and everything.  I just can't remember,

12  like, when and me reading it and all of that, but

13  I'm sure it's -- I'm sure I did.

14       Q.    Sure.  Do you have any reason to -- I

15  know you just said it, but do you have any reason

16  to doubt the veracity of this letter?

17       A.    No.

18            MS. WHITFIELD:  All right.  I'm going

19        to enter this as Defense Exhibit 3.

20                      (Exhibit 3 was marked for

21                      identification.)

22  BY MS. WHITFIELD:

23       Q.    Now, I know that you answered no to

24  being involved in any prior lawsuits, but have

25  you ever received money or a settlement from a

1    filing in any discrimination suits, either

2    pre-suit --

3         A.    No.

4         Q.    -- or anything like that before?

5              Okay.  Have you ever filed any

6    internal grievances with a previous

7    employer other than -- well, with any other

8    employer other than Georgia Tech?

9         A.    No.

10        Q.    All right.  I'm going to introduce

11   another exhibit here.  This is the -- can you see

12   the screen now?

13        A.    Yes.

14        Q.    Now, this is the -- we'll scroll down

15   a little bit here.  Does this look like Desiree

16   Turner, Plaintiff versus the Board of Regents, a

17   document titled Complaint, does this look like a

18   fair and accurate copy of the Complaint you filed

19   in this case, or that your attorney filed?

20        A.    Yes.

21        Q.    All right.  Let me scroll down here.

22   And then dated May 15th, 2024, does that sound

23   about accurate as far as the date of filing?

24        A.    Yes.

25              MS. WHITFIELD:  I will enter this as

1       Defense Exhibit 4, Plaintiff's Complaint.

2                 (Exhibit 4 was marked for

3                 identification.)

4  BY MS. WHITFIELD:

5      Q.   So what I would like to do is just go

6  over some of the claims you've raised in this

7  lawsuit, according to your Complaint.  So we will

8  scroll down here to Page 14.  I just want to

9  review everything and make sure that we have

10  everything for the record.

11        So Count I, you've alleged Gender and

12  Sexual Harassment and Discrimination in violation

13  of the Civil Rights Act of 1964, otherwise known

14  as Title VII, against Georgia Tech; is that

15  correct?

16      A.   Yes.

17      Q.   Count II, a similar claim

18  Gender/Sexual Harassment/Discrimination in

19  violation of the Georgia Fair Employment

20  Practices Act 45-19-29.  Does that look correct?

21      A.   Yes.

22      Q.   And then again, Count III,

23  Retaliation in violation of Title VII as to

24  Defendant Georgia Tech.  Also correct?

25      A.   Yes.

1  Q.   Count IV, Retaliation in Violation of

2  the Georgia Code, the Georgia Fair Employment

3  Practices Act.  Does that also look -- sound

4  accurate?

5  A.   Yes.

6  Q.   And then Count V, Hostile Workplace

7  Environment in violation of Title VII as to

8  Georgia Tech.  Does that look correct?

9  A.   Yes.

10  Q.   And then lastly, Count VI, Violation

11  of 42 United States Code Section 1983 as to

12  Defendant Damon Williams for Sexual and Gender

13  Harassment.  Does that also look correct?

14  A.   Yes.

15  Q.   And for the record, what is your sex

16  or gender?

17  A.   Female.

18  Q.   And for the record, what is your

19  race?

20  A.   I'm black.

21  Q.   And who is Defendant Damon Williams?

22  I'm sorry.  What is his sex?

23  A.   He's a male.

24  Q.   And as far as you're aware, what is

25  his race, as well?

1          A.    He's black.

2          Q.    Okay.  I'm going to go back to your

3     interrogatories just real quick to review and

4     verify.

5               In answer to Interrogatory No. 4 -- I

6     should just keep sharing my screen the whole

7     time, probably.  All right.  So Interrogatory

8     No. 4, your employment history prior to

9     employment with Georgia Tech, is this still

10    accurate here, KIPP South Fulton Academy, dates

11    of employment, 2018 to 2022?

12         A.    Yes.

13         Q.    And Navy Federal Credit Union, 2016

14    to 2018?

15         A.    Yes.

16         Q.    Do you have any history of any

17    disciplinary actions against yourself in these

18    positions?

19         A.    No.

20         Q.    Do you have -- have you made any

21    prior complaints of sex or gender discrimination,

22    sexual harassment or retaliation at any of these

23    places of employment?

24         A.    No.

25         Q.    Were you yourself the subject of a

1  complaint of discrimination, sexual harassment or

2  retaliation?

3       A.    No.

4       Q.    All right.  I'd like to move on to

5  your, then, employment at Georgia Tech.  Tell me

6  a little bit about how you found the position and

7  the reason you started at Georgia Tech.

8       A.    I found the role on LinkedIn.  I was

9  transitioning out of the classroom, out of

10 teaching.  As it says here, I just wanted to

11 advance in my career.  The role itself was

12 exciting and connected to things that I had

13 previously done, especially as it relates to just

14 programming for women and girls.  So I applied, I

15 interviewed, and accepted the position.

16      Q.    Great.  I have another exhibit here.

17 Can you see the screen where it says Educational

18 Outreach Manager 1?

19      A.    Yes.

20      Q.    And it may not look the same format,

21 but does this -- I'll give you a chance to review

22 this document, the Job Summary and the

23 Responsibilities.  Does this look like a fair and

24 accurate representation of the job posting that

25 you saw for this position?

1          A.    Yes.

2          Q.    And Required Qualifications,

3    obviously, and Preferred Qualifications.

4          A.    Yes.

5                MS. WHITFIELD:  I'm going to enter

6          this as Defense Exhibit 5.

7                        (Exhibit 5 was marked for

8                        identification.)

9    BY MS. WHITFIELD:

10         Q     Would you say -- now, looking at the

11   Job Summary and the Job Duties right here, and

12   I'll stop scrolling, I promise, would you say

13   that after reviewing this, this encompasses all

14   the duties that you had when you started the role

15   as Educational Outreach Manager?

16         A.    No.

17         Q.    What other duties did you have?

18         A.    If you have the role description for

19   the director role I could point them out, but I

20   essentially ran the Woman in Engineering Program,

21   so it -- I don't see here -- let me doublecheck

22   to make sure.  Yeah.  So I managed relationships

23   with our stakeholders, including managing

24   multiple grants that we had.  I don't see that

25   listed.  I believe that is under the director

1    role.

2         Q.    I'm sorry.  I don't mean to cut you

3    off.  We are going to get into talking about the

4    director role and sort of the duties that you may

5    have taken on.

6         A.    Understood.

7         Q.    With that, I do just want to know,

8    when you started as the Educational Outreach

9    Manager, what was the date of your hire, first of

10   all?

11        A.    I don't remember the date that I was

12   hired.  I attended the banquet that is held in

13   April before my start date, and at that point it

14   was kind of kept under wraps in terms of me

15   stepping into this role, but I started officially

16   in June.  So I don't recall my hire date, but it

17   was -- I knew I was hired by sometime in April,

18   but I didn't start until June.

19        Q.    Was this June of 2022?

20        A.    Yes.

21        Q.    So when you started the position in

22   June of 2022, does this look like a fair

23   assessment of the job duties that you were

24   performing at the time?

25        A.    Yes.  I just -- as long as it's noted

1  that I did do these duties in addition to other

2  duties, as well.

3      Q.    And we'll get to those in just a few

4  minutes.  I'll give you an opportunity to speak

5  to that.

6          When you -- give me just one moment

7  to find a page.  I apologize.  One moment.  All

8  right.  There we go.

9          So I am sharing what we'd like to

10  mark as -- well, we'll get to that in a second.

11  I'm also sharing with you what Georgia Tech has

12  indicated is your sort of personnel file, your

13  paperwork you signed back when you started at

14  Georgia Tech, and there's a couple of pages on

15  this, so, you know, emergency contacts, that kind

16  of thing.

17          Does this look about -- even if it

18  wasn't in this format, does this look like

19  information you entered with Georgia Tech when

20  you started?

21      A.    Yes.

22      Q.    And are those your initials there and

23  the date of April 20th, 2022?

24      A.    Yes.

25          MS. WHITFIELD:  I will enter this as

1      Defendants' Exhibit 6.

2                          (Exhibit 6 was marked for

3                          identification.)

4  BY MS. WHITFIELD:

5      Q.    I'm going to scroll down here, and on

6  this page in particular, Page 16, do you see

7  where it says Non-Discrimination and

8  Anti-Harassment Policy?

9      A.    Yes.

10      Q.    And do you recall clicking to review

11  this policy?

12      A.    Yes.

13      Q.    And is that your signature or your

14  initials right there, DT, with a date of April

15  20, 2022?

16      A.    Yes.

17      Q.    Thank you.  Now, when you began at

18  Georgia Tech in the role of Educational Outreach

19  Manager, who did you report to at the time?

20      A.    Christine.

21      Q.    Christine, what's her last name?

22      A.    I can't think of her last name right

23  now.

24      Q.    All right.  If I say Christine Valle,

25  would that ring a bell?

1          A.     Yes.  That's her last name.

2          Q.     Sure.  What was her position?  Do you

3     recall?

4          A.     She was the director.

5          Q.     And how was your working relationship

6     with her at the start?

7          A.     It was great.  I enjoyed working with

8     her.  We had a great rapport with each other.

9          Q.     Are you aware of what duty she was

10    performing as the director of Women in

11    Engineering?

12         A.     Yes.

13         Q.     Okay.  What duties were those --

14         A.     Just helping to --

15         Q.     -- that you can recall?

16         A.     I mean, helping to run the program.

17    We did a lot of things hand-in-hand, so

18    interacting with our sponsors and donor

19    relationships, grant management.  She spoke with,

20    met with students about scholarships, yeah.  I

21    mean, she had -- there's a lot of duties -- I

22    can't -- I wasn't with her all day, every day,

23    so --

24         Q.     All right.  Understood.

25         A.     She was in charge of my performance

1    and things at that time, so, yeah.

2         Q.    All right.  Did she give you a

3    probationary performance review --

4         A.    Yes, she did.

5         Q.    -- when you started?

6              I'm going to bring that up here just

7    to review.  Okay.  This document title Classified

8    Performance Appraisal Record, do you see this

9    document in front of you?

10        A.    Yes.

11        Q.    I'm just making sure my screen

12   sharing still works.

13             Do you see where it says, Desiree

14   Turner, Job Title at WIE, Associate Director,

15   College of Engineering, reviewed by Dr. Christine

16   Valle, Date of Review, December 9th, 2022, but

17   the review period is from June through December

18   of 2022.  Does this look like a fair and accurate

19   copy of your probationary performance review?

20        A.    Yes.

21        Q.    All right.  And I believe that's your

22   signature at the bottom from December 13, 2022 --

23        A.    Yes.

24        Q.    -- Employee Name?

25             And then as far as you're aware, is

1  that Dr. Valle's signature there, as well --

2       A.    Yes.

3       Q.    -- if you know?

4       A.    Yes.

5            MS. WHITFIELD:  I will enter this as

6       Defense Exhibit 7.

7                         (Exhibit 7 was marked for

8                         identification.)

9  BY MS. WHITFIELD:

10      Q.    So I see your -- obviously your job

11 title here, WIE associate Director, but you had

12 been hired as the Educational Outreach Manager,

13 correct?

14      A.    Yes.  But Dr. Valle, she consistently

15 referred to me as the Lead Associate Director.

16      Q.    Okay.  Why did she refer to you as

17 such?

18      A.    I believe that was just my working

19 title.  And as I said before, we did a lot of

20 things hand-in-hand.  I did duties beyond just an

21 Educational Outreach Manager, and essentially ran

22 multiple parts of the Women in Engineering

23 Program as a whole.  So just in conversation --

24 like, not just on this document, but in

25 conversation when introducing me to others, etc.,

1  etc., she always referred to me as Associate

2  Director, so I just thought that was -- I assumed

3  that as my unofficial title --

4        Q.    So it was Dr. Valle --

5        A.    -- (indiscernible)

6        Q.    I'm sorry.  Go ahead.

7        A.    No.  That's it.  I was just saying

8  that that's what she referred to me as the entire

9  time that we worked together.

10        Q.    Sure.  So Dr. Valle took it upon

11  herself to start referring to you as that?

12        A.    Yes.

13        Q.    Did you ask to be referred to that at

14  all?

15        A.    No.

16        Q.    Do you recall if she ever

17  distinguished between Associate Director or

18  Assistant Director?  Did she call you -- I'm

19  sorry.  Let me -- I'll ask that question first.

20  Did she distinguish between Associate and

21  Assistant Director?

22        A.    No.

23        Q.    Did she ever call you Assistant

24  Director instead of Associate --

25        A.    No.

```
 1           Q.      -- or vice versa?
 2                   Did she only call you Associate
 3    Director?
 4           A.      Yes.
 5           Q.      Did she ever refer to you as
 6    Educational Outreach Manager?
 7           A.      No.
 8           Q.      As far as what you knew Georgia Tech
 9    had in their system, you know, in their -- your
10    employment file, was your title at that time
11    Associate Director?
12           A.      Can you ask that again?
13           Q.      Sure.  So as far as the official
14    title that Georgia Tech had for you, was that
15    title Associate Director?
16           A.      I -- I don't know.  I'm on the -- on
17    the WIE website at the time, my title was also
18    Associate Director, so that's, again, what I
19    referred to myself as was the associate director
20    also.
21           Q.      Do you recall who put the --
22           A.      Dr. Valle did that with the website.
23           Q.      Dr. Valle was the one who told the
24    website to put, okay, Associate Director --
25           A.      She did it --
```

        Q.     -- (indiscernible).

        A.     -- herself.

        Q.     Oh, she did it?  She put it up on the
website herself?

        A.     Yes.

        Q.     Understood.  Were you aware at the
time -- and we kind of talked about this a little
bit and I know you mentioned it, but just for the
record, were you aware at the time that that was
a working title?

        MS. THURMAN:  I'm objecting to the
        form of the question, but you can answer
        it.

        THE WITNESS:  Can you actually repeat
        the question?

BY MS. WHITFIELD:

        Q.     Sure.  Were you aware at the time
that Dr. Valle was referring to you as the
associate director of Women in Engineering?  Were
you aware that that was a working title?

        A.     I, again, just referred to it as my
title.  Since she's the person that I report to,
she's the person that's saying it, she put it on
my performance review, she put it on the website,
Associate Director was my title, as far as I'm

1  aware.

2         Q.    Did you ever have any conversation

3  with Human Resources about this being your

4  official title?

5         A.    Did I have any -- prior to when --

6  prior to later on when this became an issue or it

7  was just brought to my attention by Damon, no, I

8  have not.

9         Q.    All right.  So with this -- between

10 June 1st and December 1st, 2022, this review

11 period, did you talk with Human Resources

12 about --

13        A.    No.

14        Q.    -- this?

15        Okay.  When did you become aware that

16 -- let me rephrase that.  How long was Dr. Valle

17 your immediate supervisor?

18        A.    Until she retired in January.

19        Q.    In January of?

20        A.    2023.

21        Q.    2023.  When did you become aware that

22 she was retiring?

23        A.    Sometime in October.

24        Q.    Okay.  Did she tell you anything

25 about why she was leaving other than she was

1  retiring?

2       A.   A little.  After, shortly after --

3  I'm just trying to choose my words, be mindful of

4  my words.  A little.  Like, after Damon was

5  hired, there were just changes I believe that

6  were happening, just structurally, and she

7  thought that it was best for her to retire and

8  kind of go in another direction with her career.

9       Q.   What structural changes did she

10  mention?

11       A.   So when Damon was hired, the

12  department -- there were just changes in the

13  dean's office and how it was structured.  So

14  Damon, his role was new, and we had the Women in

15  Engineering and CEED, which is our parallel

16  program, were going under a new leadership, under

17  Damon's leadership, and we were split.  So just

18  the dean's office and some of the programs that

19  were under the dean's office were splitting up.

20       Q.   Did she ever talk about any -- did

21  she ever talk about any bad interactions that she

22  had with Damon, with Dr. Williams?

23       A.   No.

24       Q.   All right.  Moving on to

25  Dr. Williams, when are you aware that he started

1    at Georgia Tech?

2         A.    He's been at Georgia Tech for a long

3    time.  He was not -- he didn't start in the

4    dean's office until sometime in October, I

5    believe.

6         Q.    All right.  So he started in the

7    dean's office in this new role in October?

8         A.    Of 2022, yes.

9         Q.    Of 2022.  Had you ever worked with

10   him before he started there?

11        A.    No.

12        Q.    Had you ever interacted with him --

13        A.    No.

14        Q.    -- before he started?

15             All right.  So we're going to move

16   to, what was your first interaction with him?

17   What do you recall?

18        A.    Shortly after I found out that

19   Christine, or Dr. Valle was leaving, I reached

20   out to him because I wanted to understand what

21   his overall vision was with the transition and

22   share more about, like, what my experience had

23   been with Women in Engineering and where the

24   program was at that time and things like that.

25   So that was my first time ever interacting with

1    him.

2         Q.    Was that late Octoberish, mid to late

3    October, do you recall, 2022?

4         A.    Yes, it was.

5         Q.    Would October 24th ring a bell as

6    that being the date?

7         A.    That's the first time that I met with

8    him.  I'm sure I e-mailed him prior to that to

9    set up the meeting, but that was our first

10    face-to-face interaction.

11         Q.    Sure.  Where was this first

12    face-to-face interaction with Dr. Williams?

13         A.    Outside of a coffee shop, Kaldi's.

14         Q.    And did staff, faculty employees at

15    Georgia Tech regularly meet outside of school to

16    go over employment matters?

17         A.    It was not outside of school.  It was

18    on campus.

19         Q.    Oh, it was on campus.  My apologies.

20    Did you regularly meet outside of the office to

21    discuss, even if it was on campus, to discuss

22    work matters?

23         A.    Meetings take place all over campus,

24    so at any place on campus a meeting could be

25    held.  I've met with students, I've seen other

1    faculty members and staff meeting at various

2    places on campus.

3          Q.    Had you heard anything about

4    Dr. Williams from other individuals in the dean's

5    office or anywhere else in the College of

6    Engineering prior to meeting with him?

7          A.    No.

8          Q.    Had anybody warned you about him or

9    told you about any behaviors he had engaged in

10   with others?

11         A.    At that point, no.

12         Q.    Now, when you -- you said you reached

13   out to him to share some ideas about the program

14   and to kind of discuss goals for it, correct?

15         A.    Not just that.  I also wanted to hear

16   from him what his -- what was happening, because

17   given Dr. Valle leaving, I was going to be

18   reporting to him.  So I wanted to understand what

19   he was doing with the transition, like, what was

20   going to be happening during the transition, and

21   share, like I said, what my background is,

22   because he was completely new to the department.

23         Q.    Sure.  Did you feel comfortable

24   sharing ideas with him about the direction of

25   Women in Engineering?

1     A.     Yes, I did.

2     Q.     Now, I'm going to -- at some point

3  the discussion -- what did the discussion turn

4  toward next with Dr. Valle leaving?

5     A.     What do you mean?

6     Q.     I'm sorry.  Let me rephrase that.  Do

7  you recall -- when you talked about Dr. Valle

8  leaving, do you recall where the conversation

9  then went about your role within Women in

10 Engineering?

11    A.     Do I recall what the conversation

12 went to about my role?

13    Q.     Yeah, in light of Dr. Valle leaving.

14    A.     If you're referring to him, like, the

15 director position becoming open, he did discuss

16 that with me.  He sent a job description, he

17 e-mailed me a job description.  During our

18 meeting he mentioned that the Ph.D. qualification

19 was being moved from required to preferred.  He

20 asked if I would want to be on -- if I was

21 interested in the role, and if I wanted to be on

22 the search committee.

23    Q.     I'm going to show you -- I'll share

24 my screen.  This says Open-Rank Academic

25 Professional, Director of Women in Engineering.

1   This is a job posting that we have for the

2   Director of Engineering -- Women in Engineering,

3   excuse me.  If you review this, can you let me

4   know if this looks accurate to what Dr. Williams

5   sent to you?  Here.  I'll go back, because that's

6   all -- the core of it is in the middle here.

7          A.     Yeah.  As best I see, this is

8   accurate.

9               MS. WHITFIELD:  Okay.  I'm going to

10        introduce this as Defense Exhibit 8.

11                         (Exhibit 8 was marked for

12                          identification.)

13  BY MS. WHITFIELD:

14         Q.     Now, did he say specifically -- I'm

15  sorry, did you say he was waiving -- they were

16  waiving the terminal degree or the Ph.D. degree?

17         A.     I did not say they were waiving

18  anything.  I said that he discussed moving the

19  Ph.D. qualification from required to preferred.

20         Q.     Understood.  All right.  But a

21  terminal degree was still required, correct?

22         A.     That's what it looks like here.

23         Q.     Did he tell you that he was moving

24  the terminal requirement from required to

25  preferred?

1          A.     No.  At our next meeting we discussed

2     further me taking over WIE responsibilities and

3     getting a search committee together.  I did let

4     him know that I was going to be applying for the

5     role, and he asked me if I did not get the role,

6     would we still be friends.  And he also told me

7     during that meeting --

8          Q.     Sorry.  Go ahead.  I was going to get

9     to -- I was going to ask you questions about that

10    in a few minutes.

11         A.     Okay.  So, well, just -- I mean, I

12    might be getting ahead of myself, but I want to

13    give it context because during that meeting he

14    asked me to get together a list of Ph.D. programs

15    that I could -- or Ph.D./Ed.D. doctoral programs

16    that point -- that would apply to as it relates

17    to when we were talking about this role.

18              So even though terminal degree is a

19    required part of this job description, what would

20    it look like, me getting my -- getting a doctoral

21    or terminal degree.  So I think it's important to

22    note that.

23         Q.     Understood.  So what did you come

24    away from this meeting understanding about the

25    degree requirements, then?

1          A.     In October during that meeting I just

2     really -- it was very introductory.  And I did

3     tell him that I would think about the role, like,

4     I wasn't really sure about the role yet or if it

5     was something that I was going to pursue or not,

6     so it was very introductory.

7          Q.     You mentioned in your Complaint that

8     Dr. Williams encouraged you to apply to the

9     director role.  Do you recall that?

10         A.     Yes.  Like I said, during the next

11    time that we met, it was a more serious

12    conversation about the role, so, yeah.

13         Q.     What is the next time you met?  Do

14    you recall?

15         A.     It was, like, two weeks later, maybe,

16    in November.

17         Q.     Sure.  What did he say to encourage

18    you to apply?

19         A.     I mean, "Go for it."  Like, "Go for

20    it."  Just, like, "If you want the role, apply.

21    There's no hurt in applying," I'm sure something

22    along those lines.  I don't remember his exact

23    words.  I don't remember what his exact words

24    were.  But, again, between the meetings in

25    October and November and him encouraging or

1    asking me to look at Ph.D. programs and different

2    things like that, I would say that's -- it was

3    encouraging.

4           Q.    Did you feel you had enough

5    experience to become the director of Women in

6    Engineering when he first floated the idea?

7           A.    Yes.

8           Q.    What experience did you have that

9    would have been --

10          A.    At that point in time --

11          Q.    -- enough?

12          A.    Yeah.  I mean, at that point I was

13   the most experienced person within Women in

14   Engineering.  Between Christine -- Dr. Valle

15   leaving, like, I was going to be the most

16   experienced person in terms of the ins and outs

17   of Women In Engineering, how we do things and all

18   those things, so I thought it would make sense

19   for me to continue managing the program.  Because

20   at that point, as I mentioned earlier, Christine

21   and I were working very closely together in

22   running the program, so...

