## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

DESIREE TURNER,          )
                                  )

     Plaintiff,           )
                                  )   Civil Action File No.
v.                             )   1:24-CV-02139-SEG-JCF
                                  )
BOARD OF REGENTS OF THE   )
UNIVERSITY SYSTEM OF       )
GEORGIA by and on behalf of    )
GEORGIA INSTITUTE OF       )
TECHNOLOGY, and DAMON P.  )
WILLIAMS, in his official and   )
individual capacities,         )
                                  )
     Defendants.         )

## PLAINTIFF'S RESPONSES TO DEFENDANTS' FIRST INTERROGATORIES TO PLAINTIFF

NOW COMES, Plaintiff, DESIREE TURNER, through her attorney

CARLA D. AIKENS, P.L.C., by Carla D. Aikens, states the following in support

of his answers to Defendant's First Interrogatories to Plaintiff.

## INTERROGATORIES

1.

Please identify all persons whom you believe have knowledge or

information concerning the claims in this lawsuit. For each person so identified,

1



TURNER. v WILLIAMS, et al.
DESIREE TURNER  9/3/25
D-1
Marianne Vargas, CCR, CVR

provide a brief description of the knowledge or information you believe such person possesses.

**RESPONSE: Felicia Benton-Johnson, Cassandra Evans, and Markyta Holton have knowledge and/or information concerning the claims made in this lawsuit.**

**1.     Felicia Benton-Johnson: Ms. Benton-Johnson encouraged Plaintiff to report Damon's behavior to HR. Ms. Benton-Johnson has knowledge of the culture within the College of Engineering Dean's office and is familiar with current and former female students who have reported inappropriate behavior involving Damon.**

**2.     Cassandra Evans: At the time of the alleged incidents, Ms. Evans served as Damon's Assistant and had access to his conversations and emails. She may have knowledge of his conduct during this period, including actions that appeared intended to discredit or belittle me following my report to the Title IX office.**

**3.     Markyta Holton: Ms. Holton relayed to Plaintiff that she's experienced inappropriate behavior from Damon during this year. As an employee within the College of Engineering Dean's office, she may also provide insights into the workplace culture. Additionally, she has indicated that other staff**

**members warned her about Damon's unprofessional tendencies upon her joining the office.**

2.

Regarding the individuals named in your response to the preceding interrogatory, please state whether any of these individuals has given any statement or account, either orally or in writing, of his or her knowledge of any fact in question, and if so, please give the date, witnesses to, and substance of each statement or account.

**RESPONSE: Felicia Benton-Johnson accompanied Plaintiff to speak with Dawniah Franklin on January 10th. To her knowledge, no other individual identified in the preceding interrogatory has provided a statement or account, either orally or in writing, regarding their knowledge of any fact related to this case.**

3.

Please outline your educational background, identifying all schools, universities or colleges you have attended. In so doing please include the dates and degrees you obtained or sought to obtain.

**RESPONSE: Plaintiff attended the following educational institutions:**

**1. Virginia Tech**

- **Degree: Bachelor of Science in Applied Economic Management**

- **Graduation Date: May 2015**

**2.     Relay Graduate School of Education**

- **Degree: Master of Arts in Teaching**

- **Graduation Date: June 2020**

4.

Please outline your employment history prior to your employment with Defendant, including dates of employment, position held, name of employer, and your reason for leaving each employer.

**RESPONSE:**

- **KIPP South Fulton Academy**

  - **Dates of Employment: 2018 – 2022**
  - **Position Held: English Language Arts Teacher**
  - **Reason for Leaving: Pursued career advancement opportunities.**

- **Navy Federal Credit Union**

  - **Dates of Employment: 2016 – 2018**
  - **Position Held: Staff Assistant III**
  - **Reason for Leaving: Relocated to Atlanta, GA.**

5.

