

October 25, 2023

Desiree Turner
Sent electronically to desiree.turner@coe.gatech.edu

**PERSONAL AND CONFIDENTIAL**

Regarding Case Number: 2022438502

Georgia Institute of Technology

Employee Sexual Misconduct Policy

Notification of Decision – Title IX Hearing

Dear Desiree:

The purpose of this communication is to notify you of the outcome of the Title IX hearing held before me on September 13, 2023 and October 11, 2023 and to apprise you of resulting disciplinary or administrative actions, if any.

On January 18, 2023, a Title IX complaint was filed with Georgia Tech's Title IX Coordinator alleging Damon Williams ("Respondent") violated the Sexual Misconduct policy's prohibitions on:

Allegation - Sexual Harassment (Other Than Student on Student): Complainant alleges Respondent subjected her to sexual harassment (Other Than Student on Student) when he:

1. Made comments about her appearance.
2. Asked her to get him a plate of food and take notes for him.
3. Looked at her suggestively on one occasion.
4. Made comments about her boyfriend and her lying in bed.

Human Resources
Georgia Institute of Technology
Atlanta, GA 30332-0435 U.S.A.
Phone 404.894.4847 Fax 404.894.0944
www.ohr.gatech.edu or www.careers.gatech.edu

*A Unit of the University System of Georgia | An Equal Education and Employment Opportunity Institution*



> 5. Suggested Complainant create a Tinder-like algorithm to match female students with potential employers/sponsors and asked Complainant for the minimum height, among other things, of someone she would date.

An investigation of the allegations was conducted by Investigator, Holly McDaniel, Littler Mendelson. You were provided with an opportunity to review and respond to all relevant and directly related information gathered during the investigation and prior to finalization of the investigation report.

A copy of the final report of investigation and directly related evidence was provided to you on July 11, 2023 and a Notice of Hearing was sent to you on August 16, 2023. You attended a pre-hearing meeting with me, the Decision Maker, on September 6, 2023. The following individuals were questioned as witnesses at the live hearing:

> 1. LaJauna Ellis
> 2. Andrea Comsa
> 3. Ridha Sohani
> 4. Dawn Franklin
> 5. Lauren Morton

On September 13, 2023 and October 11, 2023, a Title IX hearing was held virtually to determine responsibility for alleged violations of Georgia Tech's Sexual Misconduct policy. You, the Respondent, the Investigator, Complainant's advisor (Carla Aikens), and Respondent's advisor (LeRoya Chester Jennings) attended the hearing. Based on information presented at the hearing and provided in the final report of investigation, the following findings of facts, rationale, and decision are made:

- Respondent was Complainant's direct supervisor during a period of time while the Director of Women in Engineering ("WIE") position was unfilled. In October 2022 Complainant reached out to Respondent to "pick his brain" about her job responsibilities and ideas. Complainant sought Respondent's assistance in helping to develop her career at Georgia Tech. Complainant was new to the work environment at Tech, and Respondent had been employed at Tech for approximately thirteen years. Respondent and Complainant discussed the possibility of Complainant applying for the open director position. Complainant applied for the director position, but Complainant did not meet the requirements of the position (she lacked a "terminal degree"). Despite her lack of terminal degree, Complainant continues to work at Georgia Tech, and she believes that she is qualified and was capable of leading the WIE program even though she does not meet the stated requirements.

- On December 1, 2022 there was a group meeting where Respondent said to Complainant: "You look different". Complainant responded in a joking manner saying that she was not wearing make-up and asked if she looked tired. Other employees in the room who heard the conversation did not perceive the conversation as based on sex. Lunch was brought in for a different group, and the leftover food was available. Complainant reported that Respondent asked her to "make him a plate" of food. Respondent was working and was worried that there would be no sandwiches remaining. Complainant brought a sandwich to Respondent and did not indicate any displeasure in being asked to grab a sandwich for Respondent. After lunch Respondent told Complainant that she would not be getting the Director of WIE

position. The decision to reject Complainant's application for the Director position was not made by Respondent. Complainant's application was not submitted to the selection committee for consideration because she did not meet the stated requirement of having a PhD or "terminal degree".

