IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DESIREE TURNER,

     Plaintiff,

v.

BOARD OF REGENTS OF THE
UNIVERSITY SYSTEM OF GEORGIA
by and on behalf of
GEORGIA INSTITUTE OF
TECHNOLOGY and
DAMON P. WILLIAMS
in his official and individual
capacities,

     Defendants.

CIVIL ACTION FILE
NO. 1:24-CV-02139-SEG-JEM

UNITED STATES MAGISTRATE JUDGE'S
FINAL REPORT AND RECOMMENDATION

Pending before the Court is Defendants' Motion for Summary Judgment, (Doc. 40). For the following reasons, the Court **RECOMMENDS** that Defendants' Motion for Summary Judgment, (Doc. 40), be **GRANTED**.

I.    **INTRODUCTION**

    A.    **Preliminary Statement**

Unless otherwise indicated, the Court draws the following facts from Defendants' Statement of Undisputed Material Facts, (Doc. 40-2, "DSMF"), Plaintiff's Response to DSMF, (Doc. 46 at 1-6, "PRDF"), Plaintiff's Statement of Additional Material Facts, (Doc. 46 at 7-9, "PAMF"), and Defendants' Response

to PAMF, (Doc. 51, "DRPF"). As indicated, and as needed, the Court may draw some facts directly from the record. *See* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record"). The Court deems admitted those facts submitted by Defendants that are supported by citations to record evidence which Plaintiff has not specifically disputed and refuted with citations to admissible record evidence. *See* LR 56.1(B)(2)(a)(2), NDGa.[1] Accordingly, for facts submitted by Defendants that Plaintiff has not disputed with citations to record evidence, the Court accepts those facts as true, so long as the facts are supported by citations to record evidence, do not make credibility determinations, and do not involve legal conclusions. *See E.E.O.C. v. Atlanta Gastroenterology Assocs., LLC*, No. CIV. A. 1:05-CV-2504-TWT, 2007 WL 602212, at *3 n.2 (N.D. Ga. Feb. 16, 2007). The Court has viewed all evidence and factual inferences in the light most favorable to Plaintiff, as required on a defendant's motion for summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *McCabe v. Sharrett*,

---

[1] Local Rule 56.1(B)(2)(a)(2), NDGa states:

This Court will deem each of the movant's facts as admitted unless the respondent: (i) directly refutes the movant's fact with concise responses supported by specific citations to evidence (including page or paragraph number); (ii) states a valid objection to the admissibility of the movant's fact; or (iii) points out that the movant's citation does not support the movant's fact or that the movant's fact is not material or otherwise has failed to comply with the provisions set out in LR 56.1(B)(1).

2

12 F.3d 1558, 1560 (11th Cir. 1994); *Reynolds v. Bridgestone/Firestone, Inc.*, 989 F.2d 465, 469 (11th Cir. 1993).

The Court has excluded any assertions of fact by either party that are immaterial, presented as arguments or legal conclusions, unsupported by a citation to admissible evidence in the record, or asserted only in a party's brief and not in the statement(s) of facts. *See* LR 56.1(B)(1), NDGa; *see also* LR 56.1(B)(2)(b), NDGa (non-movant's statement of additional facts must also comply with LR 56.1(B)(1)). But the Court includes certain facts that are not necessarily material if they are helpful to present the context of the parties' arguments. The Court will not rule on each objection or dispute presented by the parties and will discuss those objections and disputes only when necessary to do so regarding a genuine dispute of a material issue of fact.

### B.   Statement of Facts

#### 1.   About the Parties

Defendant Board of Regents ("BOR"), a state agency, oversees the public colleges and universities that comprise the University System of Georgia ("USG"). (DSMF ¶ 2.) Georgia Institute of Technology ("Georgia Tech") is a university within the USG. USG Institutions, *https://www.usg.edu/institutions/* (last visited June 8, 2026). Georgia Tech hired Plaintiff to be the Educational Outreach Manager for its Women in Engineering ("WIE") program around April 2022, and she began her employment in June 2022. (Doc. 38, Deposition of Desiree Turner, "Pl. Dep.," at 23:7-20.) Plaintiff reported to the Director of the WIE program, Dr. Christine Valle. (Pl. Dep. at 25:17-26:12.) Although Plaintiff had been hired as the

Educational Outreach Manager, Valle "consistently referred to [Plaintiff] as the Lead Associate Director" of the WIE program, which Plaintiff believed to be her unofficial "working title." (Pl. Dep. at 28:10-19, 29:1-3.) Valle listed Plaintiff as the Associate Director on her performance review and on the WIE website. (Pl. Dep. at 30:16-22, 31:17-24.) Valle retired in January 2023. (Pl. Dep. at 32:16-20.)

**2.     Events of September, October, and November 2022**

In September 2022, Defendant Dr. Damon Williams became the Associate Dean for Inclusive Excellence in Georgia Tech's College of Engineering. (DSMF ¶ 4.) In October 2022, Plaintiff learned that Valle would be retiring. (Pl. Dep. at 32:16-20, 36:17-18.) Shortly thereafter, Plaintiff reached out to Williams to discuss his vision for the department and her experience with the WIE program because she would be reporting to him after Valle retired. (Pl. Dep. at 34:18-24, 36:15-22.)

Plaintiff and Williams met for the first time on October 24, 2022, and they discussed the future of the WIE program. (DSMF ¶ 5; Pl. Dep. at 34:25-35:10.) Williams also asked Plaintiff if she was interested in the Director role and if she wanted to be on the search committee, and he sent her the job description. (Pl. Dep. at 37:11-22.) Although he told her that the terminal degree requirement may shift from required to preferred, that requirement remained part of the job description. (Pl. Dep. at 38:14-39:1, 48:24-49:1; DSMF ¶ 7.) Plaintiff told Williams that she was not sure whether she would pursue the role but that she would think about it. (Pl. Dep. at 40:1-6.) Plaintiff and Williams met again about two weeks later. (Pl. Dep. at 40:7-16.) During that meeting, Williams encouraged Plaintiff to apply to the Director role. (Pl. Dep. at 40:7-21.) Around that time,

Williams asked Plaintiff to compile a list of doctoral programs that she could apply to. (Pl. Dep. at 48:12-18.) Plaintiff did not possess a terminal degree, and she believed Williams made this request so that she could become eligible for the Director role. (DSMF ¶ 8; Pl. Dep. at 48:19-49:3.) Williams avers that he "suggested that [Plaintiff] apply for doctoral programs" not "in relation to Plaintiff's plans to apply for the WIE Director role" but rather so she could "accomplish her goal of reaching a high position." (Doc. 40-4, Declaration of Damon Williams, "Williams Decl.," ¶ 13.)

Around November 10, 2022, Plaintiff applied for the Director role. (DSMF ¶ 10.) HR screened all applications and did not advance anyone who did not meet the minimum position requirements. (DSMF ¶ 14.) Plaintiff's application was screened out by HR for failure to meet the minimum qualifications based on her lack of a terminal degree in her field. (DSMF ¶ 15.) Williams had no authority over the degree requirements for the Director role, (DSMF ¶ 13), and he was not involved in screening Plaintiff's application, (DSMF ¶ 16).[2]

---

[2] In her application, Plaintiff listed herself as the Associate Director of WIE. (DSMF ¶ 11.) According to the Director of Human Resources for the College of Engineering at Georgia Tech ("HR"), neither Plaintiff nor Valle nor Williams ever "followed the official process to request and have [Plaintiff] use the working titles of Associate Director of WIE or Assistant Director of WIE." (Doc. 40-5, Declaration of Dawniah Franklin, "Franklin Decl." ¶¶ 2, 22.) The adoption of a working title entailed a formal review process where proposed titles were submitted to Georgia Tech Human Resources for approval prior to use to ensure compliance with institutional guidelines and to mitigate risks related to perceived or real authority associated with inflated titles. (DSMF ¶ 12.)