23          Q.    So you were the only one with enough

24   experience by -- just because you were the last

25   one standing?

1    A.    No.  I also have -- like I just said,
2 I mean, I currently hold my Project Manager
3 Certification.  I've been in various leadership
4 roles.  I've had corporate experience before
5 going into education.  So also just my
6 background, I am well-qualified to run -- run --
7 run this program.  So not just being the last one
8 standing and the most knowledgeable about WIE,
9 but also my professional experience.
10    Q.    And we'll get to that in a moment,
11 because I want to unpack that a little bit.  But
12 you also allege in your Complaint that Damon
13 floated the idea of placing you in the interim
14 director role.  Do you remember this discussion
15 in October?
16    A.    Yes.
17    Q.    What was your understanding at the
18 time of the interim director role?
19    A.    What do you mean?
20    Q.    What did Dr. Williams tell you about
21 what the interim director role would look like?
22 What did -- you know, did he say anything else
23 about it?  Did he tell you about it?  Was it
24 supposed to be temporary?  There's lots of --
25 what was your understanding of what that would

1　look like?

2　　　　A.　　Well, the Interim conversation, I

3　believe, didn't come up until November, in that

4　second meeting that I just mentioned with me

5　going through the Ph.D. programs and all of that.

6　But in terms of what I understood about it,

7　interim means that if you're in an interim role,

8　it's a temporary role until a new director is

9　hired, so that's what I understood it to mean.

10　　　　Q.　　So just to confirm here, because this

11　is -- it is in your Complaint that this

12　conversation occurred in October of 2022.  Let me

13　find the exact -- Paragraph 18 here, going back

14　to Defense --

15　　　　A.　　Can you show me the date of where I

16　put -- where I have the date there?

17　　　　Q.　　Sure.  This as Defense 4.  So it's a

18　narrative in separate paragraphs.  So on or about

19　October 24th, starting here in Paragraph 12, and

20　then going down to -- so this is all still at the

21　October 24th, or around there, their meeting.

22　Paragraph 18.

23　　　　A.　　Okay.

24　　　　Q.　　So you're saying -- I just want to

25　clarify.  You're alleging this conversation did

1    not take place on October 24th?

2         A.    Between October 24th and the November

3    8th meeting, we discussed lots of these same or

4    similar things, so that's my mistake.  October,

5    November, it's around that.  They were both,

6    like, within two weeks of each other.

7         Q.    Understood.  And as far as your --

8    going back to the director role, in your

9    discussion with him, what did he tell you about

10   moving the Ph.D. from required to preferred?

11   What did he tell you about his role in that?

12        A.    I don't recall if he told me anything

13   about his role in doing that.  What I understood

14   it to be is he is in charge of hiring since that

15   would be his direct report, and that's all I can

16   really say about that.

17        Q.    Okay.  Did he tell you explicitly

18   that -- did he ever tell you explicitly, "This is

19   my," you know, in summarized language, "I get to

20   make that determination because this is who is

21   going to work under me"?

22        A.    I think given the context of the

23   situation and him bringing it to my attention, it

24   could be assumed that he was the one who made

25   that decision.

1          Q.    All right.  So that was an
2     assumption, then --
3          A.    I can't --
4          Q.    -- correct?
5          A.    I'm going to say it wasn't -- it just
6     made sense for him to come to me and say "the
7     Ph.D. qualification was moved from required to
8     preferred," that any reasonable person would
9     think that it was his decision, because he
10    brought it up.  He said it to me in the context
11    of inquiring about the transition and the search
12    for a new director and those things.
13         Q.    Understood.  As far as the terminal
14    degree requirement, that's still under Required
15    Qualifications, correct?
16         A.    It is.
17         Q.    Do you have a terminal degree in your
18    field?
19         A.    No.
20         Q.    What would be a terminal degree in
21    your field?
22         A.    A terminal degree is just a Ph.D. or
23    -- it's a doctoral degree.
24         Q.    Okay.  And what would your field be?
25    Would that be a doctoral degree in education for

1   you?

2          A.    In my field?  I don't think I

3   understand what you're asking me.  I understand a

4   terminal degree to be one that is a doctoral

5   degree, period.  I want to say -- I mean, I'm in

6   higher ed right now.  You could get a doctoral

7   degree in higher ed, you could get a doctoral

8   degree in many things, so --

9          Q.    Let me --

10         A.    -- I'm not --

11         Q.    -- rephrase that.  A terminal degree

12  in your specific discipline is what is required

13  for this role, correct, according to the --

14         A.    A doctoral degree --

15         Q.    -- job qualifications?

16         A.    -- is that specific discipline?  Yes,

17  yes.

18         Q.    So what would be a terminal degree in

19  your specific discipline?

20         A.    I don't know if I could say I have a

21  specific discipline.  I've held many different

22  types of jobs.  I've been in the corporate world,

23  I've been in education, I've been in higher --

24  K-12 education, I've been in higher education.  I

25  currently work for an ed-type company, so I don't

1    want to -- I'm not going to say I have a specific

2    discipline.  I think -- I could get a doctoral

3    degree in anything.

4         Q.    Understood.  Did you ever see

5    Dr. Williams -- going back to when he was -- he

6    said that -- or, you know, when it was

7    understood, I guess, that he could move the Ph.D.

8    from required to preferred, did you ever see him

9    alter the job description yourself?  Did you ever

10   see him alter any documents, anything to reflect

11   that?

12        A.    No.

13        Q.    Did he provide you with any

14   documents, e-mails, text messages, anything that

15   he did alter the requirements?

16        A.    No.

17        Q.    Do you know if he told anybody else

18   that he could waive it single-handedly?

19        A.    Not to my knowledge.

20        Q.    Did you ever have a discussion with

21   Human Resources about any of these requirements

22   or preferred qualifications being waived or moved

23   around in this role?

24        A.    I don't think so.

25        Q.    And I also want to go back to --

1    because your Complaint alleges that this next

2    paragraph, this next allegation also took place

3    during this meeting.  From what I understand --

4    from my understanding, it might be later.  Let me

5    doublecheck here.  Okay.  Maybe it wasn't during

6    this.  That was my mistake.  I'm sorry.

7              Going back to the list of Ph.D.

8    programs, I believe you said that was going to --

9    that was from your next meeting about two weeks

10   later in November.  Do you recall?

11        A.    Can you ask me that again?

12        Q.    Sure.  Going back to the list of

13   Ph.D. programs that you say he told you to

14   prepare, was that request of the list -- when was

15   that request made?  Was it made at the October

16   meeting or a couple of weeks later?

17        A.    I believe it was asked a couple weeks

18   later.

19        Q.    Okay.  Do you remember the purpose of

20   preparing the list of Ph.D. programs?

21        A.    The purpose of me providing him with

22   a list?

23        Q.    Yes.

24        A.    Just so that I could get my terminal

25   degree.  And since that was a requirement of the

director role and me wanting to grow and
potentially pursue that role, then that's why I
thought he was asking me about it.

Q.    Sure.  Do you recall him telling you
that as long as you apply to Ph.D. programs, that
would be sufficient to meet the requirement for
the director of Women in Engineering role?

A.    Say that again?

Q.    Do you recall him telling you as long
as you apply to these Ph.D. programs, that would
be sufficient to qualify for the director of
Women in Engineering role?

A.    No.  Those were not his word
specifically.

Q.    All right.  What words did he
specifically use, then?

A.    To get a list of programs, and have
them prepared for the next time that I was going
to meet with him.

Q.    All right.  Do you recall testifying
in your Title IX hearing about this allegation,
this list of Ph.D. programs that -- do you recall
testifying about that?

A.    Yes.

Q.    Do you recall saying that preparing a

1    list of Ph.D. programs, because that would

2    qualify you for the director role, that that

3    allegation was, quote, "in your mind"?  Do you

4    recall that?

5         A.    Sure.  I mean, yes.

6         Q.    Okay.  And do you recall discussing

7    applying for Ph.D. programs because Georgia Tech

8    would pay for it?

9         A.    I remember him -- us talking about

10   the TAP program, or the program that Georgia Tech

11   participates in to pay for you to continue your

12   education.

13        Q.    Right, through the TAP program.  I

14   didn't know what it was called.  But you do

15   recall discussing the potential for that,

16   correct?

17        A.    Uh-huh (affirmative), yes.

18        Q.    All right.  Now, after having had all

19   this discussion, when do you recall that you

20   applied for the director of Women in Engineering

21   role?

22        A.    A few days later.

23        Q.    Was this maybe early November, you'd

24   estimate?

25        A.    Sometime in November.

1    Q.    What made you decide to go ahead and

2    apply for it?

3    A.    After Damon's encouragement and

4    discussion, I mean, I'm pretty sure I told him I

5    would be applying in November.  And as I

6    mentioned before, he did ask me, like, "Oh, if

7    you didn't get the job," like, "how would you

8    act, and would we still be friends if you didn't

9    get it" and things like that.

10    Q.    Tell me little bit about that

11    conversation, you know, asking if you would still

12    be friends if you didn't get it.

13    A.    Those were his words.  That's a

14    question that he asked me.

15    Q.    Okay.  Was there anything else -- was

16    there anything more to the conversation than

17    being friends if you didn't get it?

18    A.    I'm just telling you that's the

19    question that he asked me.  I didn't consider us

20    friends, so it was just a -- that's what he asked

21    me.  Would we still be friends if I did not get

22    the job, and how would I -- how would I act?

23    Q.    Sure.  What did you respond, do you

24    remember?

25    A.    I don't remember what -- I don't

1  remember what I said in response.  I'm -- I'm not

2  sure.

3      Q.    I'm going to bring up your

4  application here for the director role.

5  Apologies for the formatting on this one.  When

6  you make a copy of a copy of a copy, it ends up

7  going a little haywire.

8          Do you see this on your screen?

9      A.    Yes.

10     Q.    All right.  "Desiree Turner, To Whom

11 it May Concern," is this the cover letter?  And

12 then I'll scroll down a little bit, your resume.

13 Is this your application for the Women in

14 Engineering director role?

15     A.    Yes.

16     Q.    I'll scroll down a little bit more,

17 but does this look like a fair and accurate copy

18 from the time --

19     A.    Yes.

20     Q.    It hasn't been altered or changed or

21 anything?

22     A.    Correct.

23         MS. WHITFIELD:  I'm going to enter

24     this as Defense 9.

25                    (Exhibit 9 was marked for

```
 1                      identification.)
 2   BY MS. WHITFIELD:
 3        Q.    So I have to ask, did you -- so when
 4   you applied for the director of Women in
 5   Engineering role, when -- you can see it on the
 6   job application, but when did you learn that
 7   it -- truly that it required a terminal degree?
 8        A.    What do you mean?
 9        Q.    When did you learn that the director
10   role required a terminal degree?
11        A.    I don't -- I don't know.  I mean, it
12   was -- like you said, it was already on the job
13   description.  I applied anyway.  Is that --
14        Q.    Yes.  I wanted to know if it was
15   before or after.  I apologize, I could've phrased
16   that better, before or after you applied.  So it
17   was before you had applied, correct?
18        A.    Yes.
19        Q.    Did you, at that time, think that you
20   would get the job?
21        A.    I thought I had a good chance of
22   getting the job, yes.
23        Q.    Now, I know you -- I'll go back to
24   the screen a little bit.  I know we talked a
25   little bit earlier about the various duties you
```

1    were performing as the Educational Outreach

2    Manager; some duties as the director.  So I just

3    want to go over some of these director roles that

4    you say you were already performing at the time.

5              Did you -- starting at, I mean, just

6    number 1, were you developing and leading the

7    implementation of strategic goals and directions

8    for Women in Engineering?

9         A.    Yes.

10        Q.    Were you -- this one is sort of

11   listed, but did you seek or obtain any donors or

12   corporate sponsors on your own to fund the Women

13   in Engineering Program?

14        A.    You said did I do what, now?  I'm

15   sorry.

16        Q.    Did you seek or obtain any donors or

17   corporate sponsors on your own for the Women in

18   Engineering Program?

19        A.    Yes.  I led my own donor, donor

20   meetings with new --

21        Q.    Were you --

22        A.    -- sponsors.

23        Q.    I'm sorry, go ahead.

24        A.    With new sponsors, yes.

25        Q.    Were you soliciting those sponsors on

1    your own?

2          A.    Typically sponsors or interested

3    partners would reach out directly to us, as well,

4    so I didn't have to go and search.  But sponsors

5    would reach out to me and I would conduct

6    meetings and get sponsorships that way.

7          Q.    Were you using your -- did you ever

8    use your network -- did you ever network for

9    donors or corporate sponsors on your own?

10         A.    Did I network on my own?

11         Q.    Yes.

12         A.    Yes.  I --

13         Q.    Sorry.  Go ahead.

14         A.    You can go.  I mean, I'm trying to

15   understand what you're getting at.  You're asking

16   -- you're trying to ask me did I secure

17   partnerships on my own or did I network on my

18   own?  I'm always networking on behalf of WIE when

19   we would go to different conferences and

20   different things like that.  So did I network on

21   my own?  Yes.  Did I lead sponsorship meetings on

22   my own?  Yes.  Did any of those meetings turn

23   into actual partnerships?  Yes.

24         Q.    Understood.  Did you draft any

25   contracts reflecting the sponsor/sponsee

1  relationship?

2      A.    That's not how it works, so I'm going

3  to say no.  Companies would send out something to

4  us to -- well, actually -- no, I'm not even going

5  to say that.  Yes.  Did I ever have to draft

6  anything to lay out what a sponsor was

7  contributing?  Yes.  Sometimes sponsors would

8  also send those to me for my, for, like, my

9  signature or verification.  I did do that.

10     Q.    So you were -- were these contracts,

11 then?

12     A.    I don't know if you want to call it a

13 contract.  I guess -- I guess yes, or just

14 something to lay out what they were contributing

15 or what it was going to, I did that.  But I don't

16 know if I would -- I don't know what verbiage to

17 use.  It didn't say on all of our documents,

18 like, "This is a contract."  But was there any

19 documents signed that said what the sponsor was

20 contributing, where the money was going to?  Yes.

21          So I don't want to get caught up on

22 what exactly it was called, but did I have to

23 write -- draft any documents to confirm what a

24 sponsor was doing for the program?  Yes.  And

25 sometimes that came from me and sometimes it came

1  from that.

2      Q.    Agreements, then --

3      A.    Sure.

4      Q.    -- maybe not a contract?

5            Okay.  Were you developing research

6  and writing proposals aimed at STEM issues

7  relating to Women in Engineering?

8      A.    I didn't have to write any proposals,

9  no.

10     Q.    Did you develop research?

11     A.    Any type of published research?  No.

12     Q.    Any type of STEM research?  I'm not

13 really sure of the research in the director role

14 but if there is any research.

15     A.    I mean, I've had to do research -- I

16 mean, you do research to understand kind of the

17 lay of the land and understand, like, or just

18 analyzing data with, like, Admissions and who --

19 where we're recruiting and things like that.  But

20 did I do, like, academic research as it relates

21 to STEM?  No.  But did I do any type of research

22 as it relates to STEM or WIE?  Yes.

23     Q.    Did you assist in recruiting and/or

24 retaining female faculty members to work in the

25 College of Engineering?

1          A.    No.

2          Q.    Did you ever work with Admissions to

3    recruit female College of Engineering students?

4          A.    Yes.

5          Q.    I'm going to move on now.  Before I

6    move on, we've been going about an hour.  Would

7    everybody mind if we take about a five-minute

8    break, just a five-minute comfort break?

9          A.    It's fine with me.

10              MS. THURMAN:  That's fine.

11              MS. WHITFIELD:  Okay.  I'll see you

12         all back in five minutes.

13          (Off the record at 11:10 a.m. EST)

14                --------------

15          (On the record at 11:18 a.m. EST)

16              MS. WHITFIELD:  We're back on the

17         record.

18    BY MS. WHITFIELD:

19          Q.    I want to move to the next portion of

20    your allegations that took place starting

21    December 1st, 2022, according to your Complaint.

22    Do you recall meeting with, and let me share my

23    screen, just from a little bit of your Complaint

24    here, we'll start that as our sort of narrative.

25              I apologize.  Let's move back to the

1    meeting on November 8th, 2022.  Your contention

2    is that you again met one-on-one to discuss the

3    vacant director role.  Do you recall that meeting

4    on November 8th, or about November 8th?

5          A.    Yes.

6          Q.    And this is the one where he asked

7    you again whether or not you'd be applying for

8    the director role.  Does that sound familiar?

9          A.    Yes.

10         Q.    All right.  And if you weren't

11   applying, that you join the Selection Committee

12   for the director role.

13              Do you recall Dr. Williams responding

14   in Paragraph No. 28 that he was proud of you for

15   applying?

16         A.    Yes.

17         Q.    What did he say specifically?

18         A.    "I'm proud of you."

19         Q.    Did you discuss applying any more

20   than that?

21         A.    I mean, I think this is, as I

22   mentioned earlier, at the same time where he

23   asked me about Ph.D. programs and having a list

24   by the time that we met next.  I don't -- I don't

25   know what more to say about that.

1        Q.    All right.  Sure.  And then he told
2    you to bring your list of Ph.D. programs to the
3    next scheduled meeting on December 1st, 2022.
4    Does that sound like about what you recall?
5        A.    Yes.
6        Q.    All right.  You applied for the
7    director role on November 10th, 2022, correct?
8        A.    Yes.
9        Q.    So on December 1st, then, do you
10   recall a meeting that took place between you and
11   Dr. Williams?
12       A.    Yeah.  We had multiple meetings that
13   day.
14       Q.    All right.
15       A.    We had multiple meetings together.
16       Q.    Sure.  Do you recall him telling you
17   at some point during -- I believe it was -- you
18   allege this was the first meeting, that you
19   "looked different," quote, unquote?
20       A.    Yep.
21       Q.    What was the context of that, do you
22   recall?
23       A.    Context as far as what?  Like, I saw
24   him.  He told me that I looked different.
25       Q.    Can you describe -- first of all, who

1  else was at the meeting with you and

2  Dr. Williams?

3      A.    This was a team meeting.

4  Dr. Mitchell, Mitchell Walker was there, and

5  Lauren, Lauren Morton was there.

6      Q.    I'm sorry, I was just going to ask

7  who they are, what their titles were, if you

8  recall?

9      A.    Mitchell, he's no longer in that

10  role.  He was another -- he was an associate dean

11  at this time, but he's currently the chair of the

12  School of Aerospace Engineering, but he was the

13  associate dean, or I think it's like Associate

14  Dean of Academics or something like that.  And

15  Lauren, she is a -- I don't know what her title

16  is, but she runs the Dean's and Clerk's Scholars

17  Program, scholarship programs, in the dean's

18  office.

19      Q.    Sure.  All right.  What was the

20  meeting about?

21      A.    I do not remember what the meeting

22  was about.

23      Q.    Understood.  Had he said anything to

24  you prior to this meeting about anything?  Had

25  you had any discussions prior to this meeting

```
 1    with Dr. Williams?
 2            A.    What do you mean?  Like --
 3            Q.    On the day.  On that day.
 4            A.    I don't think prior to this meeting
 5    on that day, I don't think I interacted with him.
 6    I don't recall.  That was our first time seeing
 7    each other that day.
 8            Q.    Sure.  Was the "looked different"
 9    comment, was that the first thing he said to you
10    that day?
11            A.    Yes.
12            Q.    How did he say it?
13            A.    "You look different," something like
14    that.
15            Q.    Did he ever tell you why he thought
16    you looked different?
17            A.    No.  I know -- and when I responded
18    to him, I said something casual like, "Oh, wow.
19    Is it because I'm not wearing makeup?  Like, are
20    you saying I look tired?  Wow.  HR."  Like, I was
21    joking, but -- I said it in a joking way, but I
22    didn't appreciate him commenting on my looks.  I
23    was professional, I dressed professionally, and
24    it was just an offhand comment to make to talk
25    about my looks.
```

1          Q.     Sure.  Were you wearing makeup that
2     day?
3          A.     No.  And he said -- his response to
4     me saying oh, I didn't -- "Are you saying that
5     I'm looking different because I'm not wearing
6     makeup?"  And then he was, like, "I know what it
7     is."  And the conversation had moved on after I
8     said, like, "Oh, is it because I'm not wearing
9     makeup?  Wow.  HR," he randomly goes, "I know
10    what it is.  You look lighter.  Does your makeup
11    make you look darker?"  And I said, "I don't
12    know.  Maybe."  And Lauren responded and said
13    something like, "Oh, well you look beautiful as
14    always, Desiree."
15         Q.     Did he say anything else about your
16    appearance, other than the comment about your
17    makeup or your complexion?
18         A.     Does my makeup make me look darker
19    and why I looked different?  Did he say anything
20    else outside of that?  In that interaction, no.
21    Later on did he say anything else about my
22    appearance?  Yes.  But in that meeting, those
23    were the only comments that were made.
24         Q.     Did he ever tell you why he was
25    asking about your makeup?

1      A.    No.  Later on when we had our
2  Title IX meeting he mentioned that I looked sick
3  and he didn't want to get his kid sick, but
4  that's -- I did not look sick.  So, yeah, it was
5  a lie.  And later on, like I said, he commented
6  further on my appearance, comparing me to another
7  colleague of ours.
8      Q.    How do you know it was a lie?
9      A.    I was not sick.  I was healthy.  I
10  vividly remember what was going on during that
11  time.  Like I said, I said, "Are you saying I
12  looked tired?  Is it because I'm not wearing
13  makeup?"  Like, I made a joke out of it.  But him
14  saying I looked sick didn't make any -- it just
15  didn't make any sense.
16      Q.    Do you think maybe he could've
17  thought that and not told you?
18      A.    No.
19      Q.    And then you mentioned in your
20  Complaint --
21      A.    Because if he thought --
22      Q.    Sorry.  Go ahead.
23      A.    I think that if he thought I looked
24  sick, he would have said that.  What he
25  specifically said is, "Oh, I know what it is.

You look lighter.  Does your makeup make you look darker?"

Q.    Okay.  So you mentioned that this made you uncomfortable.  Why did this comment make you uncomfortable?

A.    Because I think that it's odd for someone to make comments on my appearance in front of others, and then to keep on talking after I already -- and, like, to keep commenting after I already -- like, after the conversation had moved on.  It was odd and it did make me uncomfortable.  Like, we're in a meeting talking about professional things, and he was talking about my appearance.

Q.    So you mentioned previously that you had joked -- I understand it was a joke about contacting HR for your appearance, correct?  You did make that joke?

A.    Yes.

Q.    How many times have you contacted HR about a comment like that?

A.    I didn't contact HR at that time, so, I mean, I haven't ever contacted HR about -- I haven't ever contacted HR about anything prior to -- prior to when I filed this Complaint.

1    Q.    So you've never contacted HR about a

2  comment someone else might have said to you about

3  your appearance before?

4    A.    Correct.

5    Q.    All right.  Now, going back to the

6  discussion about the makeup making your skin look

7  darker, could you perceive if your makeup made

8  your skin lighter or darker?

9    A.    Did I perceive if my makeup makes my

10  skin -- no.  My makeup doesn't change my skin

11  complexion.

12    Q.    You think others might have perceived

13  it?

14    A.    No.

15    Q.    And Lauren Morton, I think you said,

16  she said you were -- brushed it off and said you

17  were beautiful as always; is that right?