Please identify and describe any positions of employment that you have held since your employment with Defendant, including: the employer's name; your job title(s); your job duties; your rate of pay or salary; the dates during which you worked there; and your reason for leaving. In doing so, also include information for any periods of time in which you have been unemployed or self-employed.

**RESPONSE: None.**

6.

Please state the nature and amount of all damages that you contend you have suffered as a result of Defendant's allegedly unlawful conduct towards you. In so doing, also describe in detail how the damages described in the response to this interrogatory were computed and/or calculated.

**RESPONSE:**

**The damages Plaintiff has suffered as a result of Defendant's allegedly unlawful conduct include the following categories, along with the manner in which they were calculated:**
1. **Loss of Earnings and Underpayment:**
   o **Plaintiff was underpaid for the responsibilities she undertook as interim director of the Women in Engineering (WIE) program. Despite performing director-level duties beginning January 2, 2023, she was never formally given the interim director title or equitable pay for this role. Instead, she received supplemental pay that was not equivalent to the compensation of a director, which is approximately $170,000.**
   o **A 9% supplemental pay increase was provided, but directors make at least $170,000 and her salary was increased to only $71,000, resulting in a significant pay disparity. Additionally, this**

supplemental pay was terminated early without notification, leading to further financial harm. Her pay was docked for a month before the issue was corrected.

- o The total amount of lost earnings is calculated based on the difference between the supplemental pay she received and the compensation of a director, for the period during which she performed director-level duties from 1/2/2023 to 8/14/2023. This amounts to approximately $70,000.

2. **Emotional Distress and Mental Anguish:**
   - o The actions of the Defendant, including dismissive behavior, inappropriate comments, and inequitable treatment, have caused significant emotional distress. Working in a hostile and demeaning environment led to anxiety, stress, and a diminished sense of professional value.
   - o Emotional distress damages are difficult to quantify precisely; however, they are a direct result of the Defendant's actions and are valued at $75,000.

3. **Professional Harm and Reputational Damage:**
   - o The Defendant's conduct negatively impacted Plaintiff's career trajectory. Despite her qualifications and proven ability to handle the responsibilities of the director role, she was overlooked, which may affect future opportunities and earning potential.
   - o The damage to Plaintiff's professional reputation is reflected in the lost opportunity for career advancement and the potential long-term impact on her professional relationships and network. Estimated damages for professional harm are valued at $100,000.

4. **Administrative Time and Effort:**
   - o Significant time and effort were spent addressing issues related to the supplemental pay, including repeated communications with HR and management to reinstate it. Additionally, time was lost performing director-level duties without proper compensation.
   - o The estimated value of this time is $100,000.

5. **Other Financial and Workplace Consequences:**
   - o As a result of filing this lawsuit, Plaintiff was forced to work from home instead of coming to the office, which has disrupted her ability to fully engage with her work and colleagues.
   - o Additionally, she continued to handle WIE responsibilities even after Joy was hired to cover 60% of WIE, leading to an increased workload without adequate support or compensation.

- o **Estimated damages for these workplace consequences amount to $175,000.**
**Total damages sought are $520,000 comprising the above categories.**

7.

Please identify all efforts you have made to mitigate your alleged damages.

**RESPONSE: Plaintiff was unable to take specific efforts to mitigate the damages due to the nature of the situation she was placed in. Plaintiff was not provided with any offer letters, contracts, or formal documentation regarding changes in my role or responsibilities. The lack of clear communication and transparency left her in a position where she was not an active participant in the decisions being made about her employment and compensation.
During this time, she was made to feel as though she had to "go with the flow" to maintain her employment. She continued performing the duties of the role assigned to her without the authority, title, or proper compensation that corresponded to the work she was doing. These circumstances prevented her from seeking alternative ways to address or resolve the situation, as she was not fully informed about the decisions being made on her behalf.**

8.

Please identify with specificity any physical, emotional, and/or

psychological injuries and/or illnesses that you contend you suffered as a result of

the actions of Defendant and/or agents or employees of Defendant.