- Following lunch on December 1, 2022, Respondent and Complainant had a meeting in his office to copy an organizational chart. Respondent's office is small, and Complainant put her lanyard containing keys and her buzz card on Respondent's desk. Respondent noticed a set of keys and buzz card on his desk, and he looked at them to determine who had left their buzz card on his desk. Later in the day on December 1, 2022, Respondent at the last-minute asked Complainant to attend a task force meeting dealing with sexual harassment complaints of student interns who were working at businesses outside of Georgia Tech. Respondent asked Complainant to attend because he thought it would be helpful, since the Director of WIE position had not been filled, and Complainant was the only person in the WIE office. Complainant was not asked to attend for the sole purpose of taking notes, and her inclusion in a new task force initiative was in furtherance of her job goals.

- On December 15, 2022 Complainant and Respondent had a brief meeting, and Complainant asserts he looked at her in a "suggestive" manner. Respondent offered Complainant a ride to a holiday/retirement luncheon, and she accepted. The luncheon was held at an off-campus restaurant and over thirty people were in attendance. Complainant sat at the table with Respondent and others during the luncheon. The discussion at lunch included work styles and the volume of work including working from home at night. Respondent drove his car, and Lajuana Ellis ("Ellis"), David Toriello ("Torello") and Complainant all rode to and from the luncheon with Respondent. Ellis rode in the front passenger seat. After the luncheon the four car occupants walked together back into the office tower. During the walk back into the office, neither Ellis nor Toriello heard Respondent say anything inappropriate to Complainant or comment on her "hair".

- The last meetings between Complainant and Respondent occurred on January 6, 2023. Complainant had scheduled a meeting with Respondent on Friday, January 6, 2023 to meet virtually with WIE corporate sponsors, and to discuss Complainant's job performance and goals. Early in the day on January 6, 2023, the office was holding a celebration for a team member who was moving to a different group. Complainant and Respondent attended the celebration, and when the celebration ended early, Complainant suggested that Respondent meet in her office. They met first in Complainant's office but moved the meeting to the 4th floor conference room to join a video meeting. While in the conference room Respondent asked Complainant to take a seat closer to him so that they could both see and be seen on the video screen. She had been about five seats away near the equipment, and she moved to a seat that was one seat apart from Respondent. Before, during or after the virtual meeting, Complainant did not indicate any objection to the seating arrangement.

- Following the video meeting, Complainant and Respondent began to discuss Complainant's items that she had requested to review with Respondent. Complainant was wearing jeans to work that day and Respondent explained that he thought professional attire was necessary in the work environment at Tech. He would not wear jeans to work, and makes a special effort to wear a tie, particularly to help avoid unconscious bias in the workplace. Respondent encouraged Complainant to seek the help or advice of

professional females (including his wife) on proper attire as it relates to the Tech work environment. Respondent also reviewed Complainant's "headshot" photo that was being used in her Georgia Tech identifications. Respondent was critical of her headshot and suggested that she needed to improve the headshot to achieve a more professional appearance. Respondent and Complainant looked at headshots of other Tech employees, and Complainant continued to listen to Respondent's suggestions without noting any objection to discussing the headshots. Respondent suggested that Complainant review possible headshots with her partner at night while lying in bed, and Respondent regularly forgot her partner's name. Complaint asserts that she was "tired" of Respondent's comments about her looks.

- Respondent told Complainant that he was a workaholic and worked late at night, and that she could contact him at night, even at 3 am in the morning if she needed anything.