### 3.    Events of December 1, 2022

On December 1, 2022, Plaintiff was talking with Williams and two other colleagues (another Associate Dean named Dr. Mitchell Walker, who is male, and the head of the Dean's and Clerk's Scholars Program, Lauren Morton, who is female) when Williams asked Plaintiff if she "looked different." (DSMF ¶ 17; Pl. Dep. at 61:3-18.) Plaintiff responded that she was not wearing any makeup. (DSMF ¶ 17.) Williams then said she looked "lighter" and asked if her makeup made her look "darker." (Pl. Dep. at 63:9-11.) This interaction made Plaintiff uncomfortable. (Pl. Dep. at 65:3-14.)

Later that day, Plaintiff, Williams, Walker, and Morton were sitting in a breakroom where attendees from another meeting had left food. (DSMF ¶ 19.) When Plaintiff and Walker went to get food, Williams asked Plaintiff if she could make him a plate as well. (*Id.*; Pl. Dep. at 77:25-78:6) Plaintiff was confused by this request because she and Williams did not have the "type of relationship where [she] would make him a plate of food." (Pl. Dep. at 76:1-5.) Plaintiff felt that this request, combined with the earlier comment about her looks, was demeaning. (Pl. Dep. at 78:21-25) ("[T]o talk about my looks . . . in a professional setting with other . . . colleagues, to then later ask me to get him a plate of food . . . , that does feel demeaning.").

While Plaintiff was in a meeting with a student, Williams sent Morton to ask Plaintiff to attend a different meeting and take notes. (DSMF ¶ 20; Pl. Dep. at 91:8-13.) Plaintiff recalls arriving at that meeting later, but she does not recall whether she took notes. (Pl. Dep. at 91:22-92:4.)

Plaintiff and Williams met to discuss Plaintiff's application for the Director role. (DSMF ¶ 21.) Williams informed Plaintiff that she did not make it past HR's initial screening of her application because she lacked a terminal degree. (*Id.*) Plaintiff testified that she has no evidence to support her belief that Williams attempted to prevent her promotion. (DSMF ¶ 62.) When Plaintiff told Williams that she was frustrated because of a negative interaction she had with another colleague, Williams responded, "[The other colleague] is disgruntled and unhappy. You're young, energetic, you're prettier than her, so that didn't have anything to do with you." (DSMF ¶ 22.) Later, Plaintiff and Williams were discussing a reorganization of the College of Engineering, and Plaintiff saw Williams staring at her Georgia Tech identification card ("Buzzcard") which contained her picture. (DSMF ¶ 23; Pl. Dep. at 89:9-14.) Plaintiff testified that he was doing so "behind [her] where maybe he was thinking that [she] couldn't see him doing it." (Pl. Dep. at 90:12-16.)

### 4.    Events of December 15, 2022

On December 15, 2022, Williams asked Plaintiff to attend a meeting even though she "didn't have anything really to do with that meeting." (Pl. Dep. at 98:11-99:4.) When Plaintiff walked into the room, Williams "looked [her] up and down in a suggestive manner." (DSMF ¶ 25; Pl. Dep. at 99:5-11.) When asked what made the look suggestive, Plaintiff explained: "There's a way that people look at you to suggest that you look good. Like, when people look you up and down . . . it's just a common way that people will look at you to suggest that you look good . . . and that's what the look was." (PRDF ¶ 25; Pl. Dep. at 99:12-23.)

Plaintiff responded "by making a disgusted face" which "should have indicated that [she] was uncomfortable." (Pl. Dep. at 100:3-11.)

Later that day, Plaintiff, Williams, and other colleagues attended an off-campus luncheon for their holiday celebration. (DSMF ¶ 26; Pl. Dep. at 102:3-4.) During the luncheon, Plaintiff and Williams sat at the same table. (DSMF ¶ 27.) At some point, the conversation turned to everyone's families, discussing that they often had so much work to do they found themselves in bed at the end of the day with their partners still working. (*Id.*) Plaintiff, however, was not at the table for that discussion. (Pl. Dep. at 103:9-104:1.) On the walk back to campus, Williams commented on how nice Plaintiff's hair looked. (Pl. Dep. at 106:19-107:2.)

Plaintiff discussed Williams with LaJuana Ellis, the Assistant Director of Business Operations for the Dean's Office of the College of Engineering at Georgia Tech. (DSMF 30; Pl. Dep. at 126:14-127:5; Doc. 40-6, Declaration of LaJuana Ellis, "Ellis Decl.," ¶ 2.) Ellis described Williams as "overly familiar and just too personable in his conversations within the office" and as an "associate dean gone wild." (Pl. Dep. at 127:21-24, 128:11-12; PRDF ¶ 30.) Plaintiff told Ellis about her interactions with Williams that had made her uncomfortable, and in response Ellis told Plaintiff about receiving an inappropriate gift from a former supervisor. (Pl. Dep. at 128:5-17.)

### 5.    Events of January 6, 2023

On January 6, 2023, at a celebration for a team member who was moving to another group, Williams joked about Plaintiff scheduling late and "unnecessary"

meetings on Fridays. (DSMF 31; Pl. Dep. at 110:11-111:4.) Plaintiff perceived this comment as aggressive and demeaning because she "was just doing her job" and "up to that point he had asked [her] to sit in on meetings and things [she] didn't feel like [she] needed to be a part of[.]" (Pl. Dep. at 112:5-21.)

Later that day, Williams told Plaintiff about his idea of a matching algorithm that he wanted her to use to match undergraduate students with companies interested in their skills and career goals, and he used the social media dating app "Tinder" as an example. (DSMF ¶ 32.) In the same conversation, Williams told Plaintiff that he responded to emails at 3:00 a.m., (DSMF ¶ 33), and that "if [she] needed something from [him] at 3:00 a.m., that would be okay," (PAMF ¶ 7).

At a virtual meeting with donors, Williams requested that Plaintiff sit next to him so that they could both appear on camera together. (DSMF ¶ 34.) They sat in adjacent chairs and never made any physical contact. (*Id.*) Immediately afterwards, Williams noted that Plaintiff was wearing jeans, that "he would never be caught dead wearing jeans on campus," and that Plaintiff "needed to dress up more if [she] wanted to be taken seriously[.]" (DSMF ¶ 35; Pl. Dep. at 115:9-19.) In her deposition, Plaintiff explained that it was a Friday and that she was allowed to wear jeans on Fridays. (Pl. Dep. at 115:13-15.) Williams offered to introduce Plaintiff to his wife as a resource on dressing professionally as a woman. (DSMF ¶ 36.) Williams then told Plaintiff that her headshot was not professional and that she needed to take a new one where she was wearing glasses and a bun. (DSMF ¶ 37.) He showed her the headshots of "other people

9

on campus" as examples, and he said, "[L]ook at what color these people are," which Plaintiff understood to mean that she, as a Black woman, could not "show up as [her]self[.]" (Pl. Dep. at 118:7-19.) He also asked her, "Do you see any other people on campus or leaders who have tattoos and piercings like you do?" (Pl. Dep. at 118:20-23.) He then showed her "pictures of women on Google," some headshots and some not, and he told her that when she was lying in bed with her boyfriend that night, she should look through those pictures and pick the pose that she would like to do for a new headshot. (Pl. Dep. at 118:23-119:4, 119:14-22.) After that conversation, Plaintiff disclosed Williams' headshot comments to HR, and HR referred Plaintiff to Georgia Tech's Title IX office. (DSMF ¶ 40.)