18    A.    She said, "Well, You look beautiful

19  as always, Desiree."

20    Q.    Were you offended when she said this?

21    A.    I was not offended.  I took it as her

22  trying to make it -- make the situation less

23  awkward and keep the conversation moving forward.

24    Q.    But she commented on your appearance.

25  Did you contact HR about that?

1      A.    She commented on my appearance to,

2   again, break the ice and the awkwardness of my

3   male superior commenting on my appearance

4   randomly, out of context, given what the

5   conversation was about.

6           So, again, it was not -- she was

7   trying to break the tension, is what I took it

8   as.  And I did not contact HR right after this

9   conversation.  It was a build up of multiple

10  comments and things that were said that were

11  egregious that made me reach out to HR.

12      Q.    Sure.  Do you remember talking with

13  Lauren Morgan after this meeting?

14      A.    It was not right after this meeting.

15  It was in the eveningtime --

16      Q.    And --

17      A.    -- after other additional comments

18  are made by Damon that day.

19      Q.    Okay.  So it was still within the

20  day, though?

21      A.    In the eveningtime.

22      Q.    In the evening.  Sure.  It was that

23  day.  Do you recall her telling you that he,

24  Dr. Williams had a, quote, "big personality"?

25      A.    Sure.  I'm sure that's what she said.

1    And on my phone call that evening, I just want to

2    make it clear that it was after multiple

3    inappropriate comments made by him that day that

4    I even mentioned -- that we ever even discussed

5    Damon, so...

6         Q.    Right.  But do you just recall, yes

7    or no, that she said he had a big personality?

8         A.    Yeah.

9         Q.    And you said she said that on the

10   phone later on that evening?

11        A.    On the phone, yes.

12        Q.    What did she mention about -- and

13   we're going to get to sort of the mentorship

14   offer in a moment, but what do recall her saying

15   about his reputation on campus, his -- what do

16   you recall her saying about his reputation on

17   campus?

18        A.    The conversation was pretty brief,

19   so, I mean, I just remember asking her, like, if

20   she knew of anything about him.  Yeah, I remember

21   her saying he had a big personality and -- I

22   can't remember -- like, honestly, I can't recall

23   all of the details of my conversation with her

24   about him.

25        Q.    I understand.  Do you remember if you

1  reached out to her to initiate a conversation

2  about it --

3        A.    I did reach out to her.

4        Q.    -- or did she reach out to you?

5        A.    I did reach out to her.

6              THE COURT REPORTER:  If we can try

7        for one at a time, that would help me.  I

8        know it gets conversational, but thank you.

9              MS. WHITFIELD:  I'm breaking one of

10       my own rules here.

11             THE WITNESS:  Sorry.

12  BY MS. WHITFIELD:

13       Q.    All right.  And I believe in your --

14  so I'm going to go back to your interrogatory

15  responses.  Right here I just want to ask about a

16  specific -- specific conversation, just to

17  confirm.  I'm going to share my screen one more

18  time just to confirm and see if this is still

19  your testimony.

20             Okay.  So this is your interrogatory.

21  This is Defense Exhibit 1.  This is in response

22  to question, I believe, 16, so I'll go back up

23  here.  It's very long.  But scrolling down here,

24  so this is after this day.  "Later that evening I

25  called Lauren Morton to see if she thought that

1  the interaction" -- Oh, I apologize.  This is for

2  something else.  I'll ask about this in just a

3  few minutes.

4          All right.  So going back to, then,

5  Mitchell Walker in that meeting, you allege that

6  he was uncomfortable but said nothing.  Is that

7  still your allegation?

8      A.   Yes.  Because as I said, Damon

9  redirected a conversation that was being had back

10  to my appearance.  And as I also mentioned,

11  that's why I felt like Lauren said, "Well, you

12  look beautiful as always, Desiree."  And during

13  that interaction, during that time, Mitchell did

14  look uncomfortable.

15      Q.   Why do you say he looked

16  uncomfortable?

17      A.   His facial expression.

18      Q.   Okay.  What was his facial

19  expression, then?

20      A.   An uncomfortable look.

21      Q.   An uncomfortable look?

22      A.   I can't, like -- I mean, I don't know

23  how to make myself in this moment do the exact

24  face that he did, but reading his body language,

25  he looked -- he presented himself to be

1  uncomfortable.

2      Q.    Did he -- was he shifting?  Was he --

3  you said he made a face.  Is that the extent --

4      A.    His facial --

5      Q.    -- of it?

6      A.    I mean, his body language, his facial

7  expression, it was awkward.  I mean, I don't --

8  it was -- you could feel the awkward -- the

9  awkward tension in the room.  Looking at him, he

10  just -- he looked uncomfortable.  Like, I would

11  say maybe shifty, his facial expression.

12      Q.    Did he ever tell you he was

13  uncomfortable at that interaction?

14      A.    I did not talk to him about the

15  interaction.

16      Q.    He never said anything to you after

17  this meeting, then, about this interaction?

18      A.    About this interaction specifically?

19  No.  We had a conversation -- I did have a

20  conversation with him that day about a different

21  -- about a meeting we had prior to this point in

22  time, a meeting that was held earlier.  We did

23  have a conversation about that.

24      Q.    What was the conversation?

25      A.    About an interaction --

1    Q.    I'm sorry, let me backtrack a little

2    bit.  Was that conversation you had with

3    Mitchell Walker about Dr. Williams?

4    A.    No.

5    Q.    Just for sake of clarity, was anybody

6    else at this meeting who would have maybe

7    witnessed this interaction?

8    A.    The only people who were in the

9    meeting are the people I said earlier, so Damon,

10   Mitchell, Lauren and myself.

11   Q.    All right.  So later on, that same

12   date, December 1st, could you describe the second

13   meeting that took place that day, I believe,

14   where there was some leftover food?

15   A.    So this is all during the same -- at

16   the same time.  Like, Mitchell, Lauren and I were

17   already together when Damon had come downstairs

18   and mentioned me looking different.  We were

19   sitting and chatting, because there was an

20   academic team meeting that was held that morning.

21   And during -- like, after this conversation about

22   I looked different, etc., Damon asked me to get

23   him a plate of food and mentioned to Lauren that

24   we -- him and I were besties.

25   Q.    So we're going to have to dig a

little deeper into this.  So what was the -- was
this a separate meaning that this was -- that
these interactions occurred in, the grabbing a
plate of food and the besties comment?

    A.    It wasn't really a meeting.  We were
sitting in the room after another meeting that
was had.

    Q.    Okay.  So it was still the same
people from the previous meeting that were in
this room right now?

    A.    Everyone else had left, so the --
like I said, the only people that were in the
room was Mitchell, Lauren and myself, and then
Damon had came down.  But there were other people
in the meeting earlier, but they had left
already.

    Q.    So tell me little bit about the plate
of food comment.  Where did it come from?  What
food was it?  Where --

    A.    It was --

    Q.    Where was it located?

    A.    So the conference room is attached
to, like, a break room, and someone -- there was
food leftover, I guess from another meeting that
was had somewhere else, so people were bringing

1    food into the break room, and Damon asked me

2    could I make him a plate.

3         Q.    Do you remember what the food was?

4         A.    Like, sandwiches and stuff like that.

5         Q.    So it didn't involve -- Strike that.

6               Do you recall what Dr. Williams was

7    doing when he made this request to you?

8         A.    No.  I mean, he had just came down

9    there shortly before, so, I mean, I don't really

10   know what he was doing.  But I'm not sure what

11   the relevance of that is because we were all

12   doing something, so...

13        Q.    I'm just asking if you recall what he

14   was doing.

15        A.    No.

16        Q.    Okay.  Do you recall if he asked

17   anybody else to grab him some food?

18        A.    He did not ask anyone else.

19        Q.    Why do you think this comment in

20   particular -- well, first, how did this comment

21   about asking you to grab him a plate, how did

22   that make you feel?

23        A.    Maybe confused.

24        Q.    Confused?  Okay.  Why?

25        A.    I don't know why he would ask me to

1    make him a plate of food.  And then to refer to

2    me as -- him and I as besties was also odd,

3    because we weren't.  Like I said, he had made the

4    comment in November about if we would still be

5    friends whether or not I got the director role.

6    Now he's referring to us as besties, and so --

7    and I did not view our professional relationship

8    that way.

9              Also, kind of even earlier when you

10   asked, like, is it possible that he thought I

11   looked sick, if he thought I looked sick, then

12   why would he ask me to make him a plate of food?

13   Or if he thought I looked sick and we were best

14   besties, I would think that someone who I had a

15   bestie relationship with would tell me that they

16   thought I looked sick.  So just to kind of

17   further add on to what we previously discussed.

18        Q.    I'm just talking about --

19        A.    So I was just --

20        Q.    I'm narrowing it down to the

21   plate-of-food comment.  And I understand there's

22   probably more to the context, right, but this

23   comment in particular, was it over the line for

24   you?  How did it make you feel in the moment?

25        A.    Yeah.  Like I said, it just made me

1 confused because I just don't know why he would

2 ask me to make him a plate of food. Like, I we

3 didn't have -- I didn't feel like we had the type

4 of relationship where I would make him a plate of

5 food.

6     Q.    Okay. Have you ever seen anybody

7 else make a plate of food for their colleague

8 before?

9     A.    No.

10     Q.    Did he say anything about -- let me

11 retract.

12           How did he ask you to make him a

13 plate?

14     A.    "Can you make me a plate?"

15     Q.    Did he call you any names?

16     A.    No.

17     Q.    Any derogatory names?

18     A.    No.

19     Q.    Did he make any other comments about

20 gender stereotypes and making food for men?

21     A.    No.

22     Q.    Did he -- do you recall at the end

23 of -- moving on towards the end of when everybody

24 is finished, do you recall him getting up from

25 eating whatever plate of food that you could grab

1    for him?

2          A.    I don't know.  I don't remember.

3          Q.    Do you recall him asking, offering to

4    get anybody else anything to eat?

5          A.    No.

6          Q.    Now, tell me a little bit about the

7    bestie comment.  Why was he saying this?  What

8    was the context of the conversation that led to

9    the bestie comment?

10         A.    It's when he was asking me to make

11    him a plate of food.  He was talking to Lauren

12    and mentioned that him and I were besties.

13         Q.    So he said this --

14         A.    Like, "Oh, we're besties."  I don't

15    know why he said that.

16         Q.    All right.  And did he ever say

17    anything about why he said that?

18         A.    No.

19         Q.    In your Complaint you allege you were

20    offended by the request to get food for

21    Dr. Williams, but prepared a plate.  You say in

22    your Complaint that it was, quote, "demeaning and

23    sexist."  Did that go through your head at that

24    time?

25         A.    Yes, because he could have also asked

 1     Mitchell, who is his -- at the same professional
 2     level as him.  He did not ask Mitchell, and yet
 3     Mitchell and I were talking and went to that area
 4     of food together.  So he chose to ask me when he
 5     could've asked Mitchell to get him a plate of
 6     food also, and he didn't --
 7             Q.    Okay.
 8             A.    -- while also talking -- while also,
 9     in the process, referring to me as his bestie.
10             Q.    So how is -- just kind of do some of
11     the work for me.  How is asking you to grab a
12     plate of food, referring to you as his bestie,
13     simply by virtue of being, you know, one of two
14     people he could have asked, how is that sexist?
15             A.    Because I just said, he could've
16     asked his male colleague, who is on the same
17     professional level as him, to get him a plate of
18     food, and instead he asked me.  And during the
19     entire interaction that we had up until that
20     point, he was talking about my looks.
21                   So to talk about my looks in front
22     of -- in a professional setting with other people
23     who are -- were all colleagues, to then later ask
24     me to get him a plate of food and referring to me
25     as his bestie, that does feel demeaning.

1    Especially, like I said, when I was going to the
2    break room with Mitchell who was on the same
3    professional level as him.  He could've asked
4    Mitchell, and he did not.  The whole context felt
5    unprofessional and demeaning.
6              And it did feel sexist, because he
7    didn't comment on anyone else's appearance.  He
8    commented on mine.  He didn't ask his male
9    colleague, again, who's on the same level as him
10   professionally.  They have similar -- the same
11   titles, so it felt -- that's how it felt
12   demeaning to me and sexist.  He didn't refer to
13   Mitchell as his bestie or anything like that.
14        Q.    Did you tell him that you were
15   uncomfortable with the request?
16        A.    No.
17        Q.    Why not?
18        A.    At that point I was already
19   uncomfortable with every other interaction that I
20   had, and I was assumed to be reporting directly
21   to him, so I just was not comfortable with saying
22   anything.  And also we were in a room with other
23   people, so it didn't -- it also didn't feel like
24   the time to say anything.
25        Q.    So how were you feeling overall after

1     the first -- the first meeting and the second

2     interaction, how were you feeling at this point

3     during the day?

4          A.     You're saying the first meeting, but

5     we didn't really have, like, a meeting.  All of

6     this is all in the same --

7          Q.     Whatever the first two interactions

8     that you had were with Dr. Williams that you said

9     were -- that you alleged in your Complaint that

10    were objectionable, how were you feeling after

11    these two?

12         A.     I was feeling uncomfortable.

13         Q.     Did you talk to --

14         A.     I mean --

15         Q.     I'm sorry.  Go ahead.

16         A.     Yeah.  I mean, I was feeling

17    uncomfortable and -- yeah.  I was just

18    uncomfortable, which is kind of -- and maybe also

19    confused and trying to figure out, like, how to

20    read the situation or analyze the situation.

21         Q.     Did you talk to anybody --

22         A.     Processing.

23         Q.     Okay.  Processing.  Did you talk with

24    anybody else --

25         A.     No.

1          Q.      -- about these interactions at the

2     time?

3          A.      At that point in time, no.

4          Q.      So moving on to your one-on-one that

5     you had with Dr. Williams later that same day,

6     this was the -- do you recall this meeting,

7     meeting one-on-one with him when he told you you

8     would not be getting the director role?

9          A.      Yes.

10          Q.      All right.  He was the one to tell

11     you that you weren't getting it?

12          A.      Uh-huh (affirmative), yes.

13          Q.      You say in your Complaint that you

14     were surprised you didn't get the director role.

15     Is that still accurate testimony?

16          A.      Yeah.  I was surprised that I didn't

17     get an interview or anything, and his words were

18     that I was not ready.

19          Q.      Did you have any other emotions you

20     were experiencing other than surprise?  Were you

21     angry?

22          A.      No.

23          Q.      Confused?

24          A.      I wasn't angry, no.

25          Q.      All right.  Now, the not-being-ready

1   comment, or that you "weren't ready" comment,

2   what exactly did he say in this conversation

3   about you not being ready?

4        A.   He just said that I was not ready.

5   He went on to say that -- I did speak with him

6   about a meeting that was held earlier that day

7   with another -- and my interaction with another

8   colleague, and he said that I -- that interaction

9   -- he described that person as disgruntled and

10  unhappy, and that I'm younger.  He's, like,

11  "You're young and energetic, you're prettier than

12  her, so that didn't have anything to do with

13  you."  And he went on to say how he would like to

14  coach and mentor me, and that I needed to trust

15  him to help me grow in my career and get me to

16  where I'm trying to go, or something like that.

17       Q.   Do you recall him speaking with you

18  about your application in particular for the

19  director role?

20       A.   He mentioned my -- One, he did

21  mention my title.  He's, like, "Associate

22  Director?  You're not the associate director."

23  And I was, like, "Well, that's what Dr. Valle

24  refers to as.  That's what she put on the

25  website, etc."  He did mention that.

1       Q.    Did he mention any other duties that

2  you had been performing or that you said you had

3  performed as the Educational Outreach Manager or

4  even associate director?  Did he mention to

5  you -- did he talk with you about that?

6       A.    No, not that I recall, no.

7       Q.    Do you believe that it was his and

8  only his decision not to select you for this

9  role?

10      A.    I don't know.  I mean, he is the one

11  who told me that I wouldn't be getting it after

12  encouraging me to apply and talking about Ph.D.

13  programs and things like that.  So as I said

14  earlier, I perceived that I had a good

15  opportunity for the role.

16      Q.    All right.  Why do you -- in your

17  opinion, why do you think you weren't selected

18  for the role?

19      A.    Later I did talk -- Dawn briefly

20  shared with me, Dawn, who's the -- over HR for

21  the dean's office, mentioned that the degree

22  requirement was -- in and of itself wouldn't

23  allow me to move forward in that process,

24  wouldn't have allowed me to move forward in that

25  process.

1      Q.    When did you have that discussion

2 with Dawn, if you just want to estimate?

3      A.    I honestly couldn't even tell you.  I

4 don't remember.  But it was past this point of me

5 having this conversation with Damon.  It was

6 quite some time later.

7      Q.    And the offering to -- the offer to

8 mentor you, did you accept his offer?

9      A.    No.  I mean, I didn't look at him as,

10 like, a coach or a mentor.  I had other -- I had

11 other mentors.

12      Q.    Did you decline his offer?

13      A.    There wasn't any further conversation

14 about whether or not he would coach or mentor me

15 or anything like that, so I wouldn't say there

16 was any type of acceptance or anything.  He just

17 mentioned it and we moved on.

18      Q.    Right.  Did you flat out tell him,

19 "No, thank you," politely decline, you know,

20 whatever you needed to do?  Did you tell him no,

21 that you were not interested in being mentored?

22      A.    No, because I didn't really take the

23 offer seriously.  I didn't take it as -- I

24 thought it was more of just like a, "You should

25 let me coach or mentor you," and we moved on.

Like, it wasn't an actual conversation about
whether or not he would, or I wanted him to coach
or mentor me.  So in that context, I didn't think
I needed to say yes or no.  Like, it was just a
thought.

Q.    Were you aware he was mentoring other
students or faculty and staff on campus at that
time?

A.    No.  And like I said, I already had
other, like, mentors and things, so to me it just
wasn't, like, relevant.  I wasn't ever coming to
him for any type of coaching or mentorship.

Q.    I understand.  Tell me little bit
about this interaction you had with another
employee.  What was the name of the employee?
What was that interaction between you and her
like that you had earlier that day?  I think you
alluded to that earlier.

A.    Dr. Felicia Benton-Johnson, who I
would say was one of my mentors while at Georgia
Tech, but she -- it was mentioned that I met with
someone at another university as it relates to
Women in Engineering, and we just talked about
some different ideas and ways that her and I
could collaborate.

1          And Dr. Johnson, she essentially just
2    did not like that.  I think she felt like I was
3    kind of stepping on her toes a bit with what
4    happened.
5          So like I mentioned earlier, when I
6    was in the break room with Mitchell, he gave me a
7    little bit of background information about just
8    what -- because Dr. Benton-Johnson was over CEED,
9    so he gave me a little background information
10   about, like, things that they're doing.  And I
11   relayed to him, I was, like, "Oh, yeah," like,
12   "that's completely separate and completely
13   different than what I was doing, so it's fine,"
14   and we moved on.
15         So when I met with Damon and just
16   kind of debriefed him, his comments were, like I
17   said, that "She is disgruntled and unhappy.
18   You're young, energetic, you're prettier than
19   her, so that didn't have anything to do with
20   you," and da-da-da-da, and then the
21   coaching/mentor -- coaching and mentorship thing
22   came up.
23   Q.    What was the -- I mean, you describe
24   it in some Title IX documents that you filed that
25   the interaction between you and Dr. Johnson was

1  weird.  What was the nature of the interaction?

2  Was it a conversation?  Was it passive

3  aggressive?  You know, what was the nature of

4  that conversation, or that interaction?

5        A.    So as I mentioned, it was in a

6  meeting.  Like, it was a full -- it was an

7  academic meeting that Mitchell, Dr. Mitchell was

8  leading, so -- and it was just weird.  I think, I

9  mean, you could hear, like, as she was asking me

10 questions about, like, what we met about and

11 different things, that she was a little, I would

12 say, passionate about what she was saying and

13 asking me.  Like, I could tell that it was kind

14 of like a touchy subject, but that was it.  Like

15 we didn't -- there was no type of combativeness,

16 no type of disrespect or anything like that.

17       Q.    And you told Dr. Williams about that

18 interaction?

19       A.    Yes.

20       Q.    Did he see that interaction?  Was he

21 in that meeting?

22       A.    No, he was not.  Mitchell was in the

23 meeting, and that's why he, like I said, gave me

24 some background about why she was probably

25 feeling the way that she felt, and that's that.

1      Q.     Were you aware of any prior history?

2   Did Mitchell tell you or did you ever -- at that

3   time, did you know of any prior history between

4   Dr. Johnson and Dr. Williams?

5      A.     No.

6      Q.     What have you learned -- have you

7   learned anything about their particular working

8   relationship or history since this time frame?

9      A.     No.  I think it was brought up in the

10  Title IX meeting, in the ultimate decision

11  letter, that there some type of -- there was some

12  type of tension, maybe, between them two, but I

13  don't have all the details on why or any of that.

14     Q.     Did he ever tell you why he made the

15  comment about allegedly saying you were younger

16  and prettier the Dr. Johnson?

17     A.     Did he tell me why he said that?

18     Q.     Yes.

19     A.     No.

20     Q.     Moving on to, I believe the two of

21  you were looking over an organizational chart

22  next in your meeting.  Does that ring a bell?

23     A.     In his office, yes.  This was --

24  yeah.  So he did ask me to come to his office to

25  look at an org chart and copy it.

1          Q.    All right.  And then you allege that
2     he was looking at your BuzzCard during this
3     meeting.
4          A.    Yes.  So --
5          Q.    Is that accurate?
6          A.    Yeah.  And his office is pretty
7     small, but I was sitting in one of the two chairs
8     that he has across from his desk, turned, copying
9     the org chart.  But I could see out of my, like,
10    side, peripheral vision, him looking at my
11    BuzzCard and, like, sliding the picture, like
12    right here.  He was sliding it out, like, looking
13    at it on the table, like, sliding it out of the
14    holder and, like, looking at the picture.
15         Q.    Why do you believe he was looking at
16    it?
17         A.    I don't know why he was looking at
18    it.  It was -- it was kind of odd, just staring
19    at my picture.
20         Q.    Why odd?
21         A.    Because that's my BuzzCard.  I was
22    sitting there, copying the thing, and it was
23    happening where maybe he thought he was, like,
24    behind me.  But to stare at my picture, I think
25    that's -- I do think that that's weird.

1          Q.     It's odd because it's weird.  Why do

2     you say it's weird to stare at your picture?

3          A.     Why is it weird for someone to stare

4     at my -- at, like, at my BuzzCard?

5          Q.     Yes.

6          A.     I'm unsure of how to answer that.  I

7     mean, yeah, I don't know.  I don't know how to

8     answer that.  I just think that it's odd for a

9     man to -- like, why is he looking at my picture?

10    Like, why is he looking at my picture?  What is

11    he -- what is he thinking?

12              And, again, on this date, like, has

13    made comments about my appearance and, like,

14    yeah, I think that -- and for it to be happening,

15    like, behind me where maybe he was thinking that

16    I couldn't see him doing it.

17              But to just stare at my picture after

18    making lots of comments about my appearance and

19    then even calling me pretty or prettier than

20    someone and staring at my picture, all of those

21    details together just make me uncomfortable with

22    the idea of someone staring at a picture of me.

23         Q.     How long did he, or can you estimate

24    he looked at your pictures for?

25         A.     I -- I do not -- I do not know the

1    answer to that.

2        Q.    Okay.  Lastly, on this day you allege

3    that Dr. Williams asked you to take notes during

4    another meeting.  You allege in your Complaint

5    that you were bothered by this as it was, quote

6    "outside your job description."  Does that still

7    -- is that still your testimony?