**RESPONSE: As a result of the Defendant's actions, specifically Damon's sexual harassment and Georgia Tech's failure to take meaningful action to address his inappropriate behavior, Plaintiff suffered the following emotional, psychological, and physical injuries:**

**1. Emotional Injuries:**

- **Persistent feelings of humiliation and lack of safety due to Damon's inappropriate behavior.**
- **Ongoing frustration and anxiety caused by Georgia Tech's inaction and failure to resolve the situation.**
- **Emotional strain from performing the duties of a director without proper acknowledgment, support, or compensation.**
- **Professional demoralization and feelings of inequity after seeing someone else (Joy) brought into the role she was effectively performing, at significantly higher compensation.**
- **Financial stress stemming from being underpaid, having supplemental pay temporarily removed, and delays in correcting payroll issues.**

**2. Psychological Injuries:**

- **Chronic anxiety and heightened stress from working in a hostile environment.**
- **Feelings of diminished self-worth and confidence in her professional capabilities.**
- **Erosion of her trust in the institution and its ability to address workplace issues equitably.**
- **Mental exhaustion from the expectation to perform well, despite the toxic workplace environment.**

**3. Physical Injuries:**

- **Persistent headaches caused by prolonged stress.**
- **Insomnia and difficulty maintaining restful sleep due to the distressing environment.**
- **Chronic fatigue and physical exhaustion from enduring constant workplace tension.**
- **Physical tension and symptoms of heightened anxiety, especially when anticipating interactions with Damon.**

9.

If you do allege that you have suffered any physical, emotional and/or psychological injuries and/or illnesses as a result of the actions of Defendant and/or agents or employees of Defendant, please identify each and every physician, psychiatrist, mental health practitioner or other practitioner of the healing arts that has treated you for any such physical, emotional and/or psychological condition(s).

**RESPONSE:**

**Plaintiff has not sought formal treatment from a physician, psychiatrist, mental health practitioner, or other licensed practitioner of the healing arts for the physical, emotional, and psychological injuries she has suffered as a result of the Defendant's actions.**

**Instead, Plaintiff has relied on the support of her faith community, family, and friends. Her church and mentors have been instrumental in helping her navigate this challenging time. Specifically, Qiuana Glover, a close friend and the minister of Crisis Here Ministries, has provided significant emotional and spiritual guidance during this process.**

10.

Please identify each expert witness upon whom you expect to rely at trial and identify the subject matter of his or her testimony.

**RESPONSE: Plaintiff has not chosen an expert at this time. Discovery is ongoing.**

11.

Please identify each lawsuit, including but not limited to bankruptcy proceedings, in which you have been a party (other than this one), including: the style of the case, the court, the nature of the case, and the outcome, including the amount of money received as a plaintiff or paid as a defendant, if any.

**RESPONSE: None.**

12.

If you have ever made or filed any complaints, grievances, or administrative charges of discrimination or retaliation in which you alleged that any person, organization, or entity violated your rights, please state the date, substance, target of, and the result of each such complaint, grievance, or administrative charge.

**RESPONSE: Other than Plaintiff's EEOC charge for this case, none.**

13.

Please identify every complaint, grievance, and administrative charge of discrimination or retaliation you have made related to USG and GT and/or Dr. Damon Williams. In so doing, state the date, substance, target of, and the result of each such complaint, grievance, or administrative charge.

**RESPONSE: The only additional complaint Plaintiff has made regarding Dr. Damon Williams was submitted to the Title IX Office.**
- **Date of Complaint: January 10, 2023**

- **Substance of Complaint: Allegations of inappropriate behavior by Dr. Damon Williams.**
- **Target of Complaint: Dr. Damon Williams.**
- **Result: The Title IX Office determined that sexual harassment did not occur; however, the judge noted that some of Dr. Williams' behavior could be considered "inappropriate."**

14.