- In discussing Complainant's job goals during the January 6, 2023 meeting that was requested by Complainant, Respondent reviewed developing potential sponsorships from outside companies. Respondent used an analogy to a "Tinder" site in attempting to explain the possibility of creating an algorithm that could match students with potential financial corporate sponsors. The conversation concerned female students since it was part of the WIE program that is focused on women. The analogy to a dating app was unusual in the work environment and especially in the context of attempting to attract females to be matched with donors (or vice versa). The use of the "Tinder" analogy was unprofessional and implicates matters based on sex or sexual themes. Complainant describes Respondent's January 6, 2023 comments as the "nail in the coffin", and she was tired of his behavior.

**Rationale and Decision:**

- Complainant's allegations raise the issue of whether she was subjected to a hostile work environment in violation of Georgia Tech's sexual misconduct policy.

- There is no allegation of inappropriate physical contact, and there are two incidents that Complainant alleges she affirmatively and contemporaneously noted her discomfort with Respondent's actions. She claims to have made one visual disgusted look at Respondent, and she made a verbal comment that she would complain to HR about Respondent questioning her appearance. The "appearance" comment was made in a group setting, and the others who heard the comments did not believe they were inappropriate or had any sex-based connotations. The "disgusted look" was made early in the day, and Complainant continued to interact with Respondent, including accepting a ride to a luncheon. While Complainant now contends that Respondent's actions made her feel uncomfortable, other than the two incidents noted (where Complainant gave Respondent a "disgusted" look and made a "joke" about reporting his comment that she "looked different" to HR), there is no evidence that shows she told Respondent that his actions were unwelcome.

- Complainant asserted facts and information to the investigator that are directly refuted by witness LaJauna Ellis ("Ellis"). Complainant alleged that she had asked Ellis about her opinion of Respondent. Complainant alleged that Ellis told her that Respondent was too personable, and that Ellis planned to speak to the Dean about Respondent's unacceptable behavior. Complainant also asserted that Ellis had

called Respondent an associate "dean gone wild" in connection with Complainant's concerns about Respondent.

- Ellis appeared at the live hearing and explained that after a meeting one day, Complainant asked Ellis what she thought about Respondent. Ellis has been employed at Georgia Tech for 27 years and has worked directly with Respondent. Ellis testified that she described Respondent in a positive way to Complainant and did not indicate that he was acting inappropriately. In fact, Ellis described Respondent as friendly, and an up-front personality, who "does not meet strangers". Ellis compared Respondent's personality to that of her husband in being very personable but not inappropriate. Complainant told Ellis that Respondent had asked her to get him a plate of food, and that the request made Complainant uncomfortable. Ellis did not perceive the request as offensive but told Complainant that if she felt uncomfortable about anything, she should say so. Ellis did not perceive any of the comments from Complainant about Respondent as rising to the level of needing to report them as inappropriate or as sexual harassment.

- Ellis explained that she did not make the "AD gone wild" comment during the discussion with Complainant about getting a plate of food. On a different day, Ellis had a separate general conversation with Complainant about workload issues, and Ellis explained that new associate deans usually begin with numerous new ideas and initiatives. Ellis freely uses the term "AD gone wild" in a positive way about many new associate deans because they come into the job with very ambitious plans. Contrary to Complainant's allegations, Ellis did not tell Complainant that Respondent had done anything inappropriate, and Ellis did not tell Complainant that she was going to report the matter to the Dean. Ellis explained that she told Complainant that Respondent was zealous about new initiatives in his new position. Complainant's credibility is compromised by her mischaracterizations of her conversations with Ellis.

- Ellis has experienced inappropriate behavior toward herself in the workplace and knows the process for reporting complaints of sexual harassment. Ellis is credible in stating that she would have reported the conversation with Complainant to HR if she thought that Complainant was being treated inappropriately by Respondent or there was any indication of sexual harassment.