Plaintiff never felt physically unsafe from Williams' conduct or comments, (DSMF ¶ 42), and she alleges no instances of aggressive, angry, or threatening behavior from Williams, (DSMF ¶ 43).

### 6.    Title IX Complaint

On January 12, 2023, Plaintiff lodged a complaint against Williams with the Title IX office. (DSMF ¶ 44.) On January 18, 2023, the Title IX office began its investigation. (DSMF ¶ 45.) In coordination with Plaintiff, the Title IX office implemented interim measures to maintain a distance between Plaintiff and Williams. (*Id.*) They were to have no further contact with one another except for work-related emails and work-related meetings at which at least one additional person had to be in attendance. (*Id.*) And indeed, Plaintiff's only interactions with Williams thereafter were through e-mail and during a team meeting. (DSMF ¶ 46.) Plaintiff also was allowed to work from home full-time if she chose

to do so. (DSMF ¶ 45.) Plaintiff chose to work from home sometimes and to be on campus other times. (Pl. Dep. at 146:25-147:2.) She testified that working from home affected her ability to do her job "maybe a little" in that it was "a little more isolating," though she "did get everything done[.]" (Pl. Dep. at 145:25-146:21; DSMF ¶ 63.)

### 7.   Post-Complaint Events

On February 8, 2023, Williams' assistant emailed Plaintiff to ask about the process for selecting a winner for a scholarship called the Helen Grenga Award. (Pl. Dep. at 161:1-6; Doc. 40-24 at 6.) Plaintiff responded by forwarding a previous email conversation between Valle and Assistant Dean Terri Lee about that process to Williams and his assistant. (Doc. 40-24 at 6-7.) Valle stated that "[t]ypically" she, Plaintiff, and another faculty member would meet with other assistant deans to determine the winner. (*Id.* at 7.) In her email to Williams and his assistant, Plaintiff said, "Damon, I'm happy to defer to you, but this is my thoughts on how we should proceed in selecting for the award." (*Id.* at 6.) The assistant asked if she should schedule a meeting with Plaintiff and the associate deans, (*id.*), and Plaintiff said yes, (*id.* at 5). Williams responded, "In the associate deans meeting earlier this week I asked [two of the other associate deans] who they wanted in the meeting to select the Helen Grenga award and they articulated that we would follow the process they've done in the past, make the selection in our associate deans meeting and notify [Lee]. Given this, Cassandra you don't have to schedule a separate meeting[.]" (*Id.*) He also asked Plaintiff to share which student she had in mind as the winner and that he "will ensure to

11

provide this information to the deans." (*Id.*) Plaintiff responded only to Williams that she was "involved with the selection process in the past and met with the associate deans to select the winner. If you are explicitly against me being in the meeting and directly participating in the conversation then I will oblige; but I must also let you know that I disagree with the decision and that it is not how it has been done in the past." (*Id.* at 4.) Williams responded to Plaintiff and Cc'd three other associate deans:

> Since I have never participated in the selection of the Helen Geneva [sic] Award I am trying to gain clarity and resolve confusion as to who should participate in the meeting to select the award winner.
>
> Desiree Turner, the educational outreach manager of WIE who worked with Christine when she was the Director, would like to participate in the meeting where the award winner is selected. She is also suggesting Larry Jacobs be present. I have no problem with their participation but was under the impression that previously the associate deans met with Christine to select the award winner.
>
> I am truly fine either way and was simply trying to follow the established protocol articulated to me in our AD's meeting on Tuesday. Kim, Krista, or Terri can someone with historical knowledge of what we normally do advise as to who should be in the meeting to select the award winner so we can ensure we get the meeting scheduled and the selection made by the deadline?

(*Id.*)[3] Lee responded, "It is important to include Desiree because this is the top award that is given at the WIE banquet I think[.]" (*Id.* at 3.) Williams thanked Lee

---

[3] Williams avers that because the WIE program lacked a director to provide guidance on potential scholarship recipients, he and the other associate deans decided to recommend potential Helen Grenga Award recipients to the Dean

and asked "everyone" about scheduling the meeting. (*Id.*) Plaintiff was included in all following emails about meeting to select the winner, (*id.* at 1-2), and she attended the meeting, (DSMF ¶ 52).

On July 11, 2023, the Title IX office concluded its investigation of Plaintiff's complaint and issued its final report. (DSMF ¶ 47.) Plaintiff's complaint then proceeded to a hearing before a neutral arbiter in September 2023 in which Plaintiff, Williams, HR, and others testified. (DSMF ¶ 48.) The hearing officer concluded that Williams had not violated Georgia Tech's sexual misconduct policy. (DSMF ¶ 49.) Plaintiff did not appeal that decision. (DSMF ¶ 50.)

From January to August 2023, Plaintiff performed some of the duties of the Director of WIE role, (DSMF ¶ 56), and she was compensated with supplemental pay, (DSMF ¶ 59). Per Georgia Tech policy, Plaintiff could not receive the full Director salary because she was not qualified for the role, (DSMF ¶ 57), so HR decided the appropriate level of supplemental pay, (DSMF ¶ 60). Williams did not have authority over or involvement in that pay decision. (DSMF ¶ 61.)

Plaintiff believes that after she complained about Williams, he ostracized her and caused others to ostracize her. (Pl. Dep. at 178:2-6.) Specifically, Plaintiff testified, Williams "mention[ed] things about the case" to Joyelle Harris, who became the new Director of WIE in August 2023. (Pl. Dep. at 10-11; DSMF ¶ 56.) However, Plaintiff does not dispute that Williams had to inform Harris of the Title IX investigation and the interim measures in place so that Harris could

---

themselves. (DSMF ¶ 51.) He avers that he referred to Plaintiff as Educational Outreach Manager because that was her official title. (DSMF ¶ 53.)

effectively perform her job, (DSMF ¶ 58), and that he did not go into details about the investigation or the allegations that Plaintiff made, (*id.*). Plaintiff testified that Williams did not include her on a meeting invitation, (Pl. Dep. at 12-14), though Harris later forwarded it to her, (Pl. Dep. at 178:14-15), and she does not dispute that she attended all meetings to which she was invited, (DSMF ¶ 54). Plaintiff testified that she has "met other people who . . . [Williams] knows who I would have a good rapport with, and then later not hear from them, or no further, like, communication after attempts to continue those professional relationships." (Pl. Dep. at 178:16-20.) Plaintiff identified a contact at a different university whom she believed stopped talking to her after she mentioned knowing Williams, (Pl. Dep. at 187:3-17), but she has no evidence that they ever spoke about her, (Pl. Dep. at 187:18-22). And Plaintiff identified a contact at Georgia Tech that "soured" because of her relationship with Williams. (Pl. Dep. at 180:8-181:1.) Plaintiff also testified to her belief that Williams ostracized her by "mentioning her name in a negative light to other people," (Pl. Dep. at 178:21-23), though she is not aware of any specific comments, (DSMF ¶ 55).

On January 6, 2025, Plaintiff informed Harris that she was resigning and that her last day would be January 21, 2025. (Pl. Dep. at 191:10-22; Doc. 40-26.)