8        A.    Yes.  He had Lauren come.  I was in

9    the middle of meeting with a student, helping her

10    with a grad school application, and Lauren came

11    to me as if it was, like, urgent or something,

12    and all he wanted me to do was take notes and sit

13    in on a meeting.

14            So, yeah, it was -- I was tied up.  I

15    had other things to do.  I mean, I was being

16    interrupted, and it wasn't like this was on my

17    calendar or anything like that.  And a random

18    meeting just to ask me to come and take notes for

19    him is outside my job description.  Like, he has

20    an assistant and other people who could do that.

21        Q.    Did you take notes at the meeting?

22        A.    I had to come late.  By the time I

23    came, I believe a student might have been in

24    there helping to take notes.  I can't recall if I

25    did -- still did or did not.  I don't remember.

1      Q.    All right.  Did you ever submit any

2  notes from this meeting, if you can recall?

3      A.    I can't -- I can't -- I can't

4  remember.

5      Q.    Just to clarify, was it Lauren Morton

6  who told you that Dr. Williams wanted you to take

7  notes at the meeting, or did Dr. Williams

8  personally himself tell you that he wanted you to

9  take notes?

10     A.    I think -- I think it was maybe

11  Lauren Morton who told me.

12     Q.    You also allege that you were

13  frustrated because Damon was presenting the

14  sexual harassment concerns at internships as his

15  own concerns when it was your concern.  So why

16  were you frustrated by that?

17     A.    I don't like it when people present

18  something as their own thoughts or ideas when

19  they're not, when they're mine.

20     Q.    So this was a sexual harassment

21  training meeting, or what was the context of this

22  meeting?

23     A.    No.  It was a meeting with the VP.  I

24  can't remember her official title and I can't

25  remember the person's name, but at the time I

1  know Chris Griffin was in the meeting.  She was
2  part of the Title IX team, and they were just
3  talking about harassment issues on campus, I
4  think, or some type of thing like that.

5          During one of the early meetings when
6  I was telling Damon about my experience with
7  Women in Engineering, that is an issue that I
8  brought to his attention, that some of our
9  students have experienced harassment during
10 co-ops or internships and different things like
11 that.

12         So it is a conversation that him and
13 I had, and at this meeting in particular he was
14 sharing these things as if it was his thoughts or
15 ideas, or something along those lines.  So I
16 think anyone probably would be, like, frustrated
17 if someone is taking credit for your ideas or
18 things that you've done, or whatever the case may
19 be, and present them as their own.

20         Q.    Were you supposed to be presenting
21 this meeting?

22         A.    I was not aware of the meeting until
23 last minute when Lauren asked me to go, or to
24 attend.

25         Q.    And if the issue is -- if the issue

1  was harassment faced by students at their

2  internships, why did it matter whose concerns

3  they were, if they were yours or Dr. Williams'?

4  Could he not have shared them?  Could he not have

5  shared the concern?

6      A.    It's not that you can't share them,

7  but you should mention how it was brought to your

8  attention or just -- there's a difference between

9  just giving information as if it's your own idea.

10 There's a difference between -- yeah, there's

11 just a difference between stealing someone's

12 ideas and thoughts and crediting -- and

13 presenting them as if they're your own versus

14 sharing something and giving credit to where it's

15 coming from.

16      Q.    Okay.  So at the end of the day on

17 December 1st you said you called Lauren Morton

18 and had a phone call with her.  Is that still

19 accurate?

20      A.    Yes.

21      Q.    All right.  And do you recall asking

22 her if she thought that, let's see, is it the

23 interaction -- after the academic team meeting,

24 do you recall her telling you that she didn't

25 think it was inappropriate?

1       A.    Yes.

2       Q.    Great.  Do you recall her saying

3 anything about taking him up on his mentorship

4 offer --

5       A.    I remember her saying --

6       Q.    -- or at least discuss it?

7       A.    Yeah, I remember her saying something

8 along the lines of, like, "Oh, well, if he wants

9 to mentor you, then maybe you should."

10      Q.    Did she express any concerns to you

11 about Dr. Williams and his behavior?

12      A.    No.

13      Q.    All right.  I'd like to try and get

14 through at least December.  I am only about

15 halfway done here.  We're going to -- I'm going

16 keep -- I'm going to ask you a little bit more

17 about these meetings in December, and then I

18 think we'll probably break for lunch and come

19 back after.

20         So I'm going to move on to December

21 7th.  It sounds like a virtual meeting.  Do you

22 recall a virtual meeting between you and

23 Dr. Williams on December 7th?

24      A.    Yes.

25      Q.    Okay.  You allege in your Complaint

1    that he was unhappy with the virtual meeting

2    because he liked to meet in person.  Did this

3    upset you somehow?

4         A.    We work in a -- I mean, did it upset

5    me?  I mean, it was just kind of -- I didn't

6    understand why, given we had virtual meetings all

7    the time, we're in a hybrid work environment, so

8    there's no need to meet in person all the time.

9         Q.    Understood.  This was the meeting

10   where I believe you allege that he offered a

11   shoulder to cry on since your grandmother had

12   passed, was that correct?

13        A.    Yes, he did.

14        Q.    All right.  And then he offered his

15   services as a pastor.  Do you know him to be a

16   pastor?

17        A.    He's mentioned -- he mentions it a

18   lot.

19        Q.    All right.  Are you aware if he

20   offered his services to anybody else --

21        A.    I'm not aware --

22        Q.    -- for other things?

23        A.    I would not know that.

24        Q.    And then it says -- you also allege

25   that during this meeting he informed you that

1    Dr. Benton-Johnson would be leaving, and that he,

2    Dr. Williams, would be serving as the interim

3    director of Women in Engineering and CEED,

4    correct?

5         A.    He did say that.  Later Dawn did

6    mention that that's not even possible for him to

7    be interim director given his role, but that is

8    what he said.

9         Q.    Okay.  How long did he said he would

10   be the interim director for?

11        A.    He didn't give a time -- he didn't

12   give a time frame.

13        Q.    Do you recall why Dawn said that it

14   would have been impossible for him to serve as

15   interim director?

16        A.    Because he's the associate dean.

17   Like, he is over those -- like, he would be over

18   the interim director or something.  I don't

19   remember the exact, like, reasoning behind it,

20   but she did say that, like, he could not serve as

21   interim director as the associate dean.  But he,

22   either way, he didn't do any -- perform any WIE

23   duties during that time.  I was.

24        Q.    I'm going to move on to December

25   15th now.  There were two meeting on -- well, I

1    guess two interactions that day.  The first one

2    is a one-on-one meeting between you and

3    Dr. Williams; is that -- on December 15th.  I

4    believe it was a one-on-one meeting.  Do you

5    recall meeting with him on that day?

6         A.    Yes.

7         Q.    Do you recall him telling you you

8    weren't needed at a particular meeting for

9    administrative needs?  Oh, I'm sorry -- Strike

10   that.

11             It's your allegation that you weren't

12   necessary at a particular meeting -- I'm not sure

13   of the context of the meeting -- that day, but he

14   invited you anyway.  Was that your understanding?

15        A.    Yes.

16        Q.    Why --

17        A.    And I believe I was helping him to

18   take notes -- I was helping him to take notes

19   on --

20        Q.    Why do you feel --

21        A.    -- that day.

22        Q.    Sure.  Why do you feel he invited you

23   to that meeting?

24        A.    I don't know.  I mean, I have notes

25   and I'm pretty sure I probably sent this to him.

1  So, yeah, I'm wondering if it was just for me to

2  take notes for him, because I didn't have

3  anything really to do with that meeting.  It was

4  to discuss admin needs for someone else.

5      Q.   And this is the interaction where you

6  allege the Dr. Williams, quote, "looked you up

7  and down in a suggestive manner."  Is that your

8  accurate recollection from -- taking place at

9  that time?

10     A.   Yes.  When I walked into the room, he

11  looked me up and down.

12     Q.   You say it was a suggestive manner.

13  What made it suggestive?

14     A.   There's a way that people look at you

15  to suggest that you look good.  Like, when people

16  look you up and down, like, or -- I don't know

17  how to -- I can't -- I think it's just a common

18  way that people will look at you to suggest that

19  you look good --

20     Q.   Did he tell --

21     A.   -- and that's what the look --

22     Q.   -- you you look good?

23     A.   -- was.

24     Q.   Okay.  Did he tell you you look good?

25     A.   He told me with the way that he

1  looked at me.  It was suggested.

2        Q.     Understood.  It was suggested.

3  Understood.  You said that you responded by

4  making a disgusted face.

5        A.     Yes, I did.

6        Q.     How -- like, what was that face?

7        A.     Like -- (demonstrating).

8        Q.     Did you tell him you were

9  uncomfortable?

10        A.     I felt like the look should have

11  indicated that I was uncomfortable.

12        Q.     Later on he asked you to sit close to

13  him during a meeting with donors.  Do you recall

14  this --

15        A.     That meeting --

16        Q.     -- meeting?

17        A.     It was not during a meeting with

18  donors.  That meeting that I sat beside him with

19  on the 15th, because I have my notes right here,

20  December 15th, it was an admin meeting with

21  Ms. Lakeita and Cassandra Evans that he was

22  having on his laptop or iPad or something.

23  And, yeah, and so instead of just projecting it

24  to the screen, he asked me to sit beside him to

25  talk on the laptop with him or whatever.

1      Q.    Did he tell you why he asked you to

2   sit next to him?

3      A.    My only assumption could be because

4   he was holding the meeting on his laptop instead

5   of projecting it, but also it was kind of -- it

6   was just weird, because why would we be sitting

7   talking on your laptop when you're in a room with

8   a projector and you could project your screen?

9      Q.    Okay.  Did he try and make any

10   physical contact with you?

11      A.    I don't think so.

12      Q.    Did you ever tell him you were

13   uncomfortable sitting so close?

14      A.    No.

15      Q.    How close were you sitting together?

16   About how far away would you estimate?

17      A.    Two chairs beside each other.  In

18   terms of a physical estimate of, like, the

19   distance, I don't know.  I can't tell you.

20      Q.    All right.  And I'm going to go

21   forward to the team lunch that happened that same

22   day on December 15th.  Do you recall that lunch?

23      A.    Uh-huh (affirmative), yes.

24      Q.    Where was that?

25      A.    It was at a restaurant.  I can't

1    remember the -- I can't remember what restaurant

2    it was at.

3         Q.    Was it on campus or off campus?

4         A.    Off campus.

5         Q.    And --

6         A.    Go ahead.

7         Q.    No.  I'll let you finish.

8         A.    Oh.  It was a staff, like, holiday

9    luncheon, so for everybody in the dean's office.

10        Q.    How did you get there?

11        A.    I rode with -- in Damon's car in the

12   backseat.

13        Q.    Did you volunteer to ride in his car?

14        A.    No.  He asked me to.  He asked me if

15   I wanted a ride.

16        Q.    And what did you say?

17        A.    Yes, or, like, "sure."

18        Q.    How was the interaction?  Was he

19   insisting that you ride with him?  What was

20   that -- how did that go?

21        A.    He wasn't insisting, but since

22   another colleague was going to be there and I

23   wasn't going to be by myself, then I felt more

24   comfortable since it wasn't just me and him.

25        Q.    Who was the other colleague in the

1    car?

2         A.    There was two in the car.  LaJuana

3    was already going, he had said LaJuana and I, and

4    then on the way out we saw David, who also rode

5    in the car with us.

6         Q.    Sure.  Do you recall any of the

7    conversations that you had as a group at lunch

8    that day?

9         A.    Yeah.  We talked about -- there was a

10   CEED team at my table and Damon, and we just all

11   talked about, like, family and the holidays and

12   stuff like that.

13        Q.    Do you recall any conversations about

14   getting work done after hours?

15        A.    No.  I know one thing specifically I

16   said, and I said this in my interview for my

17   current job, I said I do not work after hours.

18   That was a work boundary for me, so that's been,

19   like, a consistent thing I've always said with

20   coworkers.  But I don't remember us ever talking

21   about being up late, working after hours or

22   anything like that.  And I know for certain I

23   never said anything like that.

24        Q.    So you don't recall anybody else

25   talking about that?

1       A.    No.

2       Q.    How many people were at this lunch?

3       A.    As a lunch -- I don't know.  The

4 whole dean's office.  Most of the people who work

5 in the dean's office.  So I don't know how many

6 people that is, but there was multiple

7 departments present.

8       Q.    More than 10?

9       A.    More than 10 people there that day?

10 Yes.

11       Q.    More --

12       A.    But at our --

13       Q.    -- than 20?

14       A.    -- table?  I mean -- yes.  Probably.

15       Q.    Okay.  So how many people were at

16 your table, then?

17       A.    The CEED team, so it was, Felicia

18 Valentina, Jackie, Jackie.  There was at least,

19 like, four people from the CEED team, and then me

20 and Damon, so that's, like, six.  And there might

21 have been a few extra, I can't remember, but

22 probably six of us.  At the very least, at least

23 six of us at the table.

24       Q.    So then Dr. Williams was at your

25 table?

1        A.      Yes.

2        Q.      At some point you allege that

3    Dr. Williams made the comment to you during this

4    luncheon, and I believe it's quoted, "your

5    friend, boyfriend, whoever he is to you."  That

6    made you uncomfortable.  Is that --

7        A.      That was not that -- that was not

8    that day.  That was a different day.

9        Q.      What day was that?

10        A.      I think that was maybe during -- I

11    don't remember.  Honestly, I can't remember what

12    day that was.  I know that comment was made, but

13    I can't remember it being on that day.  Like, I'm

14    -- yeah.  I know that comment was made.  I don't

15    know the specific day.  I can't recall off the

16    top of my head.  He may have said it at that

17    time, maybe.

18        Q.      Okay.  So you allege that this

19    comment, whenever it did occur, made you

20    uncomfortable.  Why did it make you

21    uncomfortable?

22        A.      "Friend, boyfriend, whoever that is,"

23    I mean, why did that make me uncomfortable?  It

24    just seemed like a -- again, demeaning,

25    derogatory type of comment to make.  Friend,

1    boyfriend.  Like, no matter what context it is,

2    it seems maybe a little dismissive, dismissive of

3    my relationship, dismissive --

4         Q.    Did he say anything about your

5    relationship not --

6         A.    Later he --

7         Q.    Did he say anything about it?

8         A.    Later he did make comments about my

9    relationship, or a time where he kept asking me

10   to tell him my boyfriend's name, so, yeah.

11        Q.    All right.  Do you recall any

12   specific conversations -- going back to the team

13   lunch, then, do you recall any conversations

14   about other people discussing getting work done

15   from bed --

16        A.    No.

17        Q.    -- late at night?

18        A.    No.

19        Q.    And then after the lunch you also

20   allege that you walked back to Tech Tower

21   together, and he made a comment about how your

22   hair looked.

23        A.    Yes, how nice my hair looked.

24        Q.    Was that all he said?

25        A.    I can't remember the specific

1    comment, but it was about my hair and my hair

2    looking nice.

3         Q.    Did you tell him -- first, did it

4    make you uncomfortable to have him say your hair

5    looked nice?

6         A.    Yes.  Because, again, there's just

7    lots of things happening in regard to my

8    appearance.  Like, lots of suggestive looks,

9    comments about my appearance.

10        Q.    Did you tell him you were

11   uncomfortable?

12        A.    No.  I just tried to ignore it.  I

13   think -- or just kind of dismiss it.

14        Q.    Did you give him another disgusted

15   look?

16        A.    No.  I don't think I -- I don't think

17   I really acknowledged it.  I just kept walking

18   into the building --

19        Q.    Did you tell anybody --

20        A.    -- (indiscernible) back into Tech

21   Tower.

22        Q.    Sure.  Who were you walking with at

23   the time?

24        A.    Him and I were beside each other.

25   LaJuana and David were in front of us.

1        Q.     I'm going to move to another exhibit.
2    So around this time, I think you had a -- let's
3    see.  Do you recall reaching out to Dawn Franklin
4    in HR about sort of working titles and job
5    descriptions, etc. in December of 2022, late
6    December?
7        A.     I know I reached out to her about it.
8    I can't recall when I did.
9        Q.     All right.  I'm going to share my
10   screen with you.  I have here an e-mail -- go
11   down to the bottom where it starts -- from you,
12   to -- from Desiree Turner to Dawn Franklin on
13   Wednesday, December 21st, 2022, Subject:  Job
14   descriptions.  Does this look like an accurate
15   e-mail that you sent to Dawn?
16       A.     Yes.
17       Q.     And then up she responds that, "We
18   have a Director of Women in Engineering position,
19   but not an Assistant Director or Associate
20   Director...I think WIE has given a working title
21   of Associate Director to the Educational Outreach
22   Manager position, but the official JCCS title is
23   Educational Outreach Manager, so we would follow
24   that job description."  Do you recall receiving
25   this clarification from HR about your title?

1      A.     Yes.

2             MS. WHITFIELD:  I'm going to enter

3      this as Defense Exhibit 10.

4                      (Exhibit 10 was marked for

5                      identification.)

6   BY MS. WHITFIELD:

7      Q.     So we got through December.  I can

8   come back to January after we take a break for

9   lunch, or would you prefer I go through -- or I

10  can go up through the Title IX hearing.

11            MS. WHITFIELD:  Does everybody need a

12     bit of a break?

13            MS. THURMAN:  Let's take a lunch

14     break.

15            MS. WHITFIELD:  Okay.  We will leave

16     it there, take about 20 minutes for lunch

17     and whatever else we need to do, and we

18     will pick back up here in about -- let's

19     call it 1:00 o'clock.  Does that sound okay

20     with everybody?

21            MS. THURMAN:  That's fine.  Can we do

22     1:15?

23            MS. WHITFIELD:  1:15?  Sure.  That's

24     fine.

25            MS. THURMAN:  Thank you.

1          (Off the record at 12:26 p.m. EST)

2                  --------------

3          (On the record at 1:16 p.m. EST)

4              MS. WHITFIELD:  We're back on the

5      record.

6   BY MS. WHITFIELD:

7          Q.    We last left off at the end of

8   December 2022, so I want to move forward to some

9   interactions on January 6th, 2023, that

10  Ms. Turner, you had with Dr. Williams.

11              The first interaction that you allege

12  is a group meeting where other individuals were

13  present, but Dr. Williams allegedly made a

14  comment in this group meeting in front of other

15  people about you had been scheduling, quote,

16  "unnecessary meetings," end quote, and

17  mistreating him.  Do you recall alleging those

18  comments?

19         A.    Yes.  Are we skipping the

20  conversation that I had with LaJuana about him?

21         Q.    No.  I'm going to get to that later.

22         A.    Okay.

23         Q.    Yes.  So do you recall those comments

24  in this group meeting?

25         A.    Yes.  I remember him making comments

1     about how he -- how he gets treated.  Like, "Oh,

2     see how she treats me" or something like that,

3     and, yes, making unnecessary -- scheduling

4     unnecessary meetings or something like that.

5          Q.    How did that -- do you recall how

6     the, you know, "mistreating him," quote, unquote,

7     do you recall how that conversation started or

8     anything like that?

9          A.    No.  Maybe I might have mentioned

10    like, oh -- I really don't remember.  I don't

11    know if I maybe made a comment about the meeting

12    or, like, "Oh, don't forget about our meeting" or

13    something like that, maybe.  I honestly can't

14    recall why he made those comments, but, yeah.

15         Q.    Who do you remember he made these

16    comments to?

17         A.    This was during a celebratory lunch

18    for somebody who was leaving my team, for Susan.

19    So there were a lot of people in the room.

20         Q.    All right.  Did he make them to

21    anybody --

22         A.    A lot of people --

23         Q.    I'm sorry.  Go ahead.

24         A.    Sorry.  I was just saying, a lot,

25    like, in the dean's office, we were all

1   celebrating Susan, so...

2       Q.   Do you recall him making this comment

3   to anybody in particular?

4       A.   No.

5       Q.   You allege that he said it in a

6   joking way, but that you felt it was aggressive.

7   What about it made you feel that it was

8   aggressive?

9       A.   Just the nature -- like, just the

10  nature.  I don't -- I never even scheduled

11  meetings for him.  Like, I mean, or had -- up to

12  that point there weren't many meetings that I

13  particularly asked for or anything like that.  I

14  was just doing my job and taking care of

15  business.

16          So for him to say I was giving

17  unnecessary meetings and stuff like that, it was

18  just still demeaning and simply not true.  And if

19  anything, up to that point he had asked me to sit

20  in on meetings and things I didn't feel like I

21  needed to be a part of, so...

22      Q.   Did he express any further that he

23  was angry with you or upset with you about these

24  meetings?

25      A.   Angry or upset?  No, I didn't

1    perceive it as anger.

2         Q.    So I want to move on to the

3    one-on-one meeting that the two of you had.  What

4    was the purpose of this one-on-one on January

5    6th?

6         A.    We had to go over my -- I can't

7    remember.  I know I sent him an -- e-mailed him

8    an agenda for that day, so -- and I know I

9    submitted that.  I don't know if you're able to

10   pull it up.

11        Q.    Yes.  I'm just asking if you

12   recall --

13        A.    Yeah --

14        Q.    -- what you can recall --

15        A.    -- I know I had, like --

16        Q.    -- at the time.

17        A.    I remember I had, like, three things

18   on the agenda for that day or something.

19        Q.    Sure.  So then you -- so you recall

20   going over your, you know, talking about your,

21   was it your job performance, I think you said?

22        A.    No, it wasn't about my performance.

23   We had to set new goals, new -- we had to set new

24   performance goals, because it was right after my

25   six-month probationary period.

1      Q.    I see.  And so this wasn't an
2  official performance review, then?
3      A.    It wasn't a review.  We had to set
4  performance goals because I had just had my
5  probationary period review.
6      Q.    Understood.
7      A.    So typically each year they have --
8  like, you have your performance goals I think in
9  the summertime, maybe, that you have to set, but
10 I had to do mine sooner because, again, it was --
11 January was right after my six months.
12     Q.    Who initiated the meeting, do you
13 remember?
14     A.    I don't remember.  I just remember me
15 having an agenda for items that we needed to
16 discuss for that day.
17     Q.    And I believe this day was the day
18 that you allege that he made some more comments
19 about your dress and appearance.  Do you recall
20 that?
21     A.    Yes, in addition to a lot of other
22 comments that were inappropriate.
23     Q.    Sure.  I'll get to those in just a
24 minute what you've alleged, but I do just want to
25 go through some of these allegations that you've

1    listed in your Complaint.

2              I believe the allegation was that he

3    told you you needed to dress up more, that you --

4    he never wanted you to wear jeans on campus.  He

5    offered to introduce you to his wife about

6    dressing in -- dressing as a woman in a

7    professional environment.  Do you recall these

8    comments?

9         A.    He didn't say that I could never wear

10    jeans.  What he said was that he would never be

11    caught dead wearing jeans on campus.

12         Q.    I understand.

13         A.    But what I was wearing that day, it

14    was a Friday, I was wearing -- which we're

15    allowed to wear jeans on Friday.  I was wearing

16    jeans, a weave polo, so a Georgia Tech Women in

17    Engineering shirt, and sneakers.  And he said

18    that I needed to dress up more if I wanted to be

19    taken seriously, is what he said.

20         Q.    Understood.  Do you feel that that

21    was because of your sex or your gender that he

22    made that comment?