Please describe every instance in which you contend you reported or complained of Dr. Williams' conduct to GT, including the date of each report or complaint, to whom the report or complaint was made, the content of the report or complaint, the method of the report (i.e. verbal or written), and any witnesses to each report or complaint.

**RESPONSE: Plaintiff made a formal complaint to HR (Dawniah Franklin) and the Title IX office (Chris Griffin) on January 10th, 2023, both verbally and in writing. Felicia Benton-Johnson was a witness to her conversation with Dawniah.**

15.

Please identify each action or statement by Defendant or anyone employed by and/or affiliated with USG and GT that you contend constitutes evidence of discrimination or retaliation. In doing so, provide the date on which you contend each act occurred or each statement was made, identify the individual you contend

took each action or made each statement, and identify any witnesses to each action

or statement.

RESPONSE: Plaintiff states:

Since filing my Title IX complaint on January 10, 2023, there have been two retaliatory events which I believe constitute evidence of discrimination and retaliation. On February 9, 2023, I felt undermined during an email interaction between myself, other Associate Deans, and Damon. I had sent an email to Damon to set up a meeting to select scholarship award winners for our upcoming banquet, following a briefing from my former Director, Dr. Valle, on the selection process. Despite the process being discussed multiple times through meetings and emails, Damon tried to exclude me from the meeting I was supposed to lead with the Associate Deans, citing that they had not requested my attendance. I disagreed with his decision and emailed him directly to express that this was not how things had been done in the past, although I would oblige if he still preferred my exclusion. Damon responded by forwarding our entire email chain to the Associate Deans, implying that I was attempting to change the process and referring to me as the "Educational Outreach Manager of WIE" rather than my actual title of Associate Director. One of the Associate Deans responded confirming that I should be included in the meeting. The meeting was held on February 21, 2023, but Damon did not attend. The email chain included the following staff/faculty: Krista Walton, Kimberly Kurtis, Terri Lee, and Cassandra Evans.

Additionally, I learned that Damon appointed an interim director for WIE, Joy Harris, and neither Damon nor Joy communicated with me about this role. I continue to perform all the duties of the director role without the supplemental pay that would normally accompany it, and I believe this decision is retaliatory for my complaint. Joy Harris was later hired as the Director for WIE on July 5, 2023, without any announcement or communication with me.

On March 7, 2023, I contacted the then-director of Title IX, Chris Griffin, to relay my concerns about the retaliation. We met on March 13, 2023, and during that meeting, she characterized my interaction with Damon as a "misunderstanding." Regarding the Interim Director role, she suggested that the announcement might have just been delayed and advised me to wait. She expressed uncertainty about whether the actions I mentioned constituted

**retaliation but stated that if I chose to pursue it, the investigation would take longer. She concluded the meeting by stating she would follow up, but she never did. On April 6, 2023, I reached out to Chris for a status update, and after some scheduling difficulties, she emailed me on April 18, 2023, stating that the investigation was still under review. I received a summary of the investigation on April 28, 2023, but it contained multiple inaccuracies. I provided corrections on May 8, 2023, and offered additional evidence on May 9, 2023. On May 19, 2023, Chris informed me that the investigator had determined additional investigation was necessary and that I would have a response within two to three weeks. I followed up with the Executive Director of Title IX, Alexis Martinez. on June 28, 2023, after not receiving any further updates.**

16.

You allege in your Complaint that you were harassed by Dr. Damon Williams. Please explain this allegation in detail, including the nature and content of the harassment, the date(s) of each incident(s), describe what occurred during each incident, and the names of any individuals who witnessed these incidents. Please do not simply refer to the Complaint.