- Ellis was the front seat passenger in Respondent's car when Complainant accepted a ride to the off-campus luncheon. Ellis did not observe or hear any inappropriate communications between Respondent and Complainant in the car or at the luncheon. After the luncheon, Ellis walked back into the office tower with Respondent and Complainant. They were walking in a group (although not side by side) and she did not hear Respondent comment on Complainant's hair. Ellis was in a position to hear if Respondent had made a comment to Complainant about Complainant's hair. Ellis' testimony calls Complainant's version of facts into question, and coupled with Complainant's other exaggerations or misrepresentations casts further doubt on the accuracy or credibility of the complaints.

- Complainant and Respondent's discussion on January 6, 2023 concerning her identification photo was advice from Respondent in an attempt to explain Respondent's vision of what a professional headshot should contain. In the context of the same conversation, Respondent made a statement about Complainant lying in bed with her boyfriend, as a suggestion for a time when she could look at headshots of what he

considered more professional. The comment was made at work while specifically discussing how to improve Complainant's professional appearance. While Complainant did not agree with Respondent's advice, there is no indication that it was made in a sexual context. Complainant had sought advice from Respondent and had requested the meeting to review her professional goals, and while the discussion may have included personal comments and observations, the context of the comments does not indicate that the discussion was sexual in nature or based on sex.

- Respondent's use of the Tinder analogy during the January 6, 2023, conversation was unprofessional and overly familiar, and indicates some level of communication based on sex. The Tinder conversation alone does not indicate an action that would rise to the level of severe for purposes of sexual harassment.

- The remaining allegations of Complaint's complaint (getting plate of food, hair comments, wearing make-up, being asked to attend meeting or take notes, looking at buzz card to determine ID, sitting in proximity of zoom camera) do not indicate actions based on sex in violation of the sexual misconduct policy.

- Complainant's motivations for pursuing the allegations against Respondent may have been impacted by a disgruntled employee. Complainant's allegations occurred over a brief period of time while she was performing certain duties of the Director of WIE. Complainant had been rejected from applying for the director position due to the fact that she lacked a terminal degree. While Complainant may have considered that Respondent was in part responsible for her rejection, he did not play a part in the decision to reject her application for the director position. Complainant's application for the Director position was processed through the human resources office, and her application was not submitted to the selection committee since Complainant did not have a terminal degree. While Respondent's mentoring may have not been well received by Complainant, she did not indicate any objection to him or others, until she confided in a disgruntled employee who had not been selected for the position that Respondent now holds. On the disgruntled employee's last day of employment, she accompanied Complainant to make the actual report of sexual harassment against Respondent.

- Respondent's alleged actions were limited to a period of less than three months, and all allegedly occurred during normal work hours. No witness heard any comments or observed any behavior on behalf of Respondent that was based on sex or inappropriately sexual. When viewed as a whole and in context, the actions of Respondent do not rise to the level of being sufficiently severe, persistent, or pervasive so as to create a hostile work environment.

After reviewing all of the information presented, using a preponderance of the evidence standard and reviewing the substantial evidence, the Decision Maker has determined that Respondent, Damon Williams is **not responsible** for violating the following section(s) of the Sexual Misconduct Policy:

Allegation -Sexual Harassment (Other Than Student on Student):

Unwelcome verbal, nonverbal, or physical conduct, based on sex (including gender stereotypes), that may be any of the following:

1. Implicitly or explicitly a term or condition of employment or status in a course, program, or activity;

2. A basis for employment or educational decisions; or

3. Is sufficiently severe, persistent, or pervasive to interfere with one's work or educational performance creating an intimidating, hostile, or offensive work or learning environment, or interfering with or limiting one's ability to participate in or to benefit from an institutional program or activity.

Please note that both parties in a Sexual Misconduct matter have the right to appeal the decision. Guidelines for appeal can be found in the attached Sexual Misconduct Interim Adjudication Process for all GT Employees. In order to appeal, you must submit all appeal documents, in accordance with the appeal guidelines, to the Hearing Coordinator via email at scouncil31@gatech.edu by 5:00 p.m. on November 1, 2023. All the materials used to resolve this case will automatically be included with your appeal letter when sent to the Appellate Officer.