## II.   DISCUSSION

### A.   Summary Judgment Standard

Summary judgment is proper when no genuine issue as to any material fact is present, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit

14

under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The movant bears the burden of "informing the court of the basis for its motion and of identifying those materials that demonstrate the absence of a genuine issue of material fact." *Rice-Lamar v. City of Ft. Lauderdale, Fla.*, 232 F.3d 836, 840 (11th Cir. 2000) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The movant may also meet this burden by identifying an absence of evidence to support an element of the case on which the nonmovant bears the burden of proof. *Celotex*, 477 U.S. at 325. If the movant meets this burden, then the nonmovant must "demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). The nonmovant must "go beyond the pleadings" and present competent evidence in the form of affidavits, depositions, admissions, and the like, designating "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324. "The mere existence of a scintilla of evidence" supporting the nonmovant's case is insufficient to defeat a motion for summary judgment. *Anderson*, 477 U.S. at 252.

The Court must view the evidence and make factual inferences in the light most favorable to the nonmovant. *See United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc). To the extent that material facts are genuinely in dispute, the Court must resolve the disputes in the nonmovant's favor. *See Scott v. Harris*, 550 U.S. 372, 380 (2007); *Vaughan v. Cox*, 343 F.3d 1323, 1326 n.1 (11th Cir. 2003). If the record does not blatantly contradict the

nonmovant's version of events, then the court must determine "whether a fair-minded jury could return a verdict for the [nonmovant] on the evidence presented." *Anderson*, 477 U.S. at 252; *accord EPL, Inc. v. USA Fed. Credit Union*, 173 F.3d 1356, 1362 (11th Cir. 1999).

### B.   Analysis

#### 1.   Sex- and Gender-Based Harassment under Title VII against Georgia Tech (Counts I and V)

In her Complaint, Plaintiff alleges that Georgia Tech subjected her to sex- and gender-based harassment in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"). (Doc. 1 at 14-15.) To prevail on her harassment claim, Plaintiff must show that: (1) she belongs to a protected group; (2) she has been subject to unwelcome harassment; (3) the harassment was based on her sex or gender; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of her employment; and (5) there is a basis for holding her employer liable. *Gray v. Koch Foods, Inc.*, 144 F.4th 1298, 1312 (11th Cir. 2025) (quoting *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999) (en banc)).[4] Georgia Tech concedes only that Plaintiff belongs to a protected group because she is

---

[4] "Technically, the standards applicable to [a plaintiff's] employment-discrimination and hostile-work-environment claims are different. For whatever reason, we haven't applied the three traditional frameworks—direct evidence, *McDonnell Douglas*, and 'convincing mosaic'—to hostile-work-environment claims." *Harris v. Pub. Health Tr. of Mia.-Dade Cty.*, 82 F.4th 1296, 1304 (11th Cir. 2023) (collecting cases).

16

female. Otherwise, Georgia Tech argues that Plaintiff fails to establish any other element of her claim. The Court discusses each element in turn.

> ### i. *The harassment was based on Plaintiff's gender, and it was unwelcome.*

When viewing Williams' comments and conduct cumulatively, a reasonable jury could conclude that they were based on Plaintiff's gender.[5] To summarize the interactions briefly, (i) Williams asked Plaintiff to attend and take notes during meetings she had nothing to do with and later "joked" about her scheduling "unnecessary" meetings, (ii) he asked Plaintiff to make him a plate of food even though their male colleague was also up getting food, (iii) when Plaintiff told Williams about a negative interaction she had with a female colleague, he described the other colleague as "disgruntled and unhappy" and Plaintiff as "young, energetic," and "prettier," (iv) he looked Plaintiff "up and down in a suggestive manner," (v) he commented positively on Plaintiff's hair but later told her that she looked unprofessional and that she should dress and wear her hair a certain way, (vi) he referred her to his wife as a resource on "dressing professionally as a woman," and (vii) he commented negatively on Plaintiff's tattoos and piercings. A reasonable jury could conclude that Williams engaged in this behavior because of Plaintiff's gender and because she at times did not conform to certain gender stereotypes, "and it is well-established that

---

[5] In her brief, Plaintiff argues that Williams' conduct was gender-based rather than sex-based, (*see* Pl. Resp. at 2-4), so the Court focuses its analysis accordingly.

harassment based on gender stereotypes constitutes unlawful gender-based discrimination." *Foster v. Truist Bank, Inc.*, No. 1:20-cv-02770-LMM, 2023 U.S. Dist. LEXIS 241298, at *13 (N.D. Ga. June 26, 2023) (citing *Glenn v. Brumby*, 663 F.3d 1312, 1316 (11th Cir. 2011); *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989)). Additionally, Plaintiff testified repeatedly that this behavior was unwelcome, (*see, e.g.,* Pl. Dep. at 117:24-25, 121:15), and Defendant does not offer any substantive argument to the contrary, (*see* Def. Brief at 5-6).

### ii.     *The harassment was not severe or pervasive.*

To be sufficiently severe or pervasive, the harassment must result in an environment that the victim subjectively perceived as hostile or abusive and that a reasonable person would find hostile or abusive. *Tonkyro v. Sec'y, VA*, 995 F.3d 828, 837 (11th Cir. 2021) (citing *Miller*, 277 F.3d at 1276). Defendants argue that Plaintiff failed to satisfy the subjective component because "[she] testified that Williams' actions had no negative impact on her job performance." (Def. Brief at 9) (citing DSMF ¶ 63). That is not what the cited DSMF paragraph states. (DSMF ¶ 63) ("Turner did not experience any negative impact on her job performance *after she complained of Williams' alleged behavior*.") (emphasis added). Moreover, Plaintiff's testimony invariably shows that the harassment resulted in an environment she subjectively perceived as hostile or abusive. For example, she testified that she was uncomfortable when Williams asked her if she "looked different" and if her makeup made her look "darker." (Pl. Dep. at 65:3-14.) She felt that this comment, followed by Williams' request for her to make him a plate of food, was demeaning. (Pl. Dep. at 78:21-25.) Plaintiff understood Williams'

18

negative comments about her clothing and headshot to mean that she, as a Black woman, could not "show up as [her]self[.]" (Pl. Dep. at 118:7-19.) After that conversation, Plaintiff complained about Williams to HR and then to the Title IX office. (DSMF ¶¶ 40, 44.)

Defendants next argue that Plaintiff failed to satisfy the objective component. (Def. Brief at 6-9.) On that point, the Court agrees. To evaluate "'the objective severity of the harassment,'" courts "look to the totality of the circumstances, including: '(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance.'" *Tonkyro v. Sec'y, VA*, 995 F.3d 828, 837 (11th Cir. 2021) (quoting *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1276 (11th. Cir. 2002)). Here, the record shows that Williams' conduct was frequent and some of it may have been humiliating, but it was not severe or physically threatening, and it did not unreasonably interfere with Plaintiff's job performance.

While there is "no 'magic number' of instances of harassment sufficient to qualify as frequent[,] . . . [the Eleventh Circuit has] treated 15 instances of harassment in four months as 'not infrequent,' [and] 'more than 10' specific instances in two months as 'frequent[.]'" *Copeland v. Ga. Dep't of Corr.*, 97 F.4th 766, 776 (11th Cir. 2024) (internal citations omitted). By the Court's calculation, Plaintiff experienced approximately 12 comments or interactions over a one-month period. A reasonable jury could conclude that this was frequent.