23         A.    I do, because even then when he

24    mentioned, like, "Oh, maybe I should introduce

25    you to my wife, because maybe it would be better

1    coming from a woman." But I've never had any

2    complaints about -- I'm very professional. I

3    always dress professionally, so his comments were

4    kind of out of nowhere and unnecessary. And I've

5    never mentioned wanting any type of feedback from

6    him on how I dress or anything like that.

7         Q.    Did he ever mention anything about

8    you dressing sexier in the workplace?

9         A.    Dressing sexier?

10         Q.    Yes.

11         A.    What do you mean?

12         Q.    Did he ever tell you that he wanted

13    you to dress a certain way that would appeal to

14    him sexually?

15         A.    He said that I should dress up more.

16    Like, when I was -- the day that he looked at me

17    suggestively by looking at me up and down and

18    complimenting my hair, on that day specifically I

19    was wearing, like, a blazer, slacks and, like, a

20    buttoned-down top.

21         Q.    What I'm asking is if he ever told

22    you you need to dress --

23         A.    His specific words --

24         Q.    I'm sorry, if I could finish the

25    question.

1          A.     Yeah.

2          Q.     If he ever told you to wear any more

3   revealing clothing at work, or to dress in a way

4   that he liked that, you know, might be appealing

5   to him, did he ever explicitly say any of those

6   words to you?

7          A.     No.

8          Q.     Do you think that workplace attire

9   should've been discussed at all?

10         A.     No.

11         Q.     If a woman had discussed your

12  workplace attire with you, would you have --

13  would it have been welcomed?  Unwelcomed?

14         A.     No.  I know how to dress as a

15  professional -- I know how to dress

16  professionally.  I was not seeking any feedback

17  for how I show up to the workplace.

18         Q.     All right.  Now, getting to the

19  headshot discussion, I know he -- were you

20  looking at -- how did the discussion of your

21  headshot come up?  Let me ask that.

22         A.     This is, again, him going on to

23  continue to give me unwarranted and un- -- like,

24  I was not seeking for him to give me any type of

25  feedback.  But after talking to me about what I

1    wore that day, he mentioned that my headshot, I
2    needed to take a new one because it looked like a
3    Facebook photo, and that I needed to do a new
4    one.  So when I do, I need to wear my hair in a
5    bun, wear glasses, and find somewhere on campus
6    to take a new headshot.
7                He then showed me -- started pulling
8    up Google images of -- well, he showed me other
9    people on campus, showed me their head shots and
10   said that I needed to have some photos that
11   looked more like these people.  I expressed that
12   I thought my picture was fine, and if I wanted to
13   wear my hair down, that that's not -- that
14   shouldn't be an issue.
15               He did mention, like, "Oh, well, look
16   at what color these other people are," so, like,
17   essentially, like, that me as a black woman can't
18   just wear my hair down or show up as myself,
19   which is basically what I was saying.
20               He made additional comments about me.
21   He's, like, "Do you see any other people on
22   campus or leaders who have tattoos and piercings
23   like you do?"  He showed me pictures, he just
24   kept showing me pictures of women on Google and
25   said that when I was laying in bed that night

1   with my boyfriend at the time, when I'm in bed

2   with Ray tonight, look through these pictures and

3   pick the pose that I would like to do for a

4   headshot.

5           Additionally, during that meeting,

6   too, he kept asking, like, making -- asking me

7   questions about my boyfriend.  Like, "What's your

8   boyfriend's name again?  What's your boyfriend's

9   name again?  What's his name again?"

10          And so, yeah, he said when I'm laying

11  in bed with him that night, to look at head shots

12  and pick which pose I want to do and all of those

13  things.

14      Q.    All right.  The pictures he showed

15  you of other women as examples, were any of them

16  sexual in nature?

17      A.    No.  They were just Google images.

18      Q.    Were they for their headshots?

19      A.    Some were headshots.  I think some

20  were just, I think, women -- like, you could see

21  a full picture, but some were headshots, some

22  were not.

23      Q.    Did he ever talk about -- when he

24  made the comment about lying in bed with your

25  boyfriend, to choose, you know, pick out a

1  headshot, pick out a pose, did he ever talk about

2  anything that you and your boyfriend might do in

3  bed other than pick out a headshot?

4       A.    No, I don't think so.

5       Q.    Did he ever talk about anything

6  sexual between the two of you in bed while

7  picking out a headshot?

8       A.    Between me and my boyfriend?  No.

9       Q.    Yeah, between you and your boyfriend.

10       A.    No.

11       Q.    And the forgetting your boyfriend's

12  name, why was that important for him to remember?

13       A.    My boyfriend wasn't relevant to

14  anything that we were talking about, period, so

15  he didn't need to be brought up at all.

16       Q.    All right.  You then refer to -- the

17  conversation moves on -- oh, I'm sorry, one last

18  question.  Did he frame -- do you recall him

19  framing this discussion with you as, you know, a

20  discussion about your professionalism in the

21  workplace?

22       A.    No.  I've never had negative feedback

23  about my professionalism throughout my entire

24  career.  Even at Navy Federal I've always had the

25  highest ratings possible with my performance

1    reviews as a teacher, so I have never, in the

2    entirely of me being a professional, ever

3    received any type of negative feedback or

4    feedback in general about my professionalism that

5    was not positive.

6              So this was not a conversation that

7    was about, like, my professionalism in the

8    workplace or anything like that.  And it also

9    wasn't even a part of -- when we were talking

10   about goals, it wasn't a part of that either.

11        Q.    Do you think this would have been his

12   way to give you feedback on your professionalism

13   at work?

14        A.    No.  Again, like I said, it was not

15   warranted.  It was not welcome.  I, again, have

16   never received -- it would have been out of

17   place.  I am a professional, so I -- and what I

18   was wearing that day is not uncommon.  Other

19   people were wearing jeans that day.  He said he

20   wouldn't be caught dead wearing jeans on campus,

21   yet he has worn jeans on campus.  I've seen him

22   in jeans.  So there was no need to talk about my

23   professionalism or my appearance, because it just

24   -- it was out of place and out of the ordinary.

25        Q.    I want to move on to some of the

1  other discussions during this meeting.  This
2  conversation about a matching algorithm, do you
3  recall that conversation?
4       A.   Yes, I do.
5       Q.   What was the -- tell me little bit
6  about that.
7       A.   He told me, for one of my goals, he
8  just started talking about creating an algorithm
9  that would match our female students with
10  potential employers and sponsors.  He then
11  compared it to Tinder.  He was, like, "What's the
12  minimum height of someone that you would date?"
13  And I was taken aback by the question, and I was
14  like, "Well, I guess, like, someone taller than
15  me" or something like that.  And he was, like,
16  "All right.  Well, yeah, your profile would say
17  this and mine would say something like this, and
18  the algorithm would match us because that's how
19  the algorithms work and Tinder knows what you
20  like and what you're looking for," or something
21  like that.
22       Q.   Do you recall what he was talking
23  about, about a matching algorithm, before he went
24  into his example?
25       A.   He was just saying that it would

1 be -- like, for one of my goals, maybe it could

2 be creating this, creating an algorithm.

3     Q.    Did you know what an algorithm was at

4 the time?

5     A.    Yes.  I didn't need an extra

6 explanation for that.

7     Q.    All right.  I'm just going to go

8 through some of these.  Are you familiar with

9 Tinder and how it works?

10     A.    Yes.

11     Q.    And the matching algorithm on Tinder?

12     A.    Yeah.  I mean, I know how algorithms

13 -- I'm fully aware of what an algorithm is and

14 how they work.

15     Q.    All right.  But did you know that,

16 especially about Tinder at the time?

17     A.    Yes.

18     Q.    All right.  How did the light brights

19 comment come about?  You said he referred to

20 light-skinned black persons as, quote, "light

21 brights."

22     A.    Yeah.  I'm honestly not remembering

23 just the context of him -- why he said light

24 brights.  I don't remember, but I know he made

25 comments like that.

1    Q.    Can you recall any other time --

2    A.    (Indiscernible).

3    Q.    -- he might've said that?

4          I'm sorry.  Go ahead.

5    A.    Oh, sorry.  No, I was just saying

6    that I know that he makes, like, comments like

7    that or comments about race.  Like I was saying,

8    even with the headshot conversation, he was,

9    like, "Oh, do you see what color these people

10   are?"  Like, "You can't do that," like, if I

11   wanted to just wear my hair down and stuff like

12   that for my headshot.

13   Q.    And then he -- I think you allege

14   that he further took the conversation -- you say

15   that Dr. Williams told you that you could contact

16   him at 3:00 a.m. and he would answer, and that he

17   was a workaholic.  I note that you found it --

18   you describe it, I believe, in your Title IX as

19   odd and uncomfortable.  Why did you find it odd

20   and uncomfortable?

21   A.    For him to say -- he was, like,

22   "Well, if you needed something from me at

23   3:00 a.m., that would be okay."  Like, I wouldn't

24   ask you for something at that hour, but he would

25   be okay because he works all the time and things

1  like that.  But it was -- I would never reach out

2  to him at 3:00 a.m.  It was just -- that would be

3  an inappropriate time to reach out to him.

4      Q.    Did he ever invite you to reach out

5  to him after work hours, or especially late into

6  the night?

7      A.    Did he invite me out to anything?

8  No.

9      Q.    No.  Did he ever try to get you to

10  contact him?  You know, tell you that he would

11  like for you to contact him, something along

12  those lines, after work hours, late into the

13  night?

14      A.    No, he didn't say that he would like

15  for me to reach out to him at 3:00 a.m., but he

16  did say I could, and he would be available if I

17  did.

18      Q.    All right.  Did you take that as an

19  invitation?

20      A.    Did I take that as an invitation?

21  Yeah, I guess I would take it as, like, I had

22  permission to.

23      Q.    Did he ever make any attempt to

24  contact you -- other than e-mails saying, "You

25  can read this in the morning," you know, those

1  kinds of things, did he ever make any attempt to

2  contact you outside of work hours, at 3:00 a.m.?

3       A.    Not at 3:00 a.m.  When I got my

4  whatchamacallit, my -- when he was notifying me

5  that I was going to get a salary, like, my

6  supplemental pay, he did call me, like, after

7  work, but it was not late in the day or anything

8  like that.

9       Q.    And that was all you talked about

10  when he called you after work hours?

11       A.    I didn't answer my phone.

12       Q.    Oh, I see.

13       A.    He ended up e-mailing me.

14       Q.    And now I do want to get to the

15  conversation you had with LaJuana Ellis.  Was

16  this conversation -- when did this occur?  Was it

17  January 6th?

18       A.    I can't remember the specific day.  I

19  think it was -- it was that same week.  It was

20  before the interactions we just talked about took

21  place.

22       Q.    All right.  Was this your first time

23  speaking with her about Dr. Williams' behavior?

24       A.    Yes.

25       Q.    What did you ask her -- what was the

conversation that you had with Ms. Ellis?

A.    Yes.  I asked her if she was familiar with Damon, had she ever worked with him or knew anything of him prior to him joining the dean's office.

Q.    Did you mention any of the comments he made to you --

A.    Yes, I -- sorry.

Q.    You're fine.

A.    I'm so sorry.  I'm not trying to be rude.

Q.    I understand.  I also am -- I have a question and then I want to ask another question, too.  So I should be a little more concise there.

But did you mention any of his comments that he had said to you?

A.    Yes.  So pretty much the interactions that I described from, like, October to December, I shared those with her.  When I asked her, like, "Oh, do you know anything about him?  Have you worked with him before," she did say that she hadn't worked with him before, but he was, like, kind of overly familiar and just too personable in his conversations within the office.

But she mentioned that at that time

1    he was in the process of hiring two female tech
2    temps and wanted to pay them, like, over what is
3    typical, that he had, like, unusual requests for
4    his office and things like that.
5              I shared with her just what
6    interactions, like, made me uncomfortable,
7    especially with, like, overly complementing me,
8    excessive meetings, and just everything pretty
9    much that had taken place up to that date that
10   made me uncomfortable.
11             She had referred to him as an
12   "associate dean gone wild," and she actually
13   confided in me and shared with me a time where
14   she experienced harassment from a person that she
15   reported to prior to joining the dean's office
16   where someone had sent her -- given her an
17   inappropriate gift, basically.
18             And she was, like, "Well, I like that
19   you're not outright saying sexual harassment, but
20   inquiring about whether his actions would or
21   would not be," like, "what were or were not
22   appropriate," excuse me.
23             And then so she -- what she told me,
24   she did give me advice and she was, like, "Well,
25   next time something happens or he, like,

1   redirects the conversation, just, like, pray and

2   ask the Holy Spirit to help you and redirect the

3   conversation back to whatever you were, like

4   meeting about," or something along those lines.

5       Q.   Did she ever tell you of any

6   instances that she was aware that Dr. Williams

7   had engaged in inappropriate behavior with

8   others?

9       A.   No, she did not. I did hear that

10   from other -- I did hear -- get that from other

11   people, but not her.

12       Q.   Do you recall Ms. Ellis comparing

13   Dr. Williams to her husband at all in this

14   conversation?

15       A.   No. She did mention that in her

16   Title IX hearing, but I don't recall her ever

17   mentioning that or comparing him to her husband

18   when we -- when her and I had a conversation.

19       Q.   What do you remember the

20   associate-dean-gone-wild comment was? Was she

21   referring to any one specific thing in

22   particular?

23       A.   I think it was just a culmination of

24   things.

25       Q.   Do you think she was talking about

1   his alleged behavior towards you --

2          A.    I think --

3          Q.    -- with that comment?

4          A.    I think that was included, yes.

5          Q.    So just to clarify what she told you

6   about a previous sexual harassment issue that she

7   had faced, just clarify.  She wasn't referring to

8   Dr. Williams, right?

9          A.    No, she was not.

10         Q.    All right.

11         A.    But she shared that with me.  Like,

12  she shared her own sexual harassment story when I

13  was sharing with her what was happening with me.

14         Q.    Of course.  I know you mentioned that

15  in your interrogatory response, I think she

16  mentioned -- Ms. Ellis mentioned to you that she

17  had received lingerie as a gift from the person

18  who had harassed her.

19         A.    Right.

20         Q.    I just want to be clear.  Did

21  Dr. Williams ever give you any kind of gifts of

22  that nature?

23         A.    No.

24         Q.    Did he give you any gifts at all?

25         A.    No.

1      Q.    Okay.  I want to move on to -- I want

2    to talk about it a little bit more in detail in

3    just a minute, but first I do want to go into

4    some, you just kind of alluded to it a second

5    ago, some allegations that you had heard of from

6    other individuals about Dr. Williams' behavior.

7    So I just want to see -- I do believe in

8    interrogatory -- here.  Let me share my screen

9    with you.

10            I believe you previously indicated in

11   your interrogatory response No. 16 -- I believe

12   it was this -- this is the one, too, and I'll

13   show it to you again, just so we're on the same

14   page.

15            No. 16, I believe, yes, the

16   highlighted portion in italics.  Can you see what

17   I'm referring to at this time, a BME student?

18        A.    Yes.

19        Q.    All right.  So who was this BME

20   student?

21        A.    Her name is Julia.

22        Q.    Julia --

23        A.    She's graduated now.

24        Q.    -- what?

25        A.    François.

1      Q.    She's graduated, you said?

2      A.    She's already graduated, yes.

3      Q.    Okay.  And you said that she alleged

4  that -- you allege that, "She came to the office

5  looking for him, saying he told her to come by

6  after the break.  After talking with the student,

7  she told me that he's also called her personal

8  cell phone after another student gave her phone

9  number to him."  Is that still your testimony?

10     A.    Yes.

11     Q.    Did she allege to you that he did

12 anything inappropriate by calling on the phone?

13     A.    She said that he called her in the

14 evening, it was after work hours, that he got her

15 phone number from another student, Sidney, and

16 that she was confused as to, like, why he was

17 calling her.  Like, she answered and just, like,

18 "Oh, how did you get my phone number?"

19     Q.    She was, like --

20     A.    And he was calling -- go ahead.

21     Q.    No.  You can finish.

22     A.    Yeah.  He was -- I can't remember

23 exactly what he asked her or was talking to her

24 about.  I want to say that maybe he was just

25 asking about helping her to, like, get -- maybe

1  get an internship or something like that.

2      Q.    So just to clarify, she did not tell

3  you about any inappropriate behavior from him on

4  the phone call?

5      A.    Inappropriate in the sense of what

6  exactly?

7      Q.    Any sexual behavior, asking to see

8  her after work, you know, any of the other sort

9  of similar -- similar things that you've alleged

10  in your Complaint, anything like that.

11      A.    I won't say that she said that he

12  said or did anything sexual, but I do think she

13  found it odd, as well, though, that he got her

14  phone number from another student and called her,

15  reached out to her to offer her assistance that

16  she was not necessarily seeking him out for.

17      Q.    Just for the record's clarification,

18  I think you went into it a little bit in the

19  Title IX hearing, but what does BME mean?

20      A.    Biomedical Engineering.

21      Q.    And what does ISYE mean?

22      A.    Industrial Systems Engineering.

23      Q.    Did you tell Ms. Françoise about any

24  of your interactions with Dr. Williams?

25      A.    No.

1      Q.    Okay.  We're going to go up to

2   Interrogatory No. 1.  We're going to talk about

3   No. 2, Cassandra Evans.  If you want to pause for

4   second and reread what you wrote, then just let

5   me know if that's still your testimony.

6      A.    That she may have knowledge of his

7   conduct during this period, including actions

8   that appeared or intended to discredit or

9   belittle me following my report?

10     Q.    Yes.

11     A.    Yes.

12     Q.    All right.  Have you spoken with

13  Ms. Evans yourself about these allegations?

14     A.    No, I haven't spoken with her in

15  quite some time.  At the time, though, she was

16  his assistant, and kind of also just made her own

17  comments to me.  Like, because we were working

18  together at the time that Susan left, she kind of

19  was supporting Women in Engineering.

20     Q.    What comments did she make to you?

21     A.    Kind of just like to cross my T's and

22  dot my I's, making sure I'm crossing my T's and

23  dotting my Is, because she is privy to

24  conversations and things that he is saying and

25  doing.  She didn't really elaborate further than

1    that, but...

2         Q.    Did she -- do you have any sort of

3    documents or e-mails, texts about Dr. Williams'

4    behavior with Cassandra Evans?

5         A.    Outside of anything that I provided

6    that she was copied on, no.

7         Q.    And what about No. 3 here?  This is

8    still in Interrogatory Response No. 1, but it's

9    -- is it Markyta Holton?

10        A.    Yes.

11        Q.    If you could reread that and let me

12   know if that is still your testimony.

13        A.    It's still my testimony.

14        Q.    All right.  What sort of

15   inappropriate behavior did she allege that

16   Dr. Williams engaged in?

17        A.    Recently she shared that he did

18   something with her, like walking around her in a

19   circle, looking her up and down in a suggestive

20   manner.  There was another staff member present,

21   her name is Kristin, during that interaction.

22   And, yeah, I think just suggestive commentary and

23   behaviors.

24        Q.    What in particular are you aware of?

25        A.    What I just shared with you.

1    Q.    So you don't know any details besides
2    the walking around?
3    A.    I haven't gotten into the specific
4    details with her, outside of her just saying that
5    she's been warned about him -- that she's been
6    warned about him, her own experience with him
7    being inappropriate and making inappropriate
8    comments or looking a certain way, and walking
9    around her and looking at her appearance and
10   different things like that.
11        Q.    Do you know who warned her about
12   Dr. Williams?
13        A.    I don't know who warned her about
14   him, no.
15        Q.    So when did you decide to -- what led
16   you to file a complaint about Dr. Williams?
17        A.    After my last interaction with him
18   where he mentioned me being in the bed and made a
19   lot of comments about my appearance and the
20   Tinder algorithm and those things, I knew that
21   the uncomfortableness that I had been feeling and
22   how he was behaving towards me had reached a
23   point to where I needed to say something because
24   it was at that point, I felt, extremely
25   egregious.

1          And so that next week I did go to

2     Dr. Benton-Johnson, because I just kind of wanted

3     to make sure that what I was feeling was -- just

4     wanted to confide in someone I could trust to

5     say, like, "This is what's happening and this is

6     what I'm experiencing," and she walked with me to

7     go to report my experience with harassment to

8     Dawn.

9          Q.    Was --

10          A.    It was not her egging me on in any

11     way.  She was not hyping me up in any way.  It

12     had pretty much at that point already been

13     decided on my end that this was inappropriate and

14     I needed to tell someone and do something about

15     it, and she just walked me -- walked me through

16     it, essentially.

17          Q.    So it was your idea to go file the

18     complaint?

19          A.    Yes.

20          Q.    Do you recall who you spoke with

21     first in filing your complaint?  I think you said

22     Dawn?

23          A.    Yes.

24          Q.    What did she tell you?

25          A.    I described everything that had

1    happened, and then she was, like, "Okay.  Stop

2    right --"  Like, she kind of stopped me once I

3    got to the point of him mentioning me being in

4    bed with my boyfriend, scrolling through looking

5    at headshots and the Tinder comment.  She said,

6    like, "Okay.  Well, you don't have to share

7    anything further" and kind of directed me to

8    Chris Griffin.

9         Q.    Were you able to interact with

10   Dr. Johnson at all during this complaint process?

11        A.    Was I able to interact with her or

12   was I interacting with her?

13        Q.    Both.

14        A.    Would I have been able to?  Yes.

15        Q.    Were you interacting with her?

16        A.    No.

17        Q.    Was she there in the room with you?

18        A.    When I went to go to Dawn?  She -- I

19   -- I honestly don't remember.  She might've been

20   there for a moment, but I'm pretty sure she went

21   to go talk to the dean or something during that

22   time, so I largely remember me and Dawn having

23   our own conversation outside of her being around.

24        Q.    Do you recall her being out in the

25   hallway at all while you were talking with Dawn?

1    A.    Like I said, I think she went to the

2  dean's office.  I don't know where she -- what

3  she was doing.

4    Q.    Did Dr. Johnson tell you anything

5  about Dr. Williams before you went to go

6  complain?  I'm sorry, not complain.  Make a --

7  file a complaint.

8    A.    Did she tell me anything about

9  Dr. Williams?

10    Q.    Yes.

11    A.    The only --

12    Q.    After -- sorry.  I was going to say

13  after you confided in her about what was going on

14  and before you went to go file your complaint,

15  what did she tell you?

16    A.    I honestly don't recall.  Yeah, I

17  don't really -- I don't know.  I mean, she was --

18  when I was sharing with her, I was very upset,

19  and I remember her just kind of, like, validating

20  that what I was -- validating how I felt, and

21  just feeling really bad about what I was going

22  through.  And, yeah, I don't recall her sharing a

23  lot of details about Damon or anything like that.

24    Q.    All right.  And so then Dawn referred

25  you immediately to the Title IX office?

1          A.     Yes.

2          Q.     Do you remember who you spoke with

3     first --

4          A.     Chris Griffin.

5          Q.     -- in the Title IX office?

6          A.     Chris Griffin.

7          Q.     Chris Griffin.  Okay.  And was that

8     the same day, that conversation with Chris

9     Griffin?

10         A.     I think so.

11         Q.     Let me -- I'm going to share -- what

12    I'm going to do, we're going to get into your

13    Title IX process.  I'm basically just going to

14    upload a lot of documents for you to review, and

15    we'll go over them.  I might ask a couple of

16    questions, but most of them, we'll see.  I'm sure

17    you've seen a lot of these, so just stick with

18    me.