**RESPONSE: Plaintiff states:**

**Damon and I began meeting when I realized that Christine was leaving, and given his new role and the fact that we would be working together more closely, I wanted to gauge how he was handling the transition, discuss my experience with Women in Engineering, and my ideas on how to further the impact of our program on campus.**

**Our first meeting was on October 24, 2022. Damon asked if I would like the director position and discussed that the PhD qualification was moved from required to preferred and I told him I would think about it.**

We met again on November 8, 2022. During this meeting with discussed me being the interim director for WIE, getting a search committee together for the Director role, and I told him that I would apply for the job, He also asked me questions about how I would act if I don't get the job and if we would be "friends" and told me to create a list of PhD programs that I could apply to during the spring for us to discuss at our next meeting. I applied for the Director role on November 10th.

On December 1st, there was an academic team meeting in which there was a moment with another team member that did not go so well (Damon was not present at this meeting). After the meeting, Damon came to the conference room on the 3rd floor and the first thing he said to me was "You look different". On this particular day, I was not wearing makeup but I was still dressed professionally and presentable. I responded with "oh wow Damon, is it because I am not wearing makeup? Are you saying I look tired? Wowww, HR!" and I laughed, as a joke. Lauren Morton and Mitchell Walker were present for this conversation. The convo moved into a different direction and then Damon says, randomly, "I know what it is! You look lighter. Does your makeup make you look darker?" I said "I don't know? Maybe?" and then Lauren said "Well you look beautiful as always Desiree!" and we moved on. That day, Damon and I were scheduled to have a one on one to discuss the open director role further, and I planned to tell him about the PhD programs I looked into. Lunch was brought into the break room and Damon asked me to make him a plate while telling Lauren that him & I are "besties!" He moved our one and one meeting up that day, and rescheduled it for shortly after lunch. During the meeting he explained to me that I would not be getting the director role because I am "not ready". Damon was debriefed about the academic meeting and described my team member as "disgruntled and unhappy" and he said think about her position – "you're young and energetic and you're prettier than her so that interaction didn't have anything to do with you". He then went on to say how he needs to "coach and mentor" me and that I need to "trust him" to help me to grow in my career and he will "get me to where I'm trying to go". When I brought up the PhD programs, he said that he didn't think I would "actually do that"… even though he requested that I do so when we met on November 8th. After our conversation in the conference room, he asked me to come to his office because he wanted me to copy an org chart he created on his whiteboard. He was sitting at this desk, and I was sitting across his desk looking at the board, but I could see him with my peripheral vision. As I was

copying the org chart, I noticed him sliding my Buzzcard out of it's holder and eyeing my picture; then sliding my Buzzcard back in its holder. On this day, Lauren came to my office area as I was meeting with a student, per Damon's request, and said that Damon needed me for a meeting that was being held on the 3rd floor. This meeting was not on my calendar and I was already meeting with a student, so I told Lauren I would be down in a bit. When I got to the meeting, Damon asked for me to take notes for him, although there was a student who was also present taking notes. I came to the meeting a little late, but it was not a meeting that I actually needed to be a part of. Later that evening, I called Lauren Morton to see if she thought that the interaction with Damon (when she was around after the academic team meeting) was inappropriate and she expressed that she didn't think so and since he is well respected on campus then maybe I should let him coach me.

The following week on December 7th, Damon and I had a teams meeting where he let me know that if I needed a shoulder to cry on, he would be available and how he has to be a shoulder for plenty of people due to his pastoral duties and relationships. My grandmother passed the week prior and I let him know that I did not cry often and probably wouldn't take him up on that offer. This date, he also let me know that he was going to be the interim director for both WIE and CEED, as Felicia (the former director of CEED) was going to be leaving the college soon.

On December 15th we did not have a meeting scheduled and Damon Teams messaged me to ask if I was available for a meeting he had in the conference room on the 3rd floor. When I came downstairs and walked into the conference room, he looked me up and down in a suggestive manner and I made a weird face in response. He then wanted me to sit beside him for a virtual meeting he was having with someone instead of just using the conference room AV equipment (in which I did not truly need to be looped in on). After the meeting he asked if I wanted to ride with him and LaJauna to the holiday luncheon. After the luncheon, as we were heading back into Tech Tower – LaJauna was some steps in front of me along with David, Damon made a comment about how nice my hair looked.