If neither party chooses to appeal, the decision rendered by the Decision Maker is the final decision of the Institute and goes into effect immediately.

If any of the above information needs clarification, please contact the Hearing Coordinator at scouncil31@gatech.edu.

Sincerely,

*Joan F. Roach*

Joan F. Roach

Decision Maker

CC: Carla Aikens
    Michaela Bessant
    Alexis Martinez, Executive Director
    Shirnelle Council

Sexual Misconduct Interim Adjudication process for all GT Employees (Approved eff. 4.7.2023)

**Investigation:**
The Investigation is overseen and coordinated by the Equity & Compliance Programs office. Once the Final Report is issued, it will be forwarded to a designated Hearing Coordinator. If, during the investigation, the Respondent admits responsibility, the process may proceed to the sanctioning phase or may be informally resolved, if appropriate.

**Informal Resolution:**
The Respondent and the Complainant, as parties to the matter, may have the option of selecting informal resolution as a possible resolution in certain cases where the parties agree, and it is deemed appropriate by the Institute. Allegations of Title IX Sexual Misconduct brought by a student against an employee may not be resolved informally. The informal resolution process is conducted under the guiding principles discussed in the Sexual Misconduct Policy.

Should the parties wish to pursue informal resolution, they should contact the Title IX Coordinator.

**Adjudication/Hearing Process:**

*Notification:*
Following the issuance of a Final Report, the Hearing Coordinator will provide each party with a Notice of Hearing. The Notice shall be provided via email at least ten (10) calendar days prior to the hearing and will include the following:
1. Notice of the date, time, and location of the hearing as well as the name of the designated Decision Maker.
2. An offer for each party to meet (separately) with the designated Decision Maker prior to the hearing. A prehearing meeting is strongly recommended.
3. Requests for the identities and contact information of all witnesses the parties expect to have at the hearing. Parties must submit their witness list in writing and at least five (5) business days prior to the hearing to allow for orderly management of the hearing.

*Decision Maker:*
There will be a single Decision Maker designated for this Interim Process who will be referred to as the "Decision Maker" throughout the remainder of the process outlined below.

*Advisors:*
Both the Complainant and the Respondent, as parties to the matter, shall have the opportunity to use an advisor (who may or may not be an attorney) of the party's choosing, generally at their own expense. The advisor may accompany the party to all meetings and may provide advice and counsel to their respective party throughout the sexual misconduct process, including providing questions, suggestions and guidance to the party, but may not actively participate in the process except to conduct cross-examination at a Title IX Sexual Misconduct hearing. For any non-Title IX Sexual Misconduct hearings, the parties shall have the right to confront any witnesses, including the other party, by submitting written questions to the Decision Maker for consideration. Advisors may actively assist in drafting questions.

If a party in a Title IX Sexual Misconduct matter, as identified in the Notice of Investigation, chooses not to use an advisor during the investigation, the Institute will provide an advisor for the purpose of conducting cross-examination on behalf of the relevant party at a hearing. The Institute is under no obligation to provide a hearing advisor in a non-Title IX Sexual Misconduct matter, as identified in Notice of Investigation.

1

Sexual Misconduct Interim Adjudication process for all GT Employees (Approved eff. 4.7.2023)

*Who May be Present:*
The hearing is closed except to the Decision Maker, Hearing Coordinator, parties, and advisors. Witnesses may be present if and when called by parties and are excused when their portion of the hearing/testimony is concluded.

At all times, participants in the hearing process, including parties and advisors, are expected to act in a manner that promotes dignity and decorum throughout the hearing. Participants are expected to be temperate and respectful to others. Parties, advisors, and witnesses should be instructed to maintain appropriate decorum and told they may be asked to leave the hearing if they fail to do so after being asked.