"[W]hen 'measuring the severity of harassing conduct,' courts have recognized that 'a supervisor's [actions impact] the work environment far more severely than [those of] co-equals.'" *Copeland v. Ga. Dep't of Corr.*, 97 F.4th 766, 778 (11th Cir. 2024) (quoting *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 278 (4th Cir. 2015) (en banc)). "[P]recedent also requires our 'careful consideration of the social context in which particular behavior occurs and is experienced by its target.'" *Id.* (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998)). With these points in mind, a reasonable jury could not conclude that Williams' alleged behavior was severe. When Williams engaged in the alleged behavior, he was not Plaintiff's supervisor[6], and he did not use harsh or extreme language. *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 811-14 (11th Cir. 2010) (coworkers' frequent use of gender-specific derogatory comments, together with an incident where a coworker displayed a pornographic image of a woman on his computer, created a genuine issue of material fact regarding hostile work environment); *Hulsey v. Pride Rests., LLC*, 367 F.3d 1238, 1248 (11th Cir. 2004) (holding that supervisor's propositioning of plaintiff for sex, following her into the restroom, and repeatedly attempting to touch her breasts, place his hands down her pants, and pull off her pants created a genuine issue of material fact

---

[6] The parties agree that Williams became Plaintiff's supervisor when Valle retired in January 2023, but they do not point to any evidence establishing the exact day in January 2023 when that transition occurred. This date is relevant because some of the alleged harassment occurred in January 2023. Regardless, however, the parties seem to agree that Williams was not Plaintiff's supervisor when the alleged harassment occurred, (*see* Def. Brief at 9; Pl. Resp. at 5), so the Court has done the same.

20

regarding severe or pervasive harassment); *Webb-Edwards v. Orange Cnty. Sheriff's Ofc.*, 525 F.3d 1013, 1027-28 (11th Cir. 2008) (supervisor's comments that female plaintiff "looked hot" and "should wear tighter clothing, and that women who dye their hair have issues at home, were taunting and boorish" but not hostile or abusive); *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1247-49 (11th Cir. 1999) (en banc) (supervisor that "constantly" followed the plaintiff and stared at her, twice made a "sniffing motion" at the plaintiff's groin area, rubbed his hip against the plaintiff's hip while touching her shoulder and smiling, and once told the plaintiff, "I'm getting fired up" had not engaged in severe or pervasive conduct).

The parties agree that Williams' alleged conduct was not physically threatening. (Def. Brief at 7; Pl. Resp. at 4.) The parties disagree, however, on whether it was humiliating. (Def. Brief at 7; Pl. Resp. at 4.) Neither party presents any substantive argument on that point. (*See* Def. Brief at 6-9; Pl. Resp. at 4-5.) Nevertheless, the Court has reviewed the record and concludes that a reasonable jury could find some of the conduct humiliating—in particular, the suggestive ogling and scrutiny of Plaintiff's professional appearance. But also, there is no evidence that Williams used harsh or extreme language towards Plaintiff or about other women. And while Williams made comments to Plaintiff in front of other colleagues, no reasonable jury could find that those comments were publicly shameful or degrading. *See Reeves*, 594 F.3d at 811-12 ("A jury reasonably could find on this record that a meaningful portion of the allegedly offensive conduct in the office contributed to conditions that were humiliating and degrading to women on account of their gender, and therefore may have

21

created a discriminatorily abusive working environment. The terms 'whore,' 'bitch,' and 'cunt,' the vulgar discussions of women's breasts, nipples, and buttocks, and the pornographic image of a woman in the office were each targeted at [the plaintiff's] gender."); *Mendoza*, 195 F.3d at 1247-49 (finding that male supervisor's conduct was not threatening or humiliating to a female employee when that conduct included telling the employee he was "getting fired up," making sniffing sounds while staring at the employee's crotch, brushing his hip against the employee's hip, and following the employee around the workplace").

Neither party presents any substantive argument as to whether Williams' conduct unreasonably interfered with Plaintiff's job performance. (*See* Def. Brief at 6-9; Pl. Resp. at 4-5.) Nevertheless, the Court has reviewed the record and finds that Plaintiff has presented no evidence to support this element of her claim. In sum, while a reasonable jury could find that Williams' alleged conduct was frequent and that some of it may have been humiliating, a reasonable jury could not find that it was severe or physically threatening or that it unreasonably interfered with Plaintiff's job performance.

### iii.   There is no basis for holding Georgia Tech liable.

The parties seem to tacitly agree that the alleged harassment occurred before Williams became Plaintiff's supervisor. (*See* Def. Brief at 9; Pl. Resp. at 5) (both using the liability standard applied to coworkers rather than supervisors). When the alleged harasser is a coworker, "the employer will be held directly liable only if it knew or should have known of the harassing conduct but failed to

22

take prompt remedial action." *Wilcox v. Corr. Corp. of Am.*, 892 F.3d 1283, 1287 (11th Cir. 2018) (citing *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1278 (11th Cir. 2002)). The remedial action "must be reasonably likely to prevent the misconduct from recurring[.]" *Id.* at 1288 (quoting *Kilgore v. Thompson & Brock Mgmt., Inc.*, 93 F.3d 752, 754 (11th Cir. 1996) (internal quotation marks omitted). To evaluate whether the remedial action met this standard, courts "look to the effectiveness of the company's action in preventing the recurrence of the harassment it knew about." *Id.*

It is undisputed that Georgia Tech became aware of Williams' alleged harassment of Plaintiff when she complained to HR and the Title IX office on January 12, 2023. (*See* Def. Brief at 9; Pl. Resp. at 5.) Georgia Tech argues that it took prompt remedial action to prevent any further problematic interactions between Plaintiff and Williams when it immediately allowed Plaintiff to work from home full-time and prevented Williams from meeting with Plaintiff one-on-one. (Def. Brief at 10) (citing DSMF ¶ 45). Georgia Tech argues that those measures were successful because, after they were implemented, Plaintiff "had no further inappropriate interactions with Williams." (*Id.*) (DSMF ¶ 46.) While that is not exactly what that DSMF paragraph states, (*see* DSMF ¶ 46) ("Turner testified that, after the interim measures were put into place, she never had any further interactions with Williams except through e-mail and a team meeting."), it is true that Plaintiff has not alleged or presented evidence that Williams harassed her after the remedial measures were implemented. Georgia Tech also argues that it promptly investigated Plaintiff's harassment complaint because the

23

Title IX office began its investigation on January 18, 2023, six days after Plaintiff complained. (Def. Brief at 10) (citing DSMF ¶ 45)[7] The Title IX office issued its final report on July 11, 2023. (*Id.*) (citing DSMF ¶ 47). In September 2023, Plaintiff's complaint proceeded to a hearing, and the hearing officer concluded that Williams had not violated Georgia Tech's sexual misconduct policy. (*Id.* at 11) (citing DSMF ¶¶ 47, 49). Plaintiff did not appeal that decision. (*Id.*) (citing DSMF ¶ 50).

In response, Plaintiff does not dispute that the interim measures were not prompt, but she does argue that they were "incomplete" because Williams continued to supervise her and because she was "required" to work from home, which made her feel isolated and affected her ability to collaborate with others on campus. (Pl. Resp. at 6-7.) The undisputed evidence shows that Plaintiff was not required to work from home, (DSMF ¶ 45; PRDF ¶ 45), and she testified that she chose to work from home sometimes and to be on campus other times, (Pl. Dep. at 146:25-147:2). She also testified that working from home affected her ability to do her job "maybe a little" in that it was "a little more isolating," though she "did get everything done[.]" (Pl. Dep. at 145:25-146:21; DSMF ¶ 63.) That Georgia Tech did not assign Plaintiff a new supervisor does not necessitate the conclusion that the remedial measures it did implement were inadequate.

---

[7] Georgia Tech asserts that it "conducted a thorough investigation during which eight witnesses were interviewed and provided Plaintiff with an evidentiary hearing during which she was represented by counsel." (Def. Brief at 10) (citing DSMF ¶¶ 45, 47, 48). None of the cited DSMF paragraphs includes those specific facts, so the Court will not include them here.