19              What I have is an e-mail from -- I'm

20    going to go to the very bottom because e-mails go

21    from bottom to top sometimes, so an e-mail from

22    Chris Griffin to -- it's a very long e-mail -- to

23    Desiree Turner on Wednesday, January 11th, 2023,

24    Subject:  Title IX Communication regarding

25    complaint.  Does this look -- does this look

1    like -- can you identify this document?  Have you
2    received it?
3          A.    Yes.
4          Q.    Do you recall this e-mail between
5    yourself and Chris Griffin?
6          A.    Yes.
7          Q.    And then -- so do you recall this
8    e-mail basically going through the steps of the
9    Title IX process with you?
10         A.    Yes.
11         Q.    Did he go -- is Chris a man or a
12   woman?
13         A.    A woman.
14         Q.    All right.  Did she go over the
15   process with you in your discussion together?
16         A.    Yes.
17         Q.    What else did --
18         A.    I believe so.
19         Q.    -- you discuss?  Oh, I'm sorry.
20         A.    I was saying yes, I believe so.
21         Q.    All right.  What else did you discuss
22   in your initial meeting with Chris Griffin?
23         A.    I think just, like, what
24   accommodations I might have in the meantime.
25                MS. WHITFIELD:  All right.  I'm going

1          to mark this as Defense Exhibit 11.

2                         (Exhibit 11 was marked for

3                         identification.)

4    BY MS. WHITFIELD:

5          Q.    And then do you recall what Chris

6    Griffin told you would happen next in the

7    process, other than the accommodations?

8          A.    I think I had to meet with -- I think

9    I had to meet with someone, a Holly.  I can't

10   remember if she said exactly -- like, this was a

11   while ago.  I don't remember, like, what was

12   said.  I think the next thing, though, that I did

13   is I started being interviewed by Holly.  I think

14   that was her name, Holly.

15         Q.    All right.  We'll get to that in just

16   a moment.  I have here an Option for Informal

17   Resolution.  You did have the option for that.

18   Is there -- did you consider informal resolution

19   to this process at any time?

20         A.    Did I consider the informal

21   resolution?

22         Q.    Yes.

23         A.    No.

24         Q.    Why not?

25         A.    Because it just, to me, didn't seem

1  like the best course of action.  I wanted to -- I
2  think that especially given the situation, that
3  if it was happening to me, then it could
4  potentially be happening to someone else, and I
5  just didn't think that an informal resolution was
6  really going to solve anything.
7          Q.    All right.  And then Support Services
8  and Interim Measures highlighted here in the
9  middle of the page, they give you, it looks like,
10  a couple of -- well, these are more programs, I
11  guess.  Do you recall how many interim measures
12  they gave you while the investigation was
13  pending, how many options they gave you?
14          A.    What do you mean?
15          Q.    Do you recall what kind of interim
16  measures they gave you as options?  So, you know,
17  related to contact with Dr. Williams, related to
18  where you were going to be working.  Do you
19  recall them, you know, going through some options
20  with you about him?
21          A.    Yes.  They allowed me to work from
22  home during the time, as needed, and to
23  communicate with Damon via e-mail.  And I think
24  we just didn't have to have any additional, like,
25  any one-on-one meetings or something like that,

1  if I'm not mistaken.

2          Q.    Did you -- and I'm going to get to

3  those in just a second.  So I just wanted to make

4  sure that they gave you the option.

5             All right.  I'm going to open another

6  document here.  This is -- it says Sexual

7  Misconduct Complaint Form.  The name of the

8  person filing this complaint, Desiree Turner.

9  Dates of Incidents, and then you wrote a

10 narrative attached to it.  Do you recall drafting

11 this document or filling this document out?

12         A.    Yes.

13         Q.    All right.  There's no signature, but

14 is this your allegation of what happened, to the

15 Title IX office?

16         A.    Yes.

17             MS. WHITFIELD:  Okay.  I'm going to

18         enter this as Defense Exhibit 12.

19                          (Exhibit 12 was marked for

20                          identification.)

21 BY MS. WHITFIELD:

22         Q.    I've uploaded another document here

23 dated January 18th, 2023, to Desiree Turner.

24 This is from, if I scroll down to the bottom,

25 this is from Chris Griffin.  Do you recall

1   receiving this letter?  This is the Notice of

2   Investigation.  Do you recall receiving this?

3        A.    Yes.

4        Q.    All right.  And we talked a little

5   bit about the interim measures that were in place

6   at the time that you -- oh, here they are,

7   Page 3, Interim Measures, in this paragraph right

8   here.  Does that look -- this paragraph right

9   here where it starts with "Complainant and

10  Respondent," does that look like an accurate

11  representation of the interim measures that you

12  had in place at the time?

13       A.    Yes.

14       Q.    All right.  Did you interact with

15  Dr. Williams after these interim measures were

16  put into place?

17       A.    The only ways that we interacted were

18  through e-mail, or -- and I believe at one point

19  maybe, like, a team meeting of some sort, but

20  otherwise, no.

21       Q.    Did you report to him --

22       A.    Yes.

23       Q.    -- after these were put in place?

24       A.    Yes.

25       Q.    Okay.  Did having these interim

1    measures in place impact your ability to do your

2    job?

3           A.    I would say maybe a little.  Like, at

4    this time I was running the Women in Engineering

5    Program by myself in the spring.  It's a very

6    busy time with planning for the banquet,

7    administering scholarships, and also our outreach

8    programming.  So all of that was under my plate.

9    And so just working, working from home or just

10   trying to, like, manage all of that in a little

11   more -- it was a little more isolating at home

12   instead of being, like, on campus, and just

13   collaborating or learning from others or

14   different things like that.

15           I was able to get everything -- I did

16   get everything done, and there were times where I

17   had to be on campus, and so -- but it was

18   isolating to go from being more present on campus

19   and those types of things to then going home and

20   trying to be effective and still feel like I'm

21   part of that team environment.

22           Q.    Did you choose to work from home

23   during this time, or was that option -- were you

24   told to?

25           A.    It was an option, so I wasn't forced

1  to stay at home.  And I did have to go to campus

2  sometimes, so I still went to campus.  But like I

3  said, it was still just different, a different

4  dynamic.

5      Q.    Okay.  And then on page, this next

6  page here, you were told an investigation would

7  be conducted.  Do you recall that?

8      A.    Yes.

9      Q.    Were you in contact with the Title IX

10 investigator, whoever it -- do you recall who the

11 investigator was?

12     A.    I think it was Holly.

13     Q.    Do you remember her last name at all?

14     A.    I think that's her name.

15     Q.    Okay.  Do you remember her last name

16 at all?

17     A.    I don't.

18     Q.    So were you in contact with Holly

19 from about January to July, 2023?

20     A.    Say that again.  I'm sorry.

21     Q.    Let me strike that.  How many times

22 were you in contact with Holly, or anybody from

23 the Title IX office who was investigating this

24 case, from January until July of 2023?

25     A.    How many times?  I do not know.  I

1    know with Holly specifically we met multiple

2    times.  There were a lot of discrepancies after

3    our interview, and, like, lots of going back and

4    forth with her just getting the -- getting an

5    accurate representation of everything that I

6    shared.

7          Q.    What were some of the things that she

8    got that were -- that you think were inaccurate?

9          A.    I really can't tell you.  I'm pretty

10    -- I thought -- I mean, I've submitted it, but

11    just e-mails.  There's lots of e-mails back and

12    forth of me, like, making markings on what she

13    was sending to me to make corrections and things

14    like that.

15          Q.    Okay.  So overall, though, as far as

16    you were aware, they were conducting an

17    investigation into this, correct?

18          A.    I guess you can say that.  I mean,

19    all I can speak to is what my interactions with

20    Holly were.  I can't say -- I can't speak on

21    anything that she was doing outside of anything,

22    any type of communication with me.

23          Q.    Were you under the impression that it

24    was an investigation?

25          A.    Yes.

1          Q.    I'm also going to share this July

2    11th, 2023, letter sent to you, again from the

3    Title IX office from, let's see, I believe it was

4    Alexis Martinez, if I can find that.  Yes, Alexis

5    Martinez.  Do you recall this letter with the

6    final report of the investigation being sent to

7    you?

8          A.    Yes.

9          Q.    All right.  Does it look fair and

10   accurate in terms of nothing has been changed or

11   altered?

12         A.    Sure, yes.

13         Q.    And it says in this letter they were

14   telling you that the investigation had been

15   concluded, and that the final report was

16   available.  Was that your understanding?

17         A.    Yes.

18         Q.    And that your case was scheduled for

19   a hearing; was that correct?

20         A.    Yes.

21              MS. WHITFIELD:  Okay.  I'm going to

22         mark this as Exhibit 13.

23                        (Exhibit 13 was marked for

24                        identification.)

25   BY MS. WHITFIELD:

1      Q.    And then in your Complaint you allege

2  that "Defendant Georgia Tech conducted a Title IX

3  hearing in which many of the above facts were

4  substantiated, yet Georgia Tech did nothing to

5  address Williams' behavior."

6           So just for the record, did you

7  attend the hearing, the Title IX hearing on this

8  matter?

9      A.    Yes.

10     Q.    Do you recall when that hearing was?

11     A.    No.

12     Q.    Was it -- did it take place in 2023?

13     A.    I believe so.

14     Q.    All right.  Did it take place in the

15  fall or summer?

16     A.    I really don't remember when.  I

17  don't know.

18     Q.    All right.  But it wasn't 2024, was

19  it?

20     A.    I don't think so.

21     Q.    Do you feel that you told the hearing

22  officer everything that happened in this case?

23     A.    I think so.  There were additional

24  things that happened, so I don't know that it

25  fully encompasses everything.  I don't think even

1  you and I have discussed yet moments that

2  occurred after I filed my Complaint.

3        Q.   And I'm going to get to that.

4        A.   Okay.

5        Q.   So what things did you -- were you

6  not able to tell the hearing officer?

7        A.   I don't recall, like, everything.

8  This, at this point, was so long ago that it's,

9  you know, after the hearing what I did not get to

10 cover in the hearing, but I do know that there

11 was an incident with Joy, who was the new

12 director, after she got hired.

13        There was a moment, because he

14 shared, Damon shared with her things about the

15 Title IX case, which I was told that neither one

16 of us could speak about it.  So he did inform her

17 about our case, which I felt was an attempt to

18 try and ruin my reputation before I got a chance

19 to build a relationship with Joy.

20        So that happened after, sometime

21 after the hearing a few months later, if I'm not

22 mistaken, in an attempt to exclude me from a team

23 meeting and everybody under his leadership.

24        Q.   Okay.  I'm going to share with you a

25 letter dated October 25th, 2023.  This is the

1  hearing decision from the hearing officer Joan

2  Roach.  Do you recall receiving this letter?

3        A.     Yes.

4        Q.     And what was her finding?  Right here

5  in this paragraph, what was her finding as a

6  result of the hearing?  Just starting "After

7  reviewing all of the information presented..."

8        A.     That she determined that he is not

9  responsible for violating the Sexual Misconduct

10  Policy.

11        Q.     Okay.  Did you agree with her

12  finding?

13        A.     No.

14        Q.     Why not?

15        A.     Because I don't agree that -- I mean,

16  the unwelcome verbal, nonverbal physical conduct

17  based on sex, I believe that those things did

18  occur and that my claim is true.  If you scroll

19  up where she mentioned that they believe that my

20  motivations had something to do with whatever was

21  happening between him and Felicia, that is not

22  true.  And the comment of, "When viewed as a

23  whole and in context, the actions of Respondent

24  do not rise to the level of being sufficiently

25  severe, persistent or pervasive so as to create a

1    hostile work environment," I don't agree.  So, I

2    mean, I think just the reasons behind that and

3    the statement itself, I don't agree that no

4    sexual harassment occurred.

5           Can you scroll up a bit?  Because I

6    do believe in there that she -- there was

7    something else in there that I would like to

8    point out.

9           (Reviews document.)  Can you keep

10    scrolling for me, please?  Okay.  Right here.

11    Yeah, I can't -- I thought when I read this

12    complaint initially that essentially it alluded

13    to that some of the things that he did were

14    inappropriate, but just didn't rise to the level

15    of sexual harassment.  I could be mistaken, but I

16    thought that I read that somewhere.

17          MS. WHITFIELD:  Okay.  I'm going to

18       mark this as Defense Exhibit 14.

19               (Exhibit 14 was marked for

20               identification.)

21    BY MS. WHITFIELD:

22       Q.   Were you given an opportunity to

23    appeal it if you didn't agree with it?

24       A.   I can't recall.  Maybe.  Yes,

25    eventually.

1    Q.    Did you receive this letter dated

2  November 2nd, 2023 from Alexis Martinez

3  indicating the passing of the appeal deadline?

4    A.    Yes.

5    Q.    Why didn't you appeal it?

6    A.    I believe I was just taking heed to

7  my lawyer's advice and suggestions on how I

8  should proceed and move forward.

9    Q.    Understood.  I don't want to get into

10  those conversations.  I completely understand.

11        So I'm going to move on a little bit.

12  I know we kind of jumped forward in time a little

13  bit, but I'm going to go back in time to what

14  happened after you complained about some of your

15  allegations.

16        MS. WHITFIELD:  First, does anybody

17        need a break before I get into this, or do

18        you want me to keep going through this

19        section?

20        THE WITNESS:  Can I go to the

21        restroom really quick?

22        MS. WHITFIELD:  Yeah.  Let's take a

23        5-minute break, and we'll come back and get

24        through the rest of it.

25        MS. THURMAN:  Let's come back at --

1           let's just do 2:25.

2                     MS. WHITFIELD:  Perfect.

3                (Off the record at 2:18 p.m. EST)

4                     --------------

5                (On the record at 2:27 p.m. EST)

6                     MS. WHITFIELD:  We're back on the

7           record here.

8    BY MS. WHITFIELD:

9           Q.    So like I said before we took the

10   break, traveling back in time a little bit, so

11   February of 2023, so this is after you made your

12   Complaint to the Title IX office, but while the

13   investigation was, I guess, starting up.

14                You allege in your Complaint that you

15   were excluded from the process for selecting

16   scholarship recipients.  Is that still your

17   allegation?

18          A.    Damon attempted to exclude me.

19          Q.    I see.  So it was an attempt.  So

20   what was the -- as far as you were aware at the

21   time, what was the process for selecting the

22   scholarships?  First off, what scholarship was

23   it, and second, what was the process?

24          A.    Yeah.  So the specific scholarship

25   was the Helen Grenga Award, which is awarded to

1   the top female engineering student in the College

2   of Engineering. That meeting is usually ran by

3   the Woman in Engineering team, in it's with the

4   other associate deans within the College of

5   Engineering. That's the process for selecting.

6        So the chairs of all of the schools

7   under the College submit packets for who they are

8   nominating to win the award. And after all the

9   packets are received, there's a meeting held with

10   the Women in Engineering team and other associate

11   deans to select the winner.

12      Q. So as far as you were aware, the

13   entire Women in Engineering team, Educational

14   Outreach manager, director, was supposed to be

15   involved in the selection process?

16      A. We lead the meeting and are, yes,

17   involved with -- because we are the ones who'd

18   give out the award at the scholarship banquet.

19      Q. Okay. I'm going to share with you an

20   e-mail chain that you were a part of around this

21   time regarding the scholarship selection dated --

22   this e-mail here from Terri Lee dated February

23   3rd, 2023. Do you see this?

24      A. Yes.

25      Q. And to you, Desiree Turner, from

1    Damon Williams.  Does this look like a fair and

2    accurate -- does this look like a fair and

3    accurate representation of the e-mail chain that

4    you were a part of?  There's more to it, and I'll

5    scroll up, but does this look fair and accurate,

6    to what you received?

7              A.    Yes.

8                    MS. WHITFIELD:  I'm going to mark

9              this as Defense Exhibit 15.

10                           (Exhibit 15 was marked for

11                           identification.)

12   BY MS. WHITFIELD:

13             Q.    So this e-mail from Terri Lee, who is

14   Terri Lee?

15             A.    She's an assistant dean.

16             Q.    In the College of Engineering?

17             A.    Yes.  In the dean's office.

18             Q.    In the dean's office.  All right.

19   From what I've learned about Georgia Tech, it's

20   so decentralized I feel like I have to -- I just

21   have to specify.

22                    So she has all the nomination

23   packages for the Grenga Award.  "Desiree, feel

24   free to reach out to me via Teams if you need

25   help facilitating the selection of the award

1    winner."

2         It looks like Dr. Williams responded

3    February 5th, "Christine shared notes with me

4    that in the past she had selected the Helen

5    Grenga award winner by consulting with the other

6    associate deans.  Is that something we should

7    continue or is there another process?"  Is this

8    where you allege Dr. Williams was trying to

9    exclude you?

10        A.    No.

11        Q.    All right.  And then, "Hi Damon, I

12   think that is something we should continue,"

13   referring to consulting with the other associate

14   deans.  "Women in Engineering took over selecting

15   the Grenga award because it is the top award

16   given to a student at the banquet."  And then she

17   goes on to say, "Next year Desiree and the WIE

18   team can take over the solicitation, selection

19   and awarding of the Helen Grenga Award, unless

20   you and Mitchell decide otherwise."  Is that your

21   understanding of the -- let me rephrase that.

22        So at this time on February 6th, was

23   it your understanding that you would not

24   participate until next year, or is that -- the

25   solicitation, selection and awarding -- something

1    different than what you described to me

2    previously?

3         A.    No.  The only thing that Terri did

4    this specific year, because, again, I was by

5    myself in WIE, but she just got the packages.

6    But me and Damon would have still been the ones

7    to facilitate the meeting, and I would still have

8    been the one to award -- do the award.  But this

9    is not --

10        Q.    I see.

11        A.    This is not where there was an

12   attempt to exclude me.

13        Q.    I see.  And so there was a meeting to

14   discuss -- in terms of discussing it with

15   everybody, this is a -- your response discussing

16   the packages, the scholarship.  "I wasn't sure if

17   there was a Teams link for me to join virtually."

18   Is the meeting, is this meeting you're referring

19   to right here, is that the meeting you're

20   supposed to go over, you know, have with

21   Dr. Williams with, you know, whoever WIE was

22   going to select for the scholarship award?

23        A.    No.  If you keep reading, she shares

24   that that meeting for that day was for different

25   awards that Women in Engineering does not -- we

1    don't give out those awards.

2         Q.   I see.  All right.  Thank you for

3    clarifying.

4              All right.  Now I'm going to go to my

5    next e-mail chain.  So this is the -- do you see

6    this here from Terri Lee, Monday, Dec. 5th, 2022

7    about the Grenga Award?  Is that a -- this was to

8    -- actually, to Dr. Valle from Terri Lee.

9         A.   Dr. Valle --

10        Q.   Do you recall seeing this?  Did

11   Dr. Valle forward this to you at all?

12        A.   I can't remember if she forwarded it

13   to me, but she does share the process that I just

14   named in that next e-mail, I'm pretty sure.

15        Q.   Sure.  Yes.  To Terri, Mitchell,

16   Damon, Christine.  All right.  She shares the

17   process with that.  Did she share that with you?

18   Have you seen this e-mail?

19        A.   I think I've seen it, maybe in the

20   Title IX hearing, but I'm also just aware because

21   we had our own documents, and Christine and I had

22   our own meetings regarding the handoff for after

23   she left, so I was aware of all of these things

24   mentioned.

25        Q.   I see.  All right.  And then you --

1    do you recognize this e-mail, then, from yourself

2    to Cassandra Evans, Wednesday, February 8th,

3    2023?  "This is how the process worked in the

4    past for Helen Grenga"?  Do you recall sending

5    this e-mail?

6          A.    Yes.

7          Q.    All right.  And then it says, "Damon,

8    I'm happy to defer to you, but these are my

9    thoughts on how we should proceed in selecting

10   for the award.  Attached is a spreadsheet

11   explaining the process."  Did you send him the

12   spreadsheet explaining the process, do you

13   recall?

14         A.    Yes, I did.  I mean, pretty much it's

15   just a repetitive, what Christine already

16   mentioned, what I had already mentioned, and the

17   spreadsheet just further confirms what the

18   processes is and how it had been done in the

19   past.

20         Q.    All right.  So receiving this e-mail

21   from the Dr. Williams on Wednesday, February 8th,

22   2023, to yourself and Cassandra Evans, he

23   mentions that, "In the associate deans' meeting

24   earlier this week, I asked Kim and Krista who

25   they wanted in the meeting to select the award.

1    They articulated that we should follow the

2    process they've done in the past, make the

3    selection in our associate deans' meeting, and

4    notify Terri."  Is this where you allege that he

5    was attempting to leave you out of the meeting?

6         A.    This is where he attempts to -- this

7    is where it starts, because that's not true.  But

8    associate deans, they don't select the award in

9    the associate deans meeting.  You can see in all

10   the e-mails between Christine and Terri that

11   that's not how it had been done in the past, so

12   that's where I think it maybe starts.  I know I

13   responded and had mentioned -- e-mailed him

14   directly to state that that's not how it's --

15   that's inaccurate information, that that's not

16   how the meeting is done.

17        Q.    All right.  And I've got this

18   response here, February 9th, 2023, from you to

19   Dr. Williams about the selection process and, "If

20   you are explicitly against me being in the

21   meeting and directly participating in the

22   conversation, then I will oblige."  If he had put

23   his foot down, would you have stayed out of the

24   meeting or would you have -- no, strike that.

25             So you disagreed with the decision,

1   correct?

2        A.    That's what I said here, yes.

3        Q.    Okay.  Then you let him know that --

4   this is just a one-on-one e-mail, correct?  You

5   didn't BCC anybody on there?

6        A.    No.

7        Q.    Okay.  And then Damon, Dr. Williams

8   respond, "Since I've never participated in the

9   selection, I am trying to gain clarity and

10   resolve confusion as to who should participate in

11   the meeting."  Do you still believe he was trying

12   to exclude you with this statement?

13        A.    I think that he was trying to

14   belittle me, because he had been given the

15   information on how this meeting was conducted

16   multiple times, and still tried to do it in his

17   own way to not include me in the meeting.  And so

18   here he is mentioning, or e-mailing other people

19   above me to say that I would like to participate

20   in suggesting, etc., etc., But as you can see,

21   when they respond they say that I'm correct,

22   so...

23        Q.    Where do you see that he's belittling

24   you?

25        A.    I believe that it was belittling when

1    he decided to send an e-mail -- like, everyone

2    can see what e-mail I sent when he sends -- when

3    he mentions everyone.  So they can go down and

4    see the chain, like, the chain of e-mails.  I

5    believe that that was done to try to belittle me

6    and demean me, because I did not include anyone

7    on the e-mail, even though, like, I could've

8    included Cassandra since I was responding to

9    something that she was a part of.

10        Q.    Understood.  Do you remember those

11   interim measures we discussed a few minutes

12   ago --

13        A.    Yes.

14        Q.    -- after the Title IX Complaint?  Was

15   one of the interim measures that you had to have

16   a third party present on all e-mail

17   communications?

18        A.    I didn't understand that I had to

19   have a third party on e-mail communication.  I

20   understood it to be in, like, meetings, not

21   e-mail communication.

22        Q.    Okay.  And then -- so this next

23   e-mail, Terri responds saying that you can

24   participate in the meeting.  And then this next

25   one -- that's from Mitchell Walker.  No, sorry.

1    No.  The next one.  February 14th Damon to Terri,

2    "Thank you."  Everyone else, "Do you want to meet

3    in person or virtually?"  So did you go to the

4    meeting?