January 4th after a meeting with LaJauna Ellis and Susan Gilstrap, I pulled LaJauna to the side to ask if she was familiar with Damon at all and asked if she ever worked with him prior to his role in the Dean's office. She relayed that she had not, but described him as "overly familiar" and too personable in his conversations within the office. She relayed that the he was in the

process of hiring two new tech temps (2 female former GT students) and wanted to pay them $50/hr which was outlandish. I confided in LaJauna about Damon's previous interactions with me that made me uncomfortable – i.e overly complimenting me, excessive meetings, asking me to make him food, etc. (everything described in this letter prior to this date). She called him an "Associate Dean gone wild" and also described a sexual harassment issue that she faced in her role prior to coming to the Dean's office – she worked in ECE and had a boss who gave her Victoria Secret Lingerie as a gift. She also said that she liked how I am not outright saying "sexual harassment" but inquiring about whether or not Damon's actions were appropriate or not. She gave me advice to pray and ask the Holy Spirit for guidance in this situation, and also said that the next time he ventures off into an inappropriate sidebar when we are having a conversation, to just redirect the conversation back to whatever our agenda is for that meeting. Which led me to create an agenda for our next scheduled meeting to take place on January 6th.

Our last meeting was on Friday January 6th after a celebration for a team member who moved to another group. Damon had asked about meeting with me Thursday but I was working remotely so I scheduled a meeting for 3pm Friday. During the celebration lunch, Damon made comments about how I was scheduling "unnecessary meetings" and joking around a lot about "how he gets treated". I expressed how I made an agenda for the meeting and there were three things that were a high priority for us to talk about. He wanted to move our meeting to earlier so I made arrangements to accommodate him. We had a sponsorship meeting also scheduled so we had back to back meetings. During the first half of us meeting, as I was discussing the items in the agenda, he said that some of these things could be in an email and that he will have to get used to working with me because, like his wife, I like to discuss too many details unnecessarily. *During this time, a BME student (who I also have a relationship with) came to the office looking for him saying that he told her to come by after the break. I was confused as to why this new student in particular would need to meet with him, as he is a professor in ISYE. After talking with this student on January 13, 2023, she told me that he's also called her personal cell phone after another student gave her phone number to him.* After the sponsorship meeting, we debriefed and then continued to discuss my performance review and the goals that I would need to set for this year. Because it was Friday, I was wearing jeans, a WIE polo, and sneakers. There were multiple comments made that were egregious and inappropriate during this interaction. He

started discuss my appearance and said that I needed to "dress up more" if I wanted to "be taken seriously" because he would "never wear jeans on campus" and you "rarely see him without a tie". He mentioned maybe I needed to meet his wife because maybe it would make more sense coming from another woman. He also said that the headshot I have for Teams/Outlook/WIE Website was more like a Facebook photo and I need to get a new one. He said that I should wear my hair in a bun and wear my glasses and find somewhere to take a better picture. He then showed me pictures of other leaders on campus and said that I need to have something that looks more like photos of our leaders. I expressed that I thought my picture was fine and that if I wanted to wear my hair down that that shouldn't be an issue. He then googled pictures of other women's headshots and said "as you're laying in bed with Ray tonight, look through these pictures and pick which pose you would like to do for your headshot". Additionally, throughout our interaction at this time he kept referencing Ray and asking for his name, etc. saying he forgot…. Which was not relevant to anything that we were discussing. When we were talking about my performance and goals I should create, he started talking about me creating an algorithm that would match our female students with potential employers/sponsors. He compared it to Tinder and asked me what is the minimum height of someone I would date. He then described what my profile would be like and what his would be like and how we would match and that's how the algorithm would work because "Tinder knows what you like and what you're looking for". Lastly, during this meeting he also described himself as a workaholic and that if I needed something from him at 3AM that it would be okay, although he wouldn't ask me for something at that hour… but he would be fine because he works "all the time". Typically, performance appraisal process does not start in January, but in my case I needed to create new goals because my probationary period at Georgia Tech ended in December. After your probationary period, you have to start a new performance appraisal process.