*Order of Testimony*
Typically, for Title IX Sexual Misconduct allegations, the order of testimony is as follows: the Decision Maker will conduct direct examination of Complainant, followed by cross examination by Respondent's advisor; Complainant's advisor is permitted to then ask clarifying questions. The Decision Maker then conducts direct examination of Respondent, which is followed by cross examination from Complainant's advisor, and then clarifying questions by Respondent's advisor. Then the witnesses are questioned, first by the Decision Maker and then by the parties' advisors.

In Title IX Sexual Misconduct hearings, the parties are not permitted to conduct cross-examination; it must be conducted by the advisor. Each party's advisor will conduct live cross-examination of the other party or parties and witnesses. During this live-cross examination, the advisor will ask the other party or parties and witnesses relevant questions and follow-up questions, including those challenging credibility directly, orally, and in real time.

For Non-Title IX/Sexual Misconduct allegations, the order of testimony is as follows: the Decision Maker will ask all questions of Complainant (including those that were submitted by advisors that were deemed relevant by the Decision Maker). Next, the Decision Maker will ask all questions of the Respondent (including those that were submitted by advisors that were deemed relevant by the Decision Maker). Then the witnesses are questioned by the Decision Maker, who will ask questions of their own volition as well as questions submitted by the parties and deemed relevant by the Decision Maker.

*Evidence*
The formal Civil Rules of Evidence do not apply to the resolution process; however, the following information is not admissible during the hearing:

    a. Questions and evidence about the Complainant's sexual predisposition or prior sexual behavior shall be deemed irrelevant, unless such questions and evidence are offered to prove that someone other than the Respondent committed the alleged conduct or consent between the parties during the alleged incident.

.

    b. The Decision Maker shall not access, consider, disclose, or otherwise use a party's records made or maintained by a physician, psychiatrist, psychologist, or other recognized professional made in connection with the party's treatment unless the party has provided voluntary written consent. This also applies to information protected by recognized legal privilege.

2

Sexual Misconduct Interim Adjudication process for all GT Employees (Approved eff. 4.7.2023)

The Decision Maker will determine how the facts or evidence will be introduced. All directly related evidence shall be available at the hearing for the parties and their advisors to reference during the hearing.

The admissibility of any facts or evidence known or knowable by the parties prior to the issuance of the Final Investigative Report, and which were not submitted during the investigation, shall be determined by the Decision Maker understanding there is an obligation to provide both parties an equal opportunity to present and respond to witnesses and other evidence.

Additionally, the investigator may testify as a witness regarding the investigation and findings but shall otherwise have no part in the hearing process and shall not attempt to otherwise influence the proceedings outside of providing testimony during the hearing.

*Witnesses*
Witnesses will only be allowed in the hearing to provide their testimony (and any necessary cross-examination). At least five (5) business days before the scheduled hearing, each party shall provide the Hearing Coordinator a list of witnesses who will be called. The responsibility for notifying each witness resides with the party who has designated that witness.

*Recording*
The proceedings will be recorded. The tapes or the transcript will be the official record of the proceeding and will be preserved and maintained by the Title IX Coordinator. Following the conclusion of the hearing, all information will be provided for upload/maintenance in the Institute's Case Management system.

*Maintenance of Records*
As required by GT Policy and Federal Law, any documentation shall be maintained for seven (7) years.

*Decision:*
Within fifteen (15) business days of the conclusion of the hearing, the Decision Maker will issue a written decision via email to the parties simultaneously notifying them of the hearing outcome and any resulting disciplinary or administrative actions. The decision must include the allegations, procedural steps taken through the investigation and resolution process, findings of facts supporting the determination(s), determination(s) regarding responsibility, and the rationale for any disciplinary or other administrative action. Copied on the communication will be the Title IX Coordinator and the Hearing Coordinator.

If Respondent is determined by the Decision Maker to be responsible for violating the Sexual Misconduct Policy, then the Decision Maker will decide the appropriate disciplinary or administrative actions.