Indeed, the record shows that Plaintiff did not complain about any harassment after those measures were implemented. Based on this fact, the Court can conclude that the remedial measures were adequate. *Good v. Omni Hotels Mgmt. Corp.*, No. 1:07-CV-0621-HTW-AJB, 2008 U.S. Dist. LEXIS 129307, at *75 (N.D. Ga. Aug. 15, 2008) ("[T]he remedial measure was adequate because it stopped [the supervisor's] harassment in that there were no further sexual assaults or sexual contact.") (citing *Moore v. City of Philadelphia*, 461 F.3d 331, 350 (3d Cir. 2006) (noting that a remedy is effective if it stops the harassment); *Mandy v. Quad/Graphics, Inc.*, 49 F. Supp. 2d 1095, 1109 (E.D. Wis. 1999) ("Clearly, '[a] stoppage of harassment shows effectiveness, which in turn evidences . . . reasonable calculation.'") (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 676 (10th Cir. 1998)). *See also Fleming v. Boeing Co.*, 120 F.3d 242, 246-47 (11th Cir. 1997) (talking to the harasser and telling the complainant to report any further problems was, as an initial measure, enough to constitute "immediate and appropriate corrective action").

Plaintiff next argues that the investigation was not prompt because it took almost 10 months to be completed, and that the investigation was not adequate because she had to go "back and forth" with the investigator to ensure that the reported information was accurate. (Pl. Resp. at 6.) These facts are not properly before the Court because they do not appear in DSMF, PRDF, or PAMF. But even if they were properly before the Court and undisputed, they do not negate the fact that the remedial measures were implemented immediately after Plaintiff lodged her complaint and, as a result, the alleged harassment stopped.

25

Finally, she asserts that Georgia Tech "fail[ed] to investigate or address retaliatory conduct." (Pl. Resp. at 5.)[8] This argument is irrelevant because this claim is about harassment, not retaliation.[9] To prevail on her harassment claim, Plaintiff must show that Georgia Tech's remedial actions were neither prompt nor reasonably likely to prevent the harassment from recurring. Plaintiff does not allege or present evidence that Williams harassed her after she complained about him in January 2023. Whether Williams retaliated against her, whether she complained about that retaliation, and how Georgia Tech responded to that retaliation complaint are relevant not to Plaintiff's harassment claim but to her retaliation claim. It is therefore unclear how Georgia Tech's alleged response (or lack thereof) to her retaliation complaint renders Georgia Tech liable for harassment.

Accordingly, the Court finds that Georgia Tech is entitled to summary judgment on Plaintiff's Title VII harassment claim (Counts I and V).

### 2.    Retaliation under Title VII against Georgia Tech (Count III)

Title VII prohibits employers from "retaliating against an employee because the employee has opposed any unlawful employment practice[.]" *Gogel*

---

[8] She asserts that Williams "attempted" to exclude her from meetings and the Grenga Award selection process, and he "ostracized" her by telling Harris about her complaint and because "professional connections ended abruptly after people learned of her relationship with Dr. Williams[.]" (*Id.* at 5-6.) She does not assert whether or how she complained about these incidents or how Georgia Tech failed to investigate or address them. (*See id.*)

[9] Plaintiff does not assert a retaliatory hostile work environment claim. (*See* Doc. 1.)

*v. Kia Motors Mfg. of Georgia, Inc.*, 967 F.3d 1121, 1153 (11th Cir. 2020) (internal citations and quotations omitted); 42 U.S.C. § 2000e-3(a). A plaintiff asserting a retaliation claim under Title VII can support the claim with direct or circumstantial evidence. *Jenkins v. Nell*, 26 F.4th 1243, 1249 (11th Cir. 2022) (citations omitted); *Ismael v. Roundtree*, 161 F.4th 752, 760 (11th Cir. 2025) (citation omitted). When a plaintiff supports her claim with circumstantial evidence, the *McDonnell Douglas* burden-shifting framework "is one 'tool'" that helps an employee prove her claim. *Berry v. Crestwood Healthcare LP*, 84 F.4th 1300, 1310 (11th Cir. 2023) (quoting *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1019 (2020)). "Under the *McDonnell Douglas* framework, the plaintiff bears the burden of establishing a prima facie case[.]" *Jenkins*, 26 F.4th at 1249 (citing *Lewis v. City of Union City*, 934 F.3d 1169, 1220-21 (11th Cir. 2019)). "If an employee establishes a prima facie case, the employer may proffer a 'legitimate, [non-discriminatory or non-retaliatory] reason' for the adverse action." *Berry*, 84 F.4th at 1307 (quoting *Tolar v. Bradley Arant Boult Cummings, LLP*, 997 F.3d 1280, 1289 (11th Cir. 2021)). "If the employer does so, the employee must prove that the employer's proffered reason was a pretext for retaliation." *Id.* (citing *Tolar*, 997 F.3d at 1289). "Without relying on the *McDonnell Douglas* framework, an employee may prove [discrimination] with any circumstantial evidence that creates a reasonable inference of [discriminatory] intent." *Berry*, 84 F.4th at 1310. This approach is often referred to as presenting a "convincing mosaic" of circumstantial evidence. *Id.* at 1311. "[N]o matter how an employee presents her circumstantial evidence," however, the ultimate question for a court at summary

27

judgment is "whether the evidence permits a reasonable factfinder to find that the employer [discriminated or retaliated] against the employee." *Id.*

Plaintiff argues that she has established her claim using the *McDonnell Douglas* framework, (Pl. Resp. at 8-15), so the Court begins there. To establish a prima facie case of retaliation, a plaintiff must show that: (1) she engaged in statutorily protected activity; (2) she suffered an adverse action; and (3) a causal connection exists between the two. *Ring v. Boca Ciega Yacht Club Inc.*, 4 F.4th 1149, 1163 (11th Cir. 2021) (citation omitted). In the retaliation context, an adverse employment action "must be one that caused injury or harm that would 'dissuade a reasonable employee from engaging in the protected activity.'" *Simmons v. UPS Inc.*, No. 25-11262, 2026 U.S. App. LEXIS 1079, at *3 (11th Cir. Jan. 15, 2026) (quoting *Ounjian v. Globoforce, Inc.*, 89 F.4th 852, 858 (11th Cir. 2023)).

Plaintiff asserts that Georgia Tech retaliated against her in four ways—two of which she asserts in her Complaint, and two of which she asserts in her brief. In her Complaint, she alleges that Georgia Tech retaliated against her by (i) not promoting her, and (ii) "making her continue to do all of the Director duties without the requisite pay[.]" (Doc. 1 at 16-17.) The undisputed evidence disposes of any argument Plaintiff could make based on those allegations. It is undisputed that the decision not to promote Plaintiff to the Director role occurred one month before she complained about Williams for the first time, (DSMF ¶ 21), Plaintiff performed only some of the duties of the Director role, (DSMF ¶ 56), Plaintiff was compensated with supplemental pay for her additional work per Georgia

Tech policy, (DSMF ¶¶ 57, 59), and Williams had nothing to do with either decision, (DSMF ¶¶ 16, 61).