5        A.    I facilitated the meeting.  Damon did

6    not attend.

7                MS. WHITFIELD:  I'd like to mark this

8        as Defense 16.

9                        (Exhibit 16 was marked for

10                        identification.)

11   BY MS. WHITFIELD:

12       Q.    Now, you also state that -- first

13   off, he did he ever tell you explicitly that he

14   was trying to exclude you from this meeting?

15       A.    Did he explicitly tell me that he was

16   trying to exclude me from anything?  No.

17       Q.    From this meeting.

18       A.    From this meeting, no.

19       Q.    All right.  And I also believe you

20   said in your Complaint that during this time,

21   Dr. Williams referred to you as Educational

22   Outreach Manager instead of Associate Director.

23   I believe that was --

24       A.    He did.

25       Q.    -- down here, okay, and that --

1  instead of her appropriate title of Associate

2  Director.  Now, Educational Outreach Manager was

3  still your official title within Georgia Tech,

4  correct, at the time?

5      A.    Yes.

6      Q.    Are you aware of any obligation

7  Dr. Williams had to call you by the associate

8  director title, by a working title?

9      A.    Is he under obligation to refer to me

10  as my working title?  I don't think that he's

11  obligated to -- obligated to.  But was it -- was

12  everyone else, or just commonly -- was I commonly

13  referred to as the associate director?  Yes,

14  so...

15      Q.    So it's just more of a professional

16  courtesy?

17      A.    Correct.

18      Q.    All right.  And next, moving on to

19  when Joy Harris was hired as the director of

20  Women in Engineering, do you recall when she was

21  hired?

22      A.    I think in July, maybe, of that year,

23  July or August.

24      Q.    All right.  In your Complaint you

25  allege that Dr. Williams was appointed an interim

1    -- I'm sorry, Dr. Williams appointed an interim

2    director for Women in Engineering.  Do you recall

3    who that was?

4         A.    I was told that Joy was going to be

5    the interim director, but I had had no

6    communication with her directly, and no one

7    communicated any of that to me.

8         Q.    Should she have?

9         A.    If someone's going to be the interim

10   director of WIE and I would be reporting to them,

11   then, yes, that should be communicated to me.  Or

12   if I'm doing all the responsibilities for WIE and

13   there's an interim director, then someone else

14   should be doing the things that I was doing.

15        Q.    All right.  You also allege that she

16   "did not communicate with her, nor did she

17   perform any job duties as a director."  Is that

18   still -- is that my understanding of your

19   Complaint?

20        A.    At that time.  Like, if she was named

21   interim director, she wasn't doing anything

22   WIE-related, is what I was saying.

23        Q.    Is that after she was taken on as the

24   interim director?

25        A.    What I'm saying is that I was told --

1    like, and I don't even remember how I was told

2    exactly, but I was told that she was appointed as

3    the interim director for WIE, but no one

4    communicated that to me, that she was the interim

5    director.  And she was not performing any job

6    duties related to WIE at that time.

7         Q.    So if nobody communicated it to you

8    -- if nobody communicated to you that Joy Harris

9    was the interim director, how did you find out

10   that she was the interim director?

11        A.    I honestly don't remember how that

12   was brought up.  Maybe Cassandra had brought it

13   up, given her working for Damon at the time.  I

14   honestly, I don't remember.

15        Q.    Do you recall there being an official

16   announcement of her becoming the interim director

17   in the office?

18        A.    I don't remember when I brought this

19   to my lawyer or anyone's attention.  She was

20   officially hired in July.  I just remember her

21   being officially hired in July.  So the interim

22   conversation or whether or not she was going to

23   be interim and all of that, I can't really

24   remember, outside of maybe even -- or even if

25   Dr. Valle, maybe, mentioned it to me, because I

1    know that I had -- her and I continued to have a

2    relationship after she left.  So I don't

3    remember, honestly.  I can't recall.

4         Q.    So she did not perform any job

5    duties -- I'm sorry, I'm still trying to -- so

6    it's your allegation that she did not perform any

7    of the duties of the director while she was the

8    interim director?

9         A.    No, she didn't -- she wasn't

10   performing any WIE-related job duties as interim

11   director or anything.  I mean, when she got

12   hired, I trained her, as well, to take on the

13   director role.

14        Q.    So what was she -- what duties as the

15   director do you believe she was not performing at

16   the time?

17        A.    Any of them.  There's -- I don't

18   understand -- I think given the nature of the

19   job, there wasn't a way for her to perform the

20   role and us to not have communication at all,

21   just given all the things that were happening and

22   things like that.

23        Q.    But my question is, you know, was she

24   doing nothing?  Was she in her office --

25        A.    She wasn't in the --

1          Q.      -- twiddling her thumbs?

2          A.      She wasn't in the office, she wasn't

3     ever --

4          Q.      Just sitting at home?

5          A.      I don't know what she -- I don't know

6     what she was doing.  She had two jobs.  You know,

7     when she joined WIE she had a dual title.  She

8     was working for WIE and working for EZE still, so

9     I can't tell you what she was -- I can't tell you

10    what she was doing.  I just know she wasn't

11    present in WIE, because I was there and -- yeah,

12    I don't know.  I can't tell you what she was not

13    -- like, what she was doing maybe with her other

14    role and things like that.

15         Q.      You mentioned you had to train her.

16    How did you have to train her?

17         A.      I had to give her the lay of the land

18    for Women in Engineering in terms of introducing

19    to sponsors, explaining how our programs are run,

20    pulling student data for her, like, pulling out

21    the enrollment list every semester, showing her

22    the budget, showing her how we typically do

23    scholarships, how we run our programs.

24    Everything related to WIE and how things are

25    done, I showed her.

1        Q.     Would you have expected the director

2    of Women in Engineering to come into that role

3    already knowing that information?

4        A.     I think I would have -- I don't know.

5    I don't know how to answer that.  Like, I think

6    maybe having some level of background knowledge

7    about WIE and some things I think -- I would

8    expect someone to come in and know some, a

9    little.

10        Q.     But, you know, showing her where

11    things are, you know, explaining the process to

12    her.  If she has no previous experience in WIE,

13    is that -- is that training her or is that just

14    -- is that training her how to do the director

15    job, or is that just showing her where things

16    are?

17        A.     No, I think it's -- it was training,

18    because even down to running programs and how

19    that works and the documentation that you need

20    and different things like that, some of those

21    things are not just Women in Engineering

22    specific.

23            So I can understand your point if you

24    say, "Oh, it's just a matter of showing her where

25    to find something," but it was more than that.

1   It's procedures, it's, like, how things truly

2   operate, and how, like, just the deeper

3   background knowledge on being in compliance and

4   things like that.

5         Q.   All right.  You allege that you had

6   "been receiving supplemental pay for doing

7   director work, but when a new director was

8   brought in, Plaintiff's pay decreased despite no

9   change to her duties."  Is that still your

10  allegation?

11        A.   Yes.

12        Q.   All right.  I just want to share this

13  briefly.  This is coming from Georgia Tech's --

14  in their finance department, I think, but this is

15  -- it's an Employee Cost Detail, for you, dated

16  fiscal year January 2023 through fiscal year

17  August 2024, in the College of Engineering.

18  Regular fringe salary.  So do you -- these

19  numbers here, the $5416, does this look like your

20  average pay for these months in fiscal year '23?

21        A.   Does it look like my average pay?

22        Q.   Yes.

23        A.   Sure.  I mean, I'm not really sure --

24  I'm not sure what the numbers are.

25        Q.   Okay.  What was your salary you were

1    making at the time?

2          A.    I don't remember.

3          Q.    Okay.  Do you recall receiving

4    roughly $536 a month for supplemental pay for

5    your increased duties?

6          A.    Sure.  But you can see where it ended

7    before my increase in duties ended.

8          Q.    And was that roughly around the time

9    that Joyelle Harris was brought on as the

10   director --

11         A.    No.  She wasn't brought on --

12         Q.    -- in June or July?

13         A.    No.  She wasn't officially brought on

14   as director.  She didn't officially start until

15   August.

16         Q.    Do you think you should've received

17   more during this period?

18         A.    I think that I should have received

19   director-level pay, given that I was doing

20   director responsibilities during that interim

21   time.

22         Q.    Okay.  Before I mark this, do you

23   have any reason to doubt or to dispute this as

24   being an accurate reflection of your pay at the

25   time between January and August 2023?

1          A.    No.

2                MS. WHITFIELD:  I'm going to mark

3          this as Defense Exhibit 17.

4                          (Exhibit 17 was marked for

5                          identification.)

6    BY MS. WHITFIELD:

7          Q.    Did you speak with HR about

8    performing this extra work without pay, without

9    -- let me just say, without the pay that you

10   believed that you were owed?

11         A.    I spoke with them about my

12   supplemental pay ending early.

13         Q.    What was that conversation?

14         A.    I believe I just asked Dawn, like, if

15   it could be maybe reinstated or something along

16   those lines, just notifying her that it ended and

17   yet I was still the only one doing -- working for

18   WIE at the time.

19         Q.    Okay.  Do you believe that your

20   supplemental pay ending was in retaliation for

21   making complaints?

22         A.    I felt that way at the time, that it

23   was odd.

24         Q.    What was odd?

25         A.    My supplemental pay ending early.

1     Q.    So you felt that it was retaliation

2  at the time, but do you think that anymore?

3     A.    Yes.  I believe that it was

4  retaliation, but they did rectify it.

5     Q.    Who did you feel made that decision

6  to end it early?

7     A.    Damon.

8     Q.    Do you have any -- do you have any

9  evidence that he spoke with HR or the financial

10 wizards, I'm not sure who they are, at Georgia

11 Tech to end your pay early?

12    A.    I don't know who he would have spoken

13 to.  I don't know what his conversations could

14 have or would have been during that time, but I

15 do know that he was in charge of me receiving or

16 not receiving supplemental pay.

17    Q.    When did he first tell you that you

18 were receiving supplemental pay, do you recall?

19    A.    In January.

20    Q.    Was it before or after you

21 complained?

22    A.    Before.

23    Q.    You also allege that he prevented you

24 from obtaining a promotion so that he could keep

25 you in as a lesser role and in need of him to

1  help you advance.  How did you come to this

2  conclusion?

3       A.    Can you give me context of that

4  statement?

5       Q.    Yes.  It's in your Complaint.  I

6  believe this is in paragraph -- this is after --

7  let's see here, Paragraph 132 of your Complaint,

8  and I'll share my screen with you here.

9            On Page 13, "Upon information and

10  believe...has had other complaints."

11            Paragraph 132, "Williams prevented

12  Plaintiff from obtaining a promotion so that he

13  could keep her in as a lesser role and in need of

14  him to help her advance."

15       A.    That was in --

16       Q.    Do you stand by that?

17       A.    That was in reference to me not -- I

18  believe that was in reference for me not getting

19  the director role, so, yes.

20       Q.    Okay.  Is that still your allegation?

21       A.    Yes.

22       Q.    Did he ever tell you that he wanted

23  to keep you in, I guess, the Educational Outreach

24  Manager or associate director role?

25       A.    Did he ever say that explicitly?  No.

1        Q.    Did he -- what evidence do you have
2    of this statement, then?
3        A.    So he -- when he decided to tell me
4    that I wasn't going to -- or when he mentioned
5    I'm not advancing in terms of when I applied to
6    the director role, it was after I made the
7    comments and jokes about HR when he was
8    commenting on my appearance.  So the timing of it
9    I thought was interesting for him to say that I'm
10   just not ready and that I should -- that he
11   needed to -- wanted to coach and mentor me.  It
12   made me feel like he wanted me to depend on him
13   in terms of advancing in my -- in my career.
14       Q.    Did anybody else tell you that that
15   was what he was doing?
16       A.    No.
17       Q.    So it's safe to say that this was an
18   assumption of yours?
19       A.    No, I wouldn't say it was an
20   assumption.  I think, like I said, given all of
21   my other interactions with him, that is what it
22   felt like.  And I don't agree with using the word
23   "assume."  It's just, I think in context, it's
24   what makes sense.
25       Q.    All right.  Lastly, we'll get to the

end of this little bit here.  So moving forward
to, I mean, really Paragraph 133 here, since you
have complained about Williams, you have been
passed over for promotion to director, and
Williams has ostracized you and caused others to
ostracize you and has prevented you from
advancing in career opportunities.

How has -- in what ways has
Dr. Williams ostracized you?

A.    As I mentioned earlier, once Joy was
hired, mentioning things about the case to her,
attempting to exclude me from a full team
inclusive excellence office, meaning he did not
include me on the meeting invite.  Joy later
forwarded it to me.

I've met other people who are -- who
Damon knows who I would have a good rapport with,
and then later not hear from them, or no further,
like, communication after attempts to continue
those professional relationships.  So those are
the ways I would say that he's ostracized me or
caused others to ostracize me, by just mentioning
my name in a negative light to other people, and
while I was still at Georgia Tech, trying to
exclude me from meetings and belittle me as a

1    professional.

2         Q.    What other -- you mentioned he made,

3    I think it was, disparaging comments to you,

4    about you to other individuals.  What individuals

5    was he speaking to?  What comments did he say to

6    these individuals that you're aware of?

7         A.    I'm not aware of specific comments.

8    As I mentioned earlier, I know Cassandra has been

9    privy to conversations that he's had as his

10   assistant.  She did not share with me names and

11   details.  Like I said, she did just say kind of

12   like cross your T's and dot your I's, so I know

13   that they have been had.  I just can't tell you

14   what exactly has all been said about me.

15        Q.    Did people avoid you?  Did people

16   avoided interacting with you in the dean's

17   office?

18        A.    Did people avoid interacting with me?

19   I do think that after our -- especially after the

20   Title IX hearing, yes, when those who had to

21   attend the meeting and provide testimony about

22   things that I said happened, there were clear

23   changes in my relationships after that.

24        Q.    Who are these individuals?

25        A.    LaJuana and Lauren.  There were

definitely changes there.

Q.   What changes would you say happened in these relationships?

A.   Avoidance, general avoidance.

Q.   Has anybody else besides LaJuana and Lauren Martin, have they -- has anyone else simply stopped speaking to you?

A.   A professional connection that I made actually when I was getting my Project Manager Certification, yes.  Someone named Chris, who was a professor, and him and a colleague, we all had dinner together, him -- me, him and another colleague in a professional staff, we had a great connection during our dinner meeting.  He's like, "Oh, yeah, I'm going to ask Damon about you, because I would love for you to support us and help us on some of the things that we're doing over in the Professional Learning Office," etc., etc.

And in back of my mind, as he was mentioning, like, having a close relationship with Damon and potentially talking to Damon about me, after that dinner we did not communicate any more, even after me just, like, following up via e-mail and things like that.  So that's another

1    connection that I feel was soured.

2         Q.    What was his name?  Chris-something?

3         A.    Yes.  His name is Chris.  I'll have

4    to -- I can't remember his last name off the top

5    of my head, but I could get it.

6         Q.    And you said he was a professor?

7         A.    Yes.

8         Q.    What department is he in?

9         A.    Professional Learning.  He teaches

10   the Project Manager and Agile classes.

11        Q.    Okay.  Is that at Georgia Tech, too?

12        A.    Yes.

13        Q.    And did he ever tell you that he

14   couldn't speak with you anymore or he didn't want

15   to speak with you anymore because he knew

16   Dr. Williams?

17        A.    He didn't say that.  Like I said,

18   after meeting him it was then that I learned that

19   he had a close relationship with Damon.  And

20   after the meeting when it was said that we would

21   kind of continue our conversations, it abruptly

22   ended.

23        Q.    Do you know if Dr. Williams was

24   instructed to stop speaking with you one-on-one?

25        A.    Dr. Williams and I never spoke

1  one-on-one again after my Complaint.

2      Q.    But I'm asking if you -- do you know

3  if he was instructed to do that or do you not

4  know?

5      A.    I think it's mentioned in the Title

6  IX, like, accommodations that we wouldn't be

7  speaking one-on-one.  That was directed to both

8  of us.  Joy did say that when I spoke with her

9  after she mentioned me not going to the IEO

10 meeting.  She mentioned something about that, I

11 think.

12     Q.    Do you have any -- what career

13 opportunities do you allege you have lost as a

14 result of this?

15     A.    Well, like I just said, there's

16 opportunities with, like, with the Professional

17 Learning team that were discussed with me that

18 did not come into fruition.  And, again, me not

19 getting the director role.  I think those are

20 opportunities that I've lost as a result of this.

21     Q.    Was there ever any opportunity that

22 was, say, set in stone for you that you were

23 told, yes, you would be given this opportunity

24 and that was taken away?

25     A.    I am -- I can't recall.  I don't

1    know.

2        Q.    Were you denied travel opportunities

3    to advance your career?

4        A.    There was a -- there was a conference

5    that I did not get to attend that I thought I

6    would have been able to attend.  I can't

7    recall -- I can't recall the name, but other

8    people on the IEO team went instead of me, even

9    though it would have been to my benefit.

10        Q.    Do you allege that Dr. Williams was

11    the sole decider in keeping these opportunities

12    from you?

13        A.    Yes, because he tapped specific

14    people on the shoulder to go.

15        Q.    Do you have any -- other than your

16    allegation, do you have any evidence that he

17    purposefully excluded you from these because of

18    your complaints?

19        A.    I mean, like I said, there's people

20    who -- Lakeita, Lakeita and Valentino, we all

21    have the same roles, and they went and not me, so

22    I feel like that's -- kind of speaks for itself

23    that he went to those specific people and they

24    all have the same role, or had the same role.

25        Q.    So he went to those other individuals

1  who had the same role and specifically asked them

2  to go and not you?

3      A.    Yes.

4      Q.    Okay.  Understood.

5            In your interrogatory response, I

6  think No. 17, you allege that he had an

7  inappropriate -- not inappropriate relationship,

8  excuse me, an inappropriate discussion with Joy

9  Harris, this "damaging conversation" in Paragraph

10 No. 2 here.  You allege that he spoke to Joy

11 about this matter.  What do you allege that he

12 said exactly to her about this situation?

13     A.    That he shared -- he shared about my

14 Complaint, and that I had a complaint against

15 him.

16     Q.    Do you know if you went into any

17 details?

18     A.    I don't know the specifics of what he

19 said to her.  He mentioned in the Title IX

20 meeting that he mentioned it, that he did say

21 something to her, and Joy herself let me know

22 that he said something to her.

23     Q.    Okay.  You also state that she also

24 led -- that that conversation led her to make a

25 comment that was inappropriate and unfairly

1    tainted your professional image.  What was that

2    that she said to you?

3         A.    She asked if I wanted to go to the

4    IEO team meeting, and that I, like, did not have

5    to go, even though it was a required meeting for

6    all of the IEO staff.

7         Q.    That was inappropriate?

8         A.    It's inappropriate if there's a

9    required meeting for all IEO staff to attend a

10   meeting, which I am a part of, but to then say I

11   don't have to go, or ask me if I even wanted to

12   go.

13        Q.    Did she tell you that you were not

14   allowed to attend?

15        A.    She did not say that I was not

16   allowed, but I didn't -- and I did share with her

17   that I'm perfectly okay with still performing my

18   job responsibilities and moving forward, despite

19   whatever occurred between Damon and I., and that

20   I would not share with her any details or involve

21   her in that, because we were clearly instructed

22   to not speak about the case.

23             And so the fact that it was spoken

24   about and I was not, again, invited to a required

25   meeting for all staff, I just felt that that was

1    not appropriate.

2              Q.    Do you --

3              A.    Because she said that I --

4              Q.    Was Dr. Williams --

5              A.    Sorry.  One more --

6              Q.    Wait, wait.  Let me finish the

7    question.  Was Dr. Williams supposed to attend

8    that meeting?

9              A.    He was leading the meeting.  And also

10   I want to say that she told -- she knew that I

11   don't like Damon.  That's what was also

12   inappropriate to me, because not liking someone

13   is not grounds to not attend a meeting.  And I

14   shared with her that it wasn't a matter of me not

15   liking Damon, so I think that was also what --

16   and not even "I think."  That was also what I

17   found to be just inappropriate, like, not

18   attending a meeting because I don't like someone.

19             Q.    But you did attend the meeting,

20   correct?

21             A.    I did, after she forwarded the invite

22   to me.  But he set up the meeting, and he invited

23   all of the staff except for me.

24             Q.    This Paragraph 3 here, this

25   interaction with -- please help me pronounce

1 this.

2   A. Angelitha.

3   Q. Angelitha, okay, thank you, at NC

4 State, this is another one that you allege that

5 Dr. Williams somehow, I'm not sure, that she

6 stopped speaking with you after she found out

7 that you knew Dr. Williams, correct?

8   A. Correct.

9   Q. And did you -- did she ever tell you

10 why she stopped speaking with you?

11   A. No, she did not.  As I mentioned

12 here, like, it just was a very sudden end to our

13 communication.  And given the circumstances and

14 her being another person that mentioned, like,

15 "Oh, I know Damon, like, we have a good

16 relationship," it was just odd to me that now we

17 were no longer speaking or had communication.

18   Q. Of course.  Do you have any

19 allegations -- I'm sorry, do you have any

20 evidence that Dr. Williams and Ms. Daniel ever

21 spoke about you to each other?

22   A. I don't have specific evidence, no,

23 but I think that I have pointed out just a trend

24 and this happening with people who have

25 specifically mentioned, "Oh, I know Damon."  It's

1    an interesting coincidence, I will say.

2        Q.    And later on here you state that

3    while you acknowledge that you were under

4    significant emotional stress, and there's a

5    possibility that you may have been overly

6    sensitive or paranoid at the time, are there any

7    other allegations that you believe you have made

8    because you were acknowledged to be overly

9    sensitive or paranoid at the time?

10        A.    No.  And like I said, I would even

11   retract that statement at this point because like

12   I just told you, there's been other professional

13   connections that I've tried to make or that have

14   been presented to me that have been all of a

15   sudden ended after me knowing or realizing -- it

16   being brought to my attention that they're

17   closely connected to Damon.  So I don't think

18   that that's -- I don't think that that's, like,

19   just a coincidence.

20        Q.    What other professional

21   opportunities, or I guess professional networking

22   has ended because they learned that you -- they

23   may have learned that you knew Dr. Williams?

24        A.    I just mentioned to you the one with

25   my most recent certification that I got with my

1     PMP.

2          Q.    All right.  But you did receive the

3     certification, then?

4          A.    I received -- it's not just about

5     receiving the certification.  It's about a

6     professional relationship that was -- or

7     professional opportunities after that connection

8     was made.  Like I said, we went out to dinner

9     with another person on the Professional Learning

10    Team, and opportunities were presented to me to

11    potentially be involved with different

12    programming and things that were going on with

13    the Professional Learning Team, and then an

14    abrupt end in communication.  So, yeah.

15         Q.    All right.  You've mentioned I think

16    in -- you've mentioned workplace rumors in

17    your -- either in your Complaint or in your

18    interrogatory responses quite a bit, you know, as

19    affecting your professional reputation.  What

20    rumors about you have you heard specifically?

21         A.    I think just rumors about something

22    transpiring or complaining against Damon.

23         Q.    Any other rumors?

24         A.    No.  Just rumors about, like, there

25    being tension and things like that as it relates

1    to Damon and myself.

2         Q.    Has anyone at Georgia Tech ever told

3    you that because of these rumors you would not

4    advance there?