17.

Please describe in detail your source of information and belief in Paragraphs 133 and 134 the allegation that Defendant Williams caused others to ostracize you,

prevented you from advancing in your career opportunities, and made comments to individuals at other schools affecting your job prospects and tainting your professional reputation. In your description, please include the dates these alleged actions occurred, the identity of the other individuals at other schools to whom these statements were allegedly made, and describe in detail how this has affected your professional reputation.

**RESPONSE: Plaintiff states:**

**In response to the allegations in Paragraphs 133 and 134 regarding Defendant Williams' actions that caused others to ostracize me, hindered my career advancement, and damaged my professional reputation, I offer the following detailed explanation based on my direct experiences and observations:**

1. **Exclusion from Meetings and Travel Opportunities: After I began pursuing action regarding Damon's sexual harassment, I noticed a pattern of being excluded from important meetings and travel opportunities that were routinely extended to others with the same role. Specifically, there were instances where colleagues with similar responsibilities were invited to attend key events, while I was left out. This exclusion, in my opinion, appeared to be an intentional attempt to isolate me from professional opportunities and networking events that could have supported my career development.**
2. **Damaging Conversations with Joy, my manager: Defendant Williams took actions that directly affected my professional reputation by having a conversation with Joy about the ongoing sexual harassment case. Despite explicit instructions to refrain from discussing the matter, Williams spoke to Joy about it, which led her to make a comment to me that was not only inappropriate but also unfairly tainted my professional image. I had never previously discussed Damon or the case with Joy, and his actions in discussing the case with her only served to fuel rumors and create an environment where my professional reputation was compromised.**
3. **Interactions with Angelitha Daniel at NC State: When I first met Angelitha Daniel from NC State, she mentioned that she knew Damon professionally. Shortly after I reached out to her (likely around May) to**

reconnect as she mentioned being open in offering career guidance, I noticed that she stopped responding to my attempts to communicate. This sudden cessation of communication seemed unusual to me, especially given her initial statement about her familiarity with Damon. While I acknowledge that I was under significant emotional stress at the time, and there is a possibility I may have been overly sensitive or paranoid, the timing of her disengagement felt connected to the broader context of my strained professional relationships during that period.

4. **Impact on My Professional Reputation:** These events—being excluded from key meetings and opportunities, the damaging conversation with Joy, and the sudden change in behavior from Angelitha Daniel— collectively contributed to a sense that my professional reputation was being undermined. At the time, I felt that I could not trust who I could confide in, as the boundaries between personal and professional relationships had become blurred, and I was concerned that negative comments or rumors about me were spreading. The impact was felt not only in my immediate professional environment but also potentially within broader academic and professional circles, where the actions of Defendant Williams may have led others to view me in a negative light, affecting my job prospects and relationships within the industry.

Dated: January 17, 2025

/s/Desiree Turner
**Desiree Turner, Plaintiff**

**As to Objections only:**

Respectfully Submitted,

*/s/Carla D. Aikens*
Carla D. Aikens, (P69530)
*Attorneys for Plaintiff*
615 Griswold, Suite 709
Detroit, MI 48226
Phone: 844-835-2993
Fax: 877-454-1680
Email: carla@aikenslawfirm.com

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been served upon all opposing parties, or their attorney of record, via email correspondence on January 17, 2025.

*/s/Patricia Ramirez*
Patricia Ramirez, Paralegal
CARLA D. AIKENS, P.L.C.