In determining the severity of sanctions or corrective actions the following should be considered: the frequency, severity, and/or nature of the offense; history of past conduct; a Respondent's willingness to accept responsibility; previous institutional response to similar conduct; strength of the evidence; and the wellbeing of the university community.

Appeal information will be provided to each party with the written decision.

Sexual Misconduct Interim Adjudication process for all GT Employees (Approved eff. 4.7.2023)

**Appeals**

*First Level of Appeal*
Either party may appeal the Decision Maker's determination and/or the disciplinary decision. A party wishing to appeal the findings and/or sanctions imposed must submit a written appeal to the Hearing Coordinator within five (5) business days of the date (issuance/publication) of the final written decision. A party has the right to appeal the outcome on the following three (3) grounds only:
1. to consider new information that is sufficient to alter the decision, or other relevant facts not brought out in the original investigation (or hearing), because such information was not known or knowable to the person appealing during the time of the investigation (or hearing);
2. to allege a procedural error within the investigation or hearing process that may have substantially impacted the fairness of the process, including but not limited to whether any hearing questions were improperly excluded or whether the decision was tainted by a conflict of interest or bias by the Title IX Coordinator, investigator(s), or decision maker(s); or
3. to allege that the finding was inconsistent with the weight of the information.

If either party submits an appeal, the Hearing Coordinator will notify the other party after receipt of the appeal. The non-appealing party is given an opportunity to review the appealing party's submissions and material and submit a written response. The written response must be submitted within five (5) business days after the non-appealing party is notified of the appeal.

Upon review, the first level appellate decision maker may:
a. affirm the original finding and sanction
b. affirm the original finding but issue a new sanction of greater or lesser severity,
c. remand the case back to the Decision Maker to correct a procedural or factual defect, or
d. reverse or dismiss the case if there was a procedural or factual defect that cannot be remedied by remand.

The appellate hearing officer's decision shall be simultaneously issued in writing to the Complainant and the Respondent within a reasonable period, usually not exceeding twenty (20) business days, with a copy to the Title IX Coordinator.

*Second Level of Appeal*
Either party may appeal the first appellate decision maker's determination. A party wishing to appeal the findings and/or sanctions imposed must submit a written appeal to the Hearing Coordinator within five (5) business days of the date of the first appellate decision maker's final written decision.  Any appeal is still subject to the same three grounds:
1. to consider new information that is sufficient to alter the decision, or other relevant facts not brought out in the original investigation (or hearing), because such information was not known or knowable to the person appealing during the time of the investigation (or hearing or first appeal);
2. to allege a procedural error within the investigation or hearing process that may have substantially impacted the fairness of the process, including but not limited to whether any hearing questions were improperly excluded or whether the decision was tainted by a conflict of interest or bias by the Title IX Coordinator, investigator(s), or decision maker(s); or
3, to allege that the finding was inconsistent with the weight of the information

4

Sexual Misconduct Interim Adjudication process for all GT Employees (Approved eff. 4.7.2023)

If either party submits an appeal, the Hearing Coordinator will notify the other party after receipt of the appeal. The non-appealing party is given an opportunity to review the appealing party's submissions and material and submit a written response. The written response must be submitted within five (5) business days after the non-appealing party is notified of the appeal.

Upon review, the second level appellate decision maker may
       a. affirm the original finding and sanction
       b. affirm the original finding but issue a new sanction of greater or lesser severity,
       c. remand the case back to the Single Decision Maker to correct a procedural or factual defect, or
       d. reverse or dismiss the case if there was a procedural or factual defect that cannot be remedied by remand.

The second level appellate decision maker's decision shall be simultaneously issued in writing to the Complainant and the Respondent within a reasonable period, usually not exceeding twenty (20) business days, with a copy to the Title IX Coordinator. This decision shall constitute the Institute's final decision.

Finally, should the Respondent or Complainant wish to appeal the second level appellate decision, they may request review by the Board of Regents in accordance with the Board of Regents' Policy on Discretionary Review.

D-00000862