In her brief, Plaintiff asserts that Williams retaliated against her via email on February 9, 2023, and Georgia Tech retaliated against her via the Title IX office during the complaint investigation process. (Pl. Resp. at 8-10.) As to the February 2023 email exchange, Plaintiff asserts that Williams "attempted to exclude her" from the Grenga Award selection meeting and when she raised this concern with him, he "deliberately undermined" her by forwarding the email chain to other associate deans, by "mischaracterizing her actions as attempting to 'create a new process,'" and by referring to her as the Educational Outreach Manager instead of Associate Director. (Pl. Resp. at 8-9) (citing Pl. Dep. at 162:23-163:22, 165:1-9, 165:22-24, 166:21-24, 166:5-6, 167:2-16).[10] No reasonable jury would agree with Plaintiff's characterization of that email exchange. To summarize: (i) Plaintiff emailed Williams that she would defer to him on the selection process; (ii) Williams responded that, according to the other associate deans, the winner would be selected at the next associate deans' meeting; (iii) Plaintiff told Williams that she should be included; (iv) Williams asked the other associate deans to clarify who should be included, and he said, "I have no problem with [Plaintiff's] participation but was under the impression that previously the associate deans met with [Valle] to select the award winner. I am

---

[10] These factual assertions are not properly before the Court because they do not appear in DSMF, PRDF, or PAMF. However, the email chain to which Plaintiff refers was properly included in the record by Defendants as an exhibit to Plaintiff's deposition.

truly fine either way and was simply trying to follow the established protocol articulated to me in our AD's meeting on Tuesday."; (v) one of the associate deans said that Plaintiff should be included; (vi) Williams thanked her and asked everyone on the email chain, including Plaintiff, about scheduling the meeting; and (vii) Plaintiff attended the meeting. Williams did not state that Plaintiff was trying to create a new selection process, and Plaintiff does not dispute that Williams referred to her as the Education Outreach Manager because that was her official title. (DSMF ¶ 53; PRDF ¶ 53.) Even if a reasonable jury could conclude that Williams initially attempted to exclude Plaintiff from the meeting and that it was inappropriate for him to forward their email exchange to the other associate deans, no reasonable jury could conclude that those actions would have dissuaded a reasonable employee from complaining. That is because they are more akin to trivial, petty slights rather than any serious effort to affect Plaintiff's employment or reputation. *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (explaining that "personality conflicts at work that generate antipathy and snubbing by supervisors and co-workers are not actionable" but rather may be considered "those petty slights or minor annoyances that often take place at work and that all employees experience" and that "[a] supervisor's refusal to invite an employee to lunch is normally trivial, a nonactionable petty slight. But to retaliate by excluding an employee from a weekly training lunch that contributes significantly to the employee's professional advancement might well deter a reasonable employee from complaining about discrimination"); *Manns v. City of Atlanta*, No. 1:06-CV-0609-

30

TWT, 2008 U.S. Dist. LEXIS 2630, at *26 (N.D. Ga. Jan. 10, 2008) ("A challenged action must do more than merely affront a 'plaintiff's unusual subjective feelings' and cannot be a trivial harm that offends 'a general civility code for the American workplace.'") (quoting *White*, 548 U.S. at 68-69).

As to the Title IX investigation process, Plaintiff seems to assert that on March 7, 2023, she complained about this purportedly retaliatory email exchange "and other incidents" (which she does not identify) by sending an email to then-Title IX Director Chris Griffin. (Pl. Resp. at 9.) She asserts that "[w]hen nothing changed," she asked Griffin for a status update on April 6, 2023. (*Id.*) On April 18, 2023, Griffin "lay[ed] out Georgia Tech's three-part retaliation standard, including the requirement of an 'adverse employment action,' and stated she did not yet see that element satisfied." (*Id.*) In other words, Griffin told Plaintiff that what she had complained about did not appear to be retaliatory behavior. Griffin then directed Plaintiff to submit a separate retaliation complaint through a different channel if she believed that retaliation had occurred. (*Id.*) On April 28, 2023, the Title IX office issued its "initial investigative report." (*Id.* at 10.) On May 8, 2023, Plaintiff responded to the report with commentary about "inaccuracies and errors" (which she does not identify). (*Id.*) She asserts that her response was received and that on May 17, 2023, it was determined that additional investigation was needed. (*Id.*) As an initial matter, these facts are not properly before the Court. They do not appear in DSMF, PRDF, or PAMF, and they are supported by citations to an exhibit that is not incorporated into the record via an affidavit, declaration, or deposition. Additionally, Plaintiff relies on these facts to

31

argue, without any citation to legal authority, that "[b]eing ignored, delayed, and provided inaccurate investigative summaries" are adverse actions "when they signal that complaints will not be taken seriously or fairly processed." (*Id.*) That very well may be true under a certain fact pattern. *See Swann v. E. Ala. Health Care Auth.*, No. 3:24-cv-244-BL-JTA, 2026 LX 178259, at *37 (M.D. Ala. Mar. 10, 2026) (explaining that a failure to investigate could be an adverse action in some cases but not others depending on the facts); *White*, 548 U.S. at 69 ("A schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school age children."). But here, Plaintiff has not presented any facts or evidence to show that Georgia Tech did not take her complaints seriously or process them fairly. Indeed, she does not explain how she was "ignored" or "delayed," how the investigative summaries were inaccurate, or how she was harmed as a consequence. Plaintiff has thus failed to show that she suffered any retaliatory adverse action as a result of her harassment complaint.

Because Plaintiff did not suffer any adverse employment action, the Court's analysis is complete. *McCormick v. Phx. Club 20, Inc.*, No. 1:24-cv-4861-LMM-JKL, 2026 U.S. Dist. LEXIS 50300, at *27 n.6 (N.D. Ga. Mar. 10, 2026) ("[B]ecause summary judgment is warranted on the adverse action ground, it is unnecessary to delve further into [the plaintiff's] undeveloped pretext argument or the analysis required by *Ismael* when a plaintiff establishes a prima facie case of retaliation."); *Franks v. Chitwood*, 572 F. Supp. 3d 1304, 1347 (N.D. Ga. 2021) (a plaintiff's "inability to establish that she suffered an adverse employment action

32

renders the convincing mosaic irrelevant") (citing *Lackey v. La Petite Acad., Inc.*, No. 2:18-CV-00429-RDP, 2020 WL 1285828, at *5 (N.D. Ala. Mar. 16, 2020) (plaintiff must establish that she suffered an adverse employment action whether she seeks to prove intentional discrimination through use of direct evidence, application of the *McDonnell Douglas* framework, or by presenting a convincing mosaic of circumstantial evidence); *Johnson v. La Petite Acad., Inc.*, No. 5:17-CV-01202-MHH, 2020 WL 2840090, at *9 (N.D. Ala. June 1, 2020) (because plaintiff did not demonstrate that she suffered an adverse employment action, her discrimination claim fails under both the *McDonnell Douglas* framework and the convincing mosaic standard); *Redding v. Fanning*, No. 5:14-CV-407 (MTT), 2016 WL 6821098, at *2 n.5 (M.D. Ga. Nov. 17, 2016) (plaintiff's failure to demonstrate an adverse employment action is fatal to his claim, regardless of whether he proceeds under the *McDonnell Douglas* framework or by presenting a convincing mosaic of circumstantial evidence)).

Accordingly, the Court finds that Georgia Tech is entitled to summary judgment on Plaintiff's Title VII retaliation claim (Count III).

### 3.    FEPA Claims (Counts II and IV)

In her Complaint, Plaintiff alleges that Defendants subjected her to sex- and gender-based harassment and retaliated against her for complaining about that harassment in violation of Georgia's Fair Employment Practices Act, O.C.G.A. § 45-19-29. (Doc. 1 at 15-18.) Defendants argue that Plaintiff did not administratively exhaust these claims because she did not file a charge with the Georgia Commission on Equal Opportunity, (Def. Brief at 24-25), and that she

has abandoned these claims by failing to address them in her response brief, (Def. Reply at 3). The Court agrees on both points. *See Gary v. Ga. DOD*, No. 1:23-CV-03008-MHC-JEM, 2025 LX 196211, at *30-34 (N.D. Ga. June 4, 2025) (explaining administrative exhaustion procedures for claims brought under the FEPA); (Pl. Resp.).

Accordingly, the Court finds that Defendants are entitled to summary judgment on Plaintiff's FEPA claims (Counts II and IV).

### 4.   Section 1983 Claim against Williams (Count VI)

Plaintiff asserts a § 1983 claim against Williams in his official and individual capacities.

### i.   *Williams in his official capacity*

Defendant argues that Plaintiff's claim against Williams in his official capacity is barred by the Eleventh Amendment because Williams, in his official capacity, is not a "person" subject to suit under § 1983. (Def. Brief at 19-20.) The Court agrees. To prevail on a § 1983 action, a plaintiff must demonstrate that she was deprived of a federal right by a "person" acting under color of state law. 42 U.S.C. § 1983; *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). "A state official, when sued in his official capacity for damages, is not a person within the meaning of § 1983." *Sarver v. Jackson*, 344 F. App'x 526, 527-28 (11th Cir. 2009) (citing *Will v. Michigan Dep't of State Police*, 491 U.S. 58 (1989)); *Kentucky*, 473 U.S. at 169-70 (Eleventh Amendment barred § 1983 action for damages against state official in official capacity); *Hobbs v. E.E. Roberts*, 999 F.2d 1526, 1528 (11th Cir. 1993) (state employees sued in their official capacity immune from suit). Employees of state

34

colleges are "state officials acting within the scope of their employment. Accordingly, they [a]re not subject to suit for damages in their official capacities." *Sarver*, 344 F. App'x at 528 (citing *Will*, *supra*). Williams is an employee of Georgia Tech, a public university. Therefore, Plaintiff cannot sue Williams in his official capacity for damages under § 1983. Plaintiff's argument to the contrary, which includes no citation to evidence or legal authority, is frivolous.

Plaintiff further asserts in her response brief that her § 1983 claim against Williams in his official capacity survives because she "seeks relief for ongoing constitutional violations, which remains permissible under *Ex parte Young*." (Pl. Resp. at 16.) "In determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" *Verizon Md. Inc. v. Public Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002) (finding that the plaintiff's suit satisfied this inquiry because it "alleges that respondents' refusal to produce the requested medical records violates federal law; and it seeks an injunction requiring the production of the records, which would prospectively abate the alleged violation") (quoting *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 296 (1997) (O'Connor, J., concurring in part and concurring in judgment)). Nowhere in Plaintiff's Complaint does she assert ongoing constitutional violations or seek prospective injunctive relief against Williams. (*See* Doc. 1; Def. Reply at 13.) Therefore, the *Ex parte Young* doctrine is inapplicable here.

### ii. *Williams in his individual capacity*

Defendant argues that Plaintiff's claim against Williams in his individual capacity fails because Williams is entitled to qualified immunity. (Def. Brief at 21-24.) For the affirmative defense of qualified immunity to apply, the public official asserting the defense "'must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred.'" *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002) (quoting *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002)). If that is established, then courts may follow a two-step inquiry: (1) "whether the plaintiff's allegations, if true, establish a constitutional violation," *Hope v. Pelzer*, 536 U.S. 730, 736 (2002) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)); (2) if so, whether the actions "violate[d] 'clearly established statutory or constitutional rights of which a reasonable person would have known,'" *id.* at 739 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Courts have the discretion to proceed to the second step of that inquiry before proceeding to the first step. *Pearson v. Callahan*, 555 U.S. 223 (2009) ("On reconsidering the [qualified immunity] procedure required in *Saucier*, we conclude that, while the sequence set forth there is often appropriate, it should no longer be regarded as mandatory. The judges of the district courts . . . should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.").

"When a plaintiff does not dispute that the defendant was acting within his discretionary authority, the Eleventh Circuit proceeds directly to whether the

36

defendant's conduct violated the plaintiff's clearly established right." *Polion v. City of Greensboro*, 26 F. Supp. 3d 1197, 1220 (S.D. Ala. 2014) (citing *Franklin v. Curry*, 738 F.3d 1246, 1249 (11th Cir. 2013); *Gilmore v. Hodges*, 738 F.3d 266, 272 (11th Cir. 2013)). Here, Plaintiff does not dispute that Williams was acting under his discretionary authority when he engaged in the alleged conduct. Therefore, the Court will proceed directly to step two of the *Saucier* analysis—whether Williams' conduct violated Plaintiff's clearly established statutory or constitutional rights of which a reasonable person would have known.

In her Complaint, Plaintiff alleges that Williams violated the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution when he subjected her to gender-based harassment and prevented her promotion. (Doc. 1 ¶ 197.) In her brief, Plaintiff also argues that Williams violated the Equal Protection Clause when he retaliated against her. (Pl. Resp. at 16.) On all of these bases, Plaintiff's claim fails. The Court has concluded that, although a reasonable jury could find that Williams subjected Plaintiff to gender-based harassment, that harassment was neither severe nor pervasive. Section II.B.1.i.-ii., *supra*. Therefore, to the extent Plaintiff's § 1983 claim is based on her Title VII gender-based harassment claim, it must fail. *Ferguson v. Ga. Dep't of Corr.*, 428 F. Supp. 2d 1339, 1364 (M.D. Ga. 2006) (explaining that "[w]hen § 1983 is used as a parallel remedy for Title VII violations, the elements of the two causes of action are the same, and identical methods of proof are employed" and granting summary judgment to individual defendants on § 1983 Equal Protection claim premised on alleged Title VII violations because plaintiff "has not

37

presented sufficient evidence to demonstrate a genuine issue of material fact as to whether the individual Defendants discriminated against him based on his race with regard to his discipline, promotion, supervision, or termination, and he has not shown that the allegedly harassing conduct was either based on race or sufficiently severe or pervasive to create a hostile work environment") (citing *Richardson v. Leeds Police Dep't*, 71 F.3d 801, 805 (11th Cir. 1995); *Cross v. Alabama*, 49 F.3d 1490, 1507-08 (11th Cir. 1995)); *Boone v. City of McDonough*, No. 1:12-cv-1036-WSD, 2013 U.S. Dist. LEXIS 124099, at *12 (N.D. Ga. Aug. 29, 2013), *aff'd* 571 F. App'x 746 (11th Cir. July 2, 2014), (adopting recommendation of summary judgment for defendant on § 1983 Equal Protection claim because it was based on plaintiff's Title VII discrimination claim which failed on the merits). Additionally, the undisputed facts show that Williams had nothing to do with Plaintiff's failure to be promoted. (DSMF ¶ 13-16.) And even if Plaintiff's Equal Protection Clause retaliation claim had been asserted in her Complaint (which it was not), "no clearly established right exists under the Equal Protection Clause to be free from retaliation." *Ratliff v. DeKalb County, Ga.*, 62 F.3d 338, 340 (11th Cir. 1995). ("The right to be free from retaliation is clearly established as a First Amendment right and as a Statutory right under Title VII; but no clearly established right exists under the Equal Protection Clause to be free from retaliation."); *Watkins v. Bowden* 105 F.3d 1344, 1344 (11th Cir. 1997) (rejecting plaintiff's Equal Protection retaliation claims despite alleged link between the plaintiff's claims of retaliation and discrimination because no clearly established right exists under Equal Protection Clause to be free from retaliation).

Accordingly, Williams, in his official and individual capacities, is entitled to summary judgment on Plaintiff's § 1983 claim (Count VI).

## III.    CONCLUSION

For the foregoing reasons, the Court **RECOMMENDS** that Defendant's Motion for Summary Judgment, (Doc. 40), be **GRANTED**. The Clerk is **DIRECTED** to **TERMINATE** the reference to the undersigned Magistrate Judge.

**SO RECOMMENDED and DIRECTED** June 24, 2026.

J. ELIZABETH McBATH
UNITED STATES MAGISTRATE JUDGE