5         A.    I think it's just been alluded to.

6    Like, I've had conversations with others, like,

7    or even Dr. Valle herself, when it was mentioned

8    what my experience was.  And when I was kind of

9    still in the -- during the time period of just

10   like, "Here's what's going on," Dr. Valle just

11   mentioned that, like, "Georgia Tech isn't going

12   to do anything, so just keep that in mind."  So

13   there was a lot of just chatter about just not

14   being -- not being supported or not being able

15   to -- yeah, just not being supported and not --

16   just basically hurting my professional reputation

17   because I decided to file a Complaint and things

18   like that.

19        Q.    Was Dr. Valle still at Georgia Tech

20   when you filed your Complaint?

21        A.    No.  She was gone.

22        Q.    What do you mean by -- or, I guess,

23   what did you take to mean by Dr. Valle's

24   statement that, you know, Georgia Tech is not

25   going to do anything?

1       A.    I took it to mean that just it's not

2  necessarily -- it's not an environment where you

3  would be supported in complaining against --

4  making any type of complaint, like sexual

5  harassment complaint or anything like that.

6       Q.    Understood.  Have you since left

7  Georgia Tech?

8       A.    Yes.

9       Q.    Okay.  What was the purpose of your

10 -- how did you leave?  Did you resign?  What

11 happened?

12      A.    I resigned.

13      Q.    Okay.  I just want to show this to

14 you very quickly.  I believe that might be the

15 last exhibit, a copy of your resignation letter

16 here from our files.  Do you see this Outlook

17 e-mail resignation, Last Day, January 21st?

18      A.    Yes.

19      Q.    Does this look like a fair and

20 accurate copy of the e-mail you sent to Joyelle

21 Harris, cc'ing Dawn about your resignation?

22      A.    Yes.

23           MS. WHITFIELD:  I will tender this as

24      Defense Exhibit 18.

25                     (Exhibit 18 was marked for

```
 1                        identification.)
 2   BY MS. WHITFIELD:
 3        Q.    So what are you doing -- are you
 4   working now?
 5        A.    Yes.
 6        Q.    Where do you work?
 7        A.    I'm contracting for an ed tech
 8   company.
 9        Q.    All right.  When did you start
10   contracting with them?
11        A.    I was hired in April.
12        Q.    All right.  What type company is it?
13        A.    It's an ed tech company called
14   Wayfinder.
15        Q.    All right.  And what is your contract
16   position?
17        A.    I'm a facilitation guide.
18        Q.    Is there anything else -- let me just
19   ask you one more question about your resignation.
20   Did you design resign voluntarily --
21        A.    Yes, I did --
22        Q.    -- from Georgia Tech?
23        A.    -- because Joy was also leaving.  She
24   now works for Georgia State, and I did not want
25   to be put in another position to where I was
```

1  going to be doing all the things for WIE and

2  essentially running the program without the

3  proper title or compensation.

4       Q.    Understood.  Now, I just want to go

5  over a couple of just final questions about the

6  allegations, and then we'll get into your damages

7  portion in just a little bit.  And we can take a

8  break in between, but the damages is really the

9  last little bit I have, so we're getting close to

10  the end here.

11           So regarding your complaint against

12  Dr. Williams individually, have you told us, have

13  you discussed every harassment allegation that

14  forms the basis -- that forms the basis of your

15  Complaint against him?

16       A.    Have I discussed every allegation?

17       Q.    Yes.

18       A.    What do you mean?

19       Q.    Have you told me everything there is

20  about your allegations of harassment, sexual

21  harassment from Dr. Williams?

22           MS. THURMAN:  I'll object to the form

23       of the question, but you can answer.

24           THE WITNESS:  To my -- I mean,

25       maybe -- to my knowledge, I think there may

1          be little details that we didn't go into,

2          but I think that the majority of my

3          Complaint has been discussed.

4     BY MS. WHITFIELD:

5          Q     Okay.  Would you like to discuss

6     those details?

7          A     No.  I think -- I think we've covered

8     it, covered the majority of things.  I just don't

9     feel comfortable saying we've discussed things in

10    totality without me, like -- I don't think we,

11    like, went through every single line, but I think

12    that everything I've shared has been mostly,

13    like, what happened, to my remembrance.

14         Q     All right.  Any other actions that we

15    have not discussed here today?  Any other major

16    action that we haven't discussed?

17         A     Not that I can think of in this

18    moment.

19         Q     Okay.  Regarding the Director

20    position, going back to October of 2022, do you

21    know if Dr. Williams personally screened your

22    application?

23         A     I do not know.

24         Q     Do you know if he participated in the

25    process of whether your application advanced for

1   consideration?

2        A.   I do not know.

3        Q.   Do you have any additional evidence

4   that we have not already discussed for us to

5   consider today?

6        A.   Do I have any additional evidence?

7        Q.   Just of any of these allegations that

8   we haven't discussed.

9        A.   I don't think so.  I believe I've

10   submitted everything that I have between, like,

11   my lawyer and you.

12        Q.   All right.  I do want to discuss a

13   little bit of your damages.  Do we need one last

14   break before we do that, or can we --

15        A.   No.  I do have a question.  I'm going

16   to have to pick up my son from school by around

17   5:30.  Will be done by then?

18        Q.   We should be done by then.

19        A.   Okay.

20        MS. WHITFIELD:  Okay.  So we're going

21        to stay on?  We can keep going?  This

22        shouldn't take too long.

23        MS. THURMAN:  Yeah, we can keep

24        going.

25        MS. WHITFIELD:  Okay.  Great.  Thank

1      you.

2  BY MS. WHITFIELD:

3      Q.    As far as your damages go, you allege

4  that you lost earnings, and you allege in your

5  damages -- actually, I will share my screen.  I

6  apologize.  I keep going back.

7          So your damages that you have

8  calculated in this case as to -- this is your

9  response to Interrogatory No. 6, loss of earnings

10 and underpayment being -- you allege that you

11 lost, you know, did not receive the compensation

12 of a director, which is approximately $170,000.

13 Is that still your calculation?

14     A.    Yes.

15     Q.    How did you make that calculation?

16     A.    You can look up salaries on Georgia

17 Tech's website, or just even anyone -- yeah, you

18 can look up salaries on Georgia Tech's website.

19     Q.    And you allege that your supplemental

20 pay ended -- I mean, we saw on the spreadsheet

21 that it ended -- I'm sorry.  Let me back up a

22 little bit.

23          Your supplemental pay ended, I

24 believe, June of 2023.  We've talked a little bit

25 about why you said that -- why you allege that it

1    ended early.  But one more time for the record,

2    why do you believe that that supplemental pay

3    ended early?

4         A.    Why do I allege that it ended early?

5         Q.    Yes.

6         A.    I mentioned that I thought it was

7    retaliatory, but -- and that they later corrected

8    it, but I didn't get it for June, on my June

9    paystub or July, if I'm not mistaken.

10        Q.    Did they give you -- did they restart

11   it after June or July of 2023?

12        A.    They gave it back to me, I believe,

13   in August after I brought it to Dawn's attention.

14        Q.    Understood.  So they didn't give it

15   to you for June or July, but then rectified it in

16   August for back pay, correct?

17        A.    Correct.

18        Q.    Okay.  Lost earnings, let's see, "The

19   total amount of lost earnings is calculated based

20   on the difference between the supplemental pay

21   she received and the compensation of a director

22   ...amounts to approximately $70,000."  Is that

23   still your allegation, your contention?

24        A.    Yes.

25        Q.    All right.  Emotional distress and

1  mental anguish.  How did you -- this calculation

2  here, $75,000 as emotional distress, how did you

3  make this calculation?

4       A.    I mean, you really can't put a number

5  on emotional distress.  I just thought that was a

6  reasonable amount.  But the amount of anxiety,

7  depression, like, stress that occurred during

8  that time was significant.  It impacted me

9  showing up for work, like, and just doing my job.

10 Not that I did not show up, but it impacted the

11 way I felt like I could show up, and in my life

12 outside of work, as well.

13            So there's not really a number that

14 I, like, I can put that would accurately -- I

15 mean, that makes you feel better, but it is the

16 number that I came up with.

17       Q.    Did you experience any physical

18 manifestations of anxiety during this time?

19       A.    I'm sorry?

20       Q.    Did you experience any physical

21 manifestations of anxiety at this time?

22       A.    Trouble sleeping and staying asleep,

23 heart -- like, heart beating fast.  So my body

24 didn't respond to the stress headaches and things

25 like that.

1          Q.     All right.  You also allege that you

2    contributed to a diminished sense of professional

3    value.  What do you mean by this phrase?

4          A.     It hurt my confidence.  During the

5    time of -- even our meeting, I mentioned -- in

6    the Title IX hearing I mentioned that Damon kind

7    of went at lengths to try to make me seem inept

8    or like I did not understand what was happening,

9    or just how I -- how I felt, just my professional

10   abilities.  It disrupted my confidence.  Yeah, so

11   that's what I mean when I say diminished sense of

12   professional value.

13         Q.     All right.  Moving to No. 3,

14   professional harm and reputational damages.  You

15   allege that his conduct negatively impacted or,

16   you know, Defendant's conduct negatively impacted

17   your career trajectory.  You allege that you were

18   overlooked for the director role.  Is that still

19   your allegation?

20         A.     Yes.

21         Q.     Who do you believe overlooked you?

22         A.     I believe that he overlooked me.

23   Yes, I believe that he overlooked me.  And even,

24   like I said, just all the comments about, like,

25   appearance and all of those, all of those things

1 combined, it just seemed, yeah, like he was

2 trying to lower -- lower my sense of who I am as

3 a professional.

4     Q.   Do you allege that you lost any

5 offers of employment as a result of this case?

6     A.   I definitely lost opportunities of --

7 I definitely believe that I lost professional

8 opportunities, yes.

9     Q.   I mean, offers of employment that

10 might've been rescinded, or you interviewed and

11 they told you it's because of this?

12     A.   No.

13     Q.   Did this case negatively impact your

14 ability to find a new position after you

15 resigned?

16     A.   So I believe -- you're saying do I

17 believe that this case specifically?  Do you mean

18 directly because of professional connections, or

19 can you elaborate on what you mean by the

20 question?

21     Q.   I mean, did you have trouble

22 obtaining a new position, yeah, because of either

23 the reputation or because of, you know, any kind

24 of direct conversations that might have been had

25 with you about the allegations in this case?  Did

1    you have any trouble with that to seek your new

2    position?

3            MS. THURMAN:  I'll object to the form

4        the question, but you can answer.

5            THE WITNESS:  Yeah.  I'm honestly

6        not -- I'm honestly not sure how to answer

7        that.

8    BY MS. WHITFIELD:

9        Q    Okay.  So how did you calculate the

10   $100,000 to reflect the estimated damages for

11   this portion?

12       A    How did I come up with the $100,000?

13       Q    Yes.

14       A    My salary, like, how much -- I don't

15   know how to answer this.  What I believe my worth

16   actually is compared to what I was actually

17   getting during my time at Georgia Tech.

18       Q    All right.  This Administrative Time

19   and Effort, "Significant time and effort were

20   spent addressing issues related to the

21   supplemental pay, including repeated

22   communications with HR and management to

23   reinstate it.  Additionally, time was lost

24   performing director-level duties without proper

25   compensation.  The estimated value of this time

1    is $100,000."  How did you make this calculation,

2    as well?

3         A.    I'm just going to say the same thing.

4    My value -- my time is valuable, even the time

5    spent during this investigation, how long it's

6    taken me to even get to this point of getting to

7    my EEOC complaint, going back and forth during

8    the investigation, and an extreme amount of time

9    to just -- like, to continue restating facts over

10   and over and over.  I spent a lot of time on this

11   case specifically over a few years, so ...

12        Q.    All right.  Other Financial and

13   Workplace Consequences.  "As a result of filing

14   the lawsuit, Plaintiff was forced to work from

15   home instead of coming to the office."  Didn't

16   you choose to work from home?  Was that an

17   interim measure that you were given the option of

18   doing?

19        A.    I was given the option to work from

20   home, but, again, given the circumstances and the

21   situation, it was the best course of action.  I

22   consulted also with my attorneys regarding me

23   working from home.  So while it wasn't a demand,

24   it was the best course of action for me.

25        Q.    Did you miss -- and I'm not including

1    any allegations of meetings that you feel that

2    Dr. Williams excluded you from, but did you miss

3    important meetings at work because you were

4    working at home?

5         A.    Did I miss important meetings as a

6    result of me working from home?

7         Q.    Yes.

8         A.    I think that that is -- that's

9    subjective.  Times where I would have been in the

10   office instead and had to be at home for

11   different meetings or collaborative opportunities

12   I could say were missed from just the nature of

13   when you're in an office, there is a

14   collaborative nature to the work that we do and

15   interaction I'm able to have with students and

16   colleagues.

17        Q.    I'm asking if you missed anything

18   specifically that was maybe on your calendar,

19   that was a required meeting, any trainings that

20   could have advanced your career because you were

21   working from home, anything of that nature.

22        A.    So I would say again, that's

23   subjective because we're in a hybrid environment,

24   so everyone works from home and on campus.  And

25   so meetings are typically constructed in a way

1   that you could go and -- some things have to be

2   in person, but sometimes you're also -- there's a

3   virtual option.

4           So as I said, I just stand behind

5   what I said with the collaborative nature of

6   being in-person and the interaction with

7   students, and some of the things that I naturally

8   was doing that was disrupted by me working from

9   home fully.

10      Q.   So to get back to my question, were

11  you able to still attend everything by working

12  from home?  Other than, you know, informal

13  collaborative processes, were you still able to

14  attend every meeting that you were requested to

15  be at, trainings, etc.?  Were you still able to

16  attend them virtually?

17      A.   Some.

18      Q.   Some.  Which ones were you left out

19  of?

20      A.   I can't name any specific instance

21  right now at this moment.

22      Q.   Were you aware that you were left out

23  of them at the time?

24      A.   I'm just going to stand behind

25  everything that I just said.  Like, if you're

1  asking if there's a specific instant that I can

2  think of from being home that I missed, I'm going

3  to say no, but that doesn't mean that I didn't

4  miss out on anything.

5  Q.    That is what I'm asking.  Thank you.

6  And then the total damages sought are $520,000,

7  comprising the above categories.

8         All right.  So we'll move on to

9  response No. 8 here.  This is referring to any

10  physical, emotional and/or psychological injuries

11  or illnesses that you contend you suffered as a

12  result.

13         For your emotional injuries you write

14  that you felt persistent feelings of humiliation.

15  How did you -- how did you feel humiliated as a

16  result of Defendant's actions?

17  A.    As I shared earlier, feelings of

18  humiliation came from him looping in other

19  higher-ups after attempting to change the way

20  that the Helen Grenga Award is laid out, during

21  the inappropriate interaction that I had prior,

22  just inappropriate commentary in front of others,

23  ruining my reputation by sharing things about the

24  case or the fact that a case existed to Joy as

25  soon as she was hired.  So a culmination of those

1    types of things made me feel humiliated.

2         Q.    You also allege a lack of safety due

3    to Damon's inappropriate behavior here.  Did you

4    ever feel unsafe as result of his behavior?

5         A.    Yes.  I felt emotionally unsafe and

6    professionally not safe.

7         Q.    I mean, physically unsafe?

8         A.    I didn't feel physically not safe.  I

9    felt emotionally and professionally unsafe.

10        Q.    Did you ever have to -- I withdraw

11   that.

12             The next -- we've talked a little bit

13   about your anxiety during this time.  "Georgia

14   Tech's inaction and failure to resolve the

15   situation," how do you allege that Georgia Tech

16   failed to resolve the situation?

17        A.    The situation still is not resolved,

18   so I would say --

19        Q.    I'm asking how they failed to resolve

20   it.

21        A.    The fact that I'm still having to go

22   through this process, the fact that what I

23   experienced was not rectified.  I believe that

24   that shows that it was not resolved.

25        Q.    Is there anything specific that you

1 allege that Georgia Tech did not do to resolve

2 the situation?

3     A.    I mean, essentially Damon was still,

4 at the time of me doing this Complaint, I was

5 still reporting to him, he was still in charge of

6 my performance and performance evaluations and

7 goals and things like that, so...

8     Q.    Did you ever receive a performance

9 evaluation from Dr. Williams?

10     A.    I did not receive a performance -- I

11 don't think I received a performance evaluation

12 from him, no, but it -- still, during that

13 performance period, he was overseeing my

14 performance from the time that there was no

15 director in place -- during the time there was no

16 director in place.

17     Q.    You mentioned emotional strain here,

18 performing duties without -- duties of a director

19 without proper acknowledgement, support or

20 compensation.  I think we talked a little bit

21 about it before, but just to answer this one,

22 what do you feel should have been the proper

23 acknowledgment, support or composition for that?

24     A.    I should have been receiving

25 director-level pay, and -- acknowledgement,

1  support and compensation.  Like, I was literally

2  running the entire Women in Engineering Program

3  by myself.  And I don't know if I can fully

4  explain all that was on my plate for one person

5  to do.  It was a lot, and I -- yeah, I was

6  completely responsible for the success or failure

7  of the program during that time, so...and

8  thankfully I did a good job, and the result of my

9  work is still evident in what Women in

10  Engineering looked like up until I left.

11       Q.    Moving on to your psychological

12  injuries that you've alleged here, you mentioned

13  a couple of these.  I'm not -- I just want to ask

14  you a couple of general questions.  Did you ever

15  see a therapist about these issues you were

16  experiencing?

17       A.    I know that at one point I was seeing

18  a therapist, but I can't really recall the timing

19  of when.  But I also had coaching and just a

20  spiritual community during this time.

21       Q.    Did you see any physician for any

22  physical symptoms of these -- well, I'll move on

23  to that in a minute.  Did you see any -- strike

24  that.  I'll take that back.

25            Moving on to physical injuries, then,

1  persistent headaches, insomnia, chronic fatigue,

2  physical exhaustion, did you ever see a physician

3  about these symptoms?

4      A.    No.

5      Q.    Did you have any of these issues

6  before you started at Georgia Tech?

7      A.    No.

8      Q.    And then just one more.  A couple

9  more questions and we should be wrapping up here.

10          You mentioned that you had to, this

11  is what's highlighted here, you were made to feel

12  as though you had to go with the flow to maintain

13  your employment.  What was this based on?

14      A.    The environment.

15      Q.    Did anybody specifically tell you you

16  have to just go with the flow because of this?

17      A.    No one specifically told me that I

18  just had to go with the flow, but given the

19  nature of the situation and my role in the dean's

20  office, things had to keep moving.  This was

21  going on during a very, very busy time of the

22  semester, in between me giving out scholarships,

23  planning for the banquet, managing our grants and

24  corporate funds that fund scholarships.  There

25  was a lot to do, and if I wasn't going to do it,

1   then who was?  Like, I still had to perform and
2   still had to keep the program running, despite
3   all of the challenges that I was experiencing
4   during the time.
5       Q.    At the bottom of this you say you
6   were not fully informed about the decisions being
7   made on your behalf.  What decisions are you
8   referring to here?
9       A.    Like the supplemental pay, like in
10  the beginning where it says there weren't any
11  offer letters, contracts or formal documentation
12  regarding what the transition explicitly was
13  going to be, what I was -- what role I was going
14  to play, or if there was a different interim
15  director, what they were going to do, how
16  responsibilities would be split up.  Pretty you
17  much every -- there was nothing communicated to
18  me besides just that Dr. Valle was leaving.
19           And then I had, again, had to keep
20  things going without a lot of direction or
21  communication, which was also limited further
22  once I had my Complaint since there was no
23  communication really happening between Damon and
24  myself.
25      Q.    Did anybody ever tell you that you

1    were just not allowed to make certain decisions,

2    yeah, certain decisions that you just referred

3    to?  Did anybody ever tell you that you weren't

4    allowed?

5         A.    I don't know what decisions I would

6    have made as it relates to my supplemental pay or

7    things that are above me.  I made decisions for

8    the program, like I said, to keep the program

9    going because I had to.

10        Q.    Are you seeking -- I know you don't

11   work there any more, but are you seeking

12   reinstatement to some type of position at Georgia

13   Tech?

14        A.    No, not anymore.

15        Q.    What else you seeking through this

16   lawsuit?

17        A.    I would like -- ultimately I would

18   just like justice, and I would like for it to be

19   acknowledged that what I said happened, happened;

20   that it was inappropriate, that it was sexual

21   harassment.  I would like disciplinary

22   consequences for Damon, in addition to monetary

23   damages that I've noted in my Complaint.

24        Q.    And just to wrap up here more

25   broadly, did you ever take any personal

1  recordings while you were employed at Georgia

2  Tech?

3          A.    Personal recordings?

4          Q.    Yes.

5          A.    No.

6          Q.    Have you ever kept any diary entries

7  about any of these allegations?

8          A.    No, I don't believe so.

9          Q.    And I see you have your notebook.

10  But other than your notebook that you've referred

11  to, did you ever take or copy any other documents

12  from Georgia Tech prior to your resignation date?

13          A.    Take documents?

14          Q.    Yes.

15          A.    No.  The only documents that I have

16  are documents that I submitted to the University

17  and my attorney.

18          Q.    I believe that is everything.  Let me

19  just -- if I could go offline for about two

20  minutes and come back, I just want to make sure

21  that I've asked all my questions today, and

22  hopefully we can get you out of here.  So give me

23  a couple moments.

24              (Off the record at 3:51 p.m. EST)

25                    --------------

1          (On the record at 3:53 p.m. EST)

2          MS. WHITFIELD:  We're finished.  I

3     have no more questions for you, Ms. Turner.

4     I thank you for your time today, unless

5     Ms. Thurman has any questions for you.

6          MS. THURMAN:  I do not.

7          MS. WHITFIELD:  I appreciate

8     everything, and I will be requesting an

9     e-transcript, Ms. Vargas.

10          THE COURT REPORTER:  All right.

11     Thank you.  I have that.  And Ms. Thurman

12     already said they're waiving signature and

13     she ordered a copy, so I'll go ahead and

14     sign us all off.

15               (Time noted: 3:54 p.m.)

16

17

18

19

20

21

22

23

24

25

DISCLOSURE

STATE OF GEORGIA
COUNTY OF FULTON

WITNESS: DESIREE TURNER

        Pursuant to Article 10.B of the Rules and
Regulations of the Board of Court Reporting of
the Judicial Council of Georgia, I make the
following disclosure:

        I am a Georgia Certified Court Reporter.

        I am not disqualified for a relationship of
interest under the provisions of O.C.G.A.
9-11-28(c).

        I am a representative of Vargas Reporting
Services, Inc.

        Vargas Reporting Services, Inc. will not be
taking this proceeding under any contract that is
prohibited by Georgia law.

                                 _____
                                 Marianne Vargas, CCR, CVR-M
                                 Certified Court Reporter
                                 Certificate Number B-1832

C E R T I F I C A T E

STATE OF GEORGIA:

COUNTY OF FULTON:

I hereby certify that the foregoing proceeding was taken down as stated in the caption, and the colloquies and questions and answers were reduced to typewriting under my direction; that the foregoing transcript is a true and correct record of the evidence given upon said hearing. I further certify that I am not of kin or counsel to the parties in the case, and am not in the regular employ of counsel for any of the said parties, nor am I in any way interested in the outcome of the case.

This certification is expressly withdrawn and denied upon the alteration, disassembly, and/or photocopying of the foregoing proceedings, including exhibits, unless such is done by the undersigned certified court reporter and the signature and original seal is attached thereto.

This date, September 15, 2025.

_____

Marianne Vargas, CCR, CVR-M
Certified Court Reporter
Certificate Number B-